**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC; MAO-MSO RECOVERY II, LLC, SERIES PMPI, a designated series of MAO-MSO RECOVERY II, LLC; and MSPA CLAIMS 1, LLC, | Case No.: 3:2020-cv-50056 |
| Plaintiffs, | Honorable John Z. Lee, District Judge |
| v. | Honorable Lisa A. Jensen, Magistrate Judge |
| MALLINCKRODT ARD INC.; MALLINCKRODT PLC; EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS HOLDING COMPANY; CURASCRIPT, INC., d/b/a CURASCRIPT SP SPECIALTY PHARMACY; and UNITED BIOSOURCE CORPORATION, LLC, | |
| Defendants. | |

**SECOND AMENDED
CLASS ACTION COMPLAINT**

Plaintiffs, MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability

company ("MSPRC"); MAO-MSO RECOVERY II, LLC, SERIES PMPI, a designated series of

MAO-MSO RECOVERY II, LLC, a Delaware series limited liability company ("Series PMPI");

and MSPA CLAIMS 1, LLC, a Florida limited liability company ("MSPA") (collectively

"Plaintiffs"), on behalf of themselves and the Class described herein, bring this action against

MALLINCKRODT ARD INC., a California corporation, MALLINCKRODT PLC, an Irish

public limited company, (collectively "Mallinckrodt"); EXPRESS SCRIPTS HOLDING

COMPANY, a Delaware corporation, EXPRESS SCRIPTS, INC., a Delaware corporation

("Express Scripts"); CURASCRIPT, INC. d/b/a CURASCRIPT SP SPECIALTY PHARMACY

("CuraScript"); and UNITED BIOSOURCE LLC, a Delaware limited liability company,

("UBC") (collectively "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are assignees of recovery rights originally held by Medicare Advantage ("MA") Plans, including Medicare Advantage Organizations,  Management Service Organizations, Independent Physician Associations, and other Medicare first tier and downstream entities, all of whom are third-party payers, providing Medicare benefits to their beneficiaries (these entities are generally referred to herein as "Medicare Advantage Plans" or "MA Plans"). Plaintiffs bring this action to challenge Defendants' monopolistic and anti-competitive pricing scheme for the drug H.P. Acthar Gel ("Acthar").

2.      Acthar has been available since 1952, and for nearly half a century, its price was modest. In 2001, a vial of the drug cost $40.

3.      But by 2018, the same vial cost over $39,000. This is a 97,500% price increase. It is as if the price of milk increased from $3 to over $2,900 per gallon, or a mortgage payment rose from $2,000 to over $2 million per month.

4.      These eye-popping price increases are not an accident, a market anomaly, or a necessary byproduct of legislation. They are the intended result of purposeful and illegal conduct by Acthar's producers, Mallinckrodt and its predecessor Questcor in concert with pharmaceutical benefit management company Express Scripts and three of Express Scripts' subsidiaries – CuraScript; United Biosource Corporation ("UBC"); and Accredo Health Group ("Accredo"). This conduct consists of a complex scheme involving illegal monopolization and anti-competitive conduct that has imposed exorbitant and pointless costs on those financially responsible for the costs of the drug, such as Plaintiffs' Assignors and a similarly situated Class of MA Plans.

5.      Although Acthar may be a billion-dollar golden goose for Mallinckrodt today, its

origins were humble. The drug is an adrenocorticotropic hormone ("ACTH") analogue produced

from the pituitary gland of pigs. It was invented in the late 1940s by the meat company Armour,

as a byproduct of pork-processing operations. At the time, Acthar was considered a miracle drug

because it stimulated the body's production of cortisol, provoking a natural anti-inflammatory

response that was beneficial for the treatment of various conditions. Acthar was given broad

approval by the FDA in 1952 to treat a wide range of ailments at a time when such broad

approvals were commonplace and did not require support from clinical trials.

6.      This also occurred before the commercial development of synthetic steroid drugs

(corticosteroids) and many popular non-steroidal anti-inflammatory drugs (NSAIDs), such as

ibuprofen. The advent of these safe, cheap alternative treatments in pill form reduced the need

for an injectable drug derived from the pituitary gland of pigs. By the 1990s, only a few key uses

remained for Acthar. For example, Acthar remains the gold standard for the treatment of infantile

spasms, a rare but catastrophic epileptic syndrome affecting babies and toddlers two years old or

younger. But other than this and a handful of similarly rare conditions, Acthar is a drug of last

resort.

7.      In 2001, Mallinckrodt's predecessor Questcor purchased the right to produce

Acthar for $100,000 plus modest royalties, seeing it as a potential gold mine for exploitation.

8.      Thereafter began a run of outrageous price increases. The cost of Acthar

ballooned from $40 in 2001, to $750 immediately after it was acquired, to $1,650 by 2007. In

that year the price was jacked up to $23,269 per vial. But the increases did not stop or reverse

course: instead the price of Acthar was increased eight more times so that by 2018, the drug cost

$38,892 per vial. And since treatment with Acthar usually requires at least three vials, a single

course of treatment can cost nearly $120,000.

9.      In just over a decade, Acthar went from a nearly extinct, financial sinkhole to a billion-dollar cash machine. In August 2014—in the midst of this meteoric price rise—Questcor merged into Mallinckrodt in a deal worth approximately $5.6 billion. At the time, Acthar was the only drug product sold by Questcor.

10.      Mallinckrodt has been able to inflate and maintain the shocking price increases of Acthar, mainly through two types of improper conduct.

11.      *First*, in 2007, Mallinckrodt (Questcor at the time) vertically integrated its sales by distributing Acthar exclusively through CuraScript. Acthar prescriptions are obtained through the "Acthar Support & Access Program" which is managed by UBC, and Acthar is sold by the Express Scripts owned and operated specialty pharmacy Accredo as well as a limited network of specialty pharmacies, including a specialty pharmacy operated by CuraScript (CuraScript SP Specialty Pharmacy). As explained below, this arrangement allowed Mallinckrodt to set and control the supracompetitive price of Acthar through every step of the supply chain and eliminated the otherwise natural competition between multiple wholesalers and amongst retailers that would ensure greater availability of Acthar at competitive prices.

12.      *Second,* Mallinckrodt eliminated the competition. It did so by acquiring and then shelving the rights to Acthar's much cheaper synthetic equivalent ACTH, a drug called Synacthen Depot ("Synacthen"). Drug giant Novartis AG ("Novartis") was already selling Synacthen in Europe, Asia, and South and Central America, but the drug was not approved for use in the United States. After Novartis launched an auction for Synacthen, Mallinckrodt substantially outbid the competition for the rights to Synacthen in the U.S. But rather than undertake the process of obtaining FDA approval for the only drug that was a direct competitor of its best-selling product, Mallinckrodt never seriously attempted to bring Synacthen to market

for any clinical use for which Acthar was approved. This kept the price of Acthar artificially high. Because of Mallinckrodt's anticompetitive behavior, the FTC and several states sued it for antitrust violations and later reached a $100 million settlement, as well as an agreement that Mallinckrodt would sublicense its Synacthen rights to a third party.

13.     This action does not seek to challenge the lawfulness of Mallinckrodt's monopoly. It seeks to challenge the lawfulness of Mallinckrodt's exercise of its monopoly power by taking actions to maintain and enhance that monopoly power in violation of antitrust and consumer protection laws. The issue is not whether Mallinckrodt possessed monopoly power for Acthar. It is whether its actions in contracting with Express Scripts to exclusively distribute Acthar through CuraScript, and in acquiring the only competitive product in the marketplace, Synacthen, constitute unlawful efforts to retain, maintain and enhance Mallinckrodt's monopoly power over Acthar in the U.S.

14.     Plaintiffs' Assignors paid an inflated price due to Mallinckrodt's illegal maintenance of monopolization and anticompetitive conduct in concert with Express Scripts and its subsidiaries.  But for Defendants' anticompetitive conduct, Plaintiffs' Assignors would not have paid as much money for Acthar. Therefore, this action seeks damages, damage multipliers, and injunctive relief under federal antitrust, state antitrust, and consumer protection laws to put an end to Defendants' anti-competitive behavior.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely the Sherman Act, 15 U.S.C. § 1, *et seq.*

16.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d), because

at least one member of the Class is a citizen of a state different from the Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

17.     This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over violations of state antitrust and consumer protection laws, including state common law claims.

18.     This Court has personal jurisdiction over the Defendant pursuant to 15 U.S.C. § 22 and because Defendants waived any objections to personal jurisdiction in this District after requesting – and being granted – transfer of the action from the Central District of California where the case was originally, and properly, filed.

## PARTIES

### I.     Plaintiffs

19.     Plaintiff MSPRC is a Delaware limited liability company with its principal place of business located at 2701 S. Lejeune Rd., Coral Gables, Florida 33134. The claims of one or more MA Plans including the right to assert the causes of action alleged in this Complaint, have been irrevocably assigned to designated series of Plaintiff MSPRC. Because of the assignment or assignments, and in accordance with MSPRC's operating agreement, Plaintiff MSPRC is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries for which Defendants are liable due to the anti-competitive conduct alleged herein.

20.     Series 16-11-509 is a series of MSPRC, to which the claims of SummaCare, Inc. ("SummaCare") have been assigned.

21.     Series 16-08-483 is a series of MSPRC, to which the claims of EmblemHealth Services Company, LLC ("Emblem") have been assigned.

22.     Series 15-09-157 is a series of MSPRC, to which the claims of ConnectiCare, Inc. ("ConnectiCare") have been assigned.

23. Series 15-08-25 is a series of MSPRC, to which the claims of University Health Care MSO, Inc. ("UNHC") have been assigned.

24. Series 15-12-404 is a series of MSPRC, to which the claims of Alianza Profesional de Cuidado Medico ("APCM") have been assigned.

25. Plaintiff MSPA is a Florida limited liability company, with its principal place of business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, Florida 33134. The claims of one or more MA Plans, including the right to assert the causes of action alleged in this Complaint, have been irrevocably assigned to this Plaintiff. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries for which Defendants are liable due to the anti-competitive conduct alleged herein.

26. Plaintiff Series PMPI is a designated series of MAO-MSO, which is a Delaware limited liability company with its principal place of business at 45 Legion Drive, Cresskill, New Jersey 07626. The claims of Preferred Medical Plans, Inc., including the right to assert the causes of action alleged in this Complaint, have been irrevocably assigned to this Plaintiff. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries for which Defendants are liable due to the anti-competitive conduct alleged herein.

## II. Defendants

### A. Mallinckrodt and Questcor

27. Mallinckrodt ARD LLC has its principal place of business at 1425 Route 206, Bedminster, NJ, 07921. Mallinckrodt ARD LLC was previously named Mallinckrodt ARD, Inc., and before that was named Questcor Pharmaceuticals, Inc.

28. Mallinckrodt ARD LLC is a subsidiary of Mallinckrodt PLC, an Irish public limited company with its corporate headquarters in Staines-upon-Thames, United Kingdom. Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG. On April 4, 2014, Mallinckrodt PLC entered into an Agreement and Plan of Merger with Questcor, a California corporation located at 3260 Whipple Road, Union City, California 94587. Mallinckrodt absorbed Questcor as a wholly owned subsidiary on August 14, 2014 for approximately $5.6 billion.

29. Questcor survived the merger as a wholly owned indirect subsidiary of Mallinckrodt plc and continued to market Acthar thereafter, until changing its name to Mallinckrodt ARD, Inc. on July 27, 2015.

30. On January 26, 2019, Mallinckrodt ARD, Inc. converted to Mallinckrodt ARD LLC and it continues to market Acthar to this day.

### B. Express Scripts, CuraScript, and United BioSource Corporation

31. In 2007, Mallinckrodt agreed with Express Scripts Holding Company and Express Scripts Inc. ("Express Scripts"), a Delaware-incorporated Missouri-based pharmacy benefit management company (with its principal place of business at 1 Express Way, St. Louis, Missouri 63121), to provide integrated services critical to the scheme and to do so through certain of Express Scripts' subsidiaries. Each of these subsidiaries had separate functions, but their coordinated purpose was to support and maintain Mallinckrodt's inflated Acthar prices, including by acting as Mallinckrodt's agent for purposes of pricing.

32. CuraScript, a Florida-based specialty pharmacy distributor, served as Mallinckrodt's exclusive distributor for Acthar. CuraScript was engaged by Mallinckrodt to deliver Acthar to the network of specialty pharmacies, which then deliver the medicine to

patients' homes. This part of the operation is managed by the distribution arm of CuraScript, named CuraScript SD. CuraScript also operates a specialty pharmacy within the United States under the moniker of CuraScript SP Specialty Pharmacy. Both CuraScript SD and CuraScript SP Specialty Pharmacy are subsidiaries of Express Scripts.

33.      United BioSource Corporation, formerly known as HealthBridge and now known as United BioSource LLC ("UBC"), a Pennsylvania-based company, provided pharmaceutical support services. During most of the relevant time period, UBC was also an Express Scripts subsidiary, though Express Scripts completed its sale of UBC to a private equity firm in 2018. UBC was engaged by Mallinckrodt to act as the administrator for the reimbursement of Acthar, interacting directly with patients and third-party payers by coordinating various patient-assistance programs, including the ASAP Program described further below.  UBC was responsible for selecting the specialty pharmacy within the limited special pharmacy network from which a patient could obtain Acthar. Mallinckrodt's control over UBC ensured that UBC primarily selected the specialty pharmacy, Accredo (another of Mallinckrodt's agents and discussed in more detail below) to dispense Acthar to patients, and only resorting to other specialty pharmacies in the network when Accredo was unable to fill a prescription. Accredo Health Group, Inc. ("Accredo"), is also an Express Scripts subsidiary. Accredo is a specialty pharmacy services company that assists patients in obtaining medications, including by advocating for insurance coverage of the drug.

34.      As applied to Acthar, UBC acted as the hub between these entities, designing and coordinating Acthar's sale, distribution, and reimbursement through its patient access programs. So, for example, when a doctor prescribes an initial or renewal course of Acthar to a patient, the prescription is sent to the "Acthar Hub" and a case manager is assigned to the patient through

9

UBC or Accredo, which performs administrative services associated with obtaining insurance coverage of the drug from health plans such as Plaintiffs' Assignors and Class Members. CuraScript, as the Acthar distributor, ships the drug to the specialty pharmacy (such as Accredo) and the health plan pays the specialty pharmacy (which could be Accredo, CuraScript SP Specialty Pharmacy, or another specialty pharmacy within the limited network of specialty pharmacies authorized to dispense Acthar). Payment then flows from the specialty pharmacy back to Mallinckrodt through CuraScript (which passes the chargeback to Mallinckrodt). CuraScript merely acts as Mallinckrodt's agent, collecting payment and shipping the medication.

## REGULATORY BACKGROUND

35.     As stated above, Plaintiffs' Assignors are MA Plans. With regard to the allegations herein, MA Plans operate like any third-party payer: providing payment for medical items and services for their beneficiaries. This section is provided to introduce and clarify the types of MA Plans.

**I.      Medicare Advantage Plans**

36.     Medicare benefits are divided into four parts. Medicare Part A, 42 U.S.C. § 1395c, *et seq.*, provides coverage for costs of inpatient hospital services and is available without payment of premiums to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible. Medicare Part B, 42 U.S.C. § 1395j, *et seq.*, funded through premiums and general tax revenue, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of his or her medically-necessary outpatient services, such as doctors' office visits. Medicare Part C, 42 U.S.C. § 1395w-21(a)(1), *et seq.*, permits individuals eligible for Medicare to elect to receive their Medicare benefits through enrollment in

an MA Plan. Medicare Part D, 42 U.S.C. § 1395w-101 *et seq.*, provides voluntary prescription drug coverage to Medicare enrollees.

### A.    Medicare Advantage Organizations

37.    Medicare Advantage Organizations ("MAOs")[1] enter into contracts with the Centers for Medicare and Medicaid Services ("CMS") to administer and provide the same benefits under traditional Medicare. 42 U.S.C. §§ 1395w-21, 1395w-23. Pursuant to this contract, MAOs receive a fixed payment from CMS for each enrollee. MAOs do not issue a Medicare "insurance policy" but, rather, send out a document describing the Medicare benefits that beneficiaries receive. They do not pay benefits pursuant to a "policy," but rather under a statutory framework. Thus, MAOs pay healthcare providers directly for the care received by Part C beneficiaries. If the costs of this care exceed the fixed payment received from the government, the MAO assumes the risk and cost.

38.    To become an MAO, a private insurer must enter a bidding process, meeting certain requirements set by CMS. Additionally, in providing the basic benefits offered to traditional Medicare beneficiaries, MAOs must abide by coverage determinations provided by CMS and all coverage disputes between beneficiaries and MAOs must go through the traditional Medicare appeals process. CMS sets the fixed rate at which MAOs will be remunerated per enrollee and establishes services the MAO must provide.

39.    Currently, there are over 16 million individuals enrolled in MA Plans nationwide. More than 37 million individuals are enrolled in Medicare prescription drug plans, either on a

---

[1] Consistent with the Medicare Advantage statutory terminology and framework, Plaintiffs refer to "MA Plans" as inclusive of *all* entities described herein that provide benefits to enrolled beneficiaries. "MAOs" are the subset of MA Plans that contract directly with CMS, as described in this paragraph.

stand-alone basis or in connection with an MA Plan.

### B. First-Tier and Downstream Entities

40. A first-tier entity is any party that enters into a written arrangement with a MAO, acceptable to CMS, to provide administrative or health care services for a Medicare-eligible individual under the MA program. 42 C.F.R. § 422.2; *see also Medicare Managed Care Manual*, Ch. 11 (Rev. 83, 04-25-07).

41. A downstream entity is any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MAO (or applicant) and a first-tier entity. *See* 42 C.F.R. § 422.2.

42. First-tier and downstream entities administer and provide Medicare services to the enrollees. The first-tier and downstream entities bear the full risk of loss pursuant to their contractual obligation with MAOs.

43. First-tier and downstream entities include Management Service Organizations ("MSOs") and Independent Physician Associations ("IPAs").

## II. Medicare Prescription Drug Coverage

44. Medicare does not offer its beneficiaries prescription drug coverage directly. Instead, prescription drug coverage is an optional benefit. Prescription drug benefits are provided by insurance companies and other private companies approved by Medicare ("Part D").

45. Medicare beneficiaries have two options for obtaining Part D prescription drug coverage: (1) through their MA Plan that offers Part C benefits as well as prescription coverage; or (2) through a separate Medicare Prescription Drug Plan.

46. Generally, MA Plans that offer Part C benefits include prescription drug benefits. In fact, an MA Plan that offers prescription drug coverage can disenroll a beneficiary if the

12

beneficiary enrolls in a separate Part D plan instead of using the MA Plan's drug coverage.

47.     Plans that provide Part D coverage must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

48.     Part D has different stages of cost sharing until a beneficiary reaches a set limit on out-of-pocket costs for the year. For 2020, the limit on out-of-pocket costs is $6,350.00.[2]

49.     Because of the high cost of Acthar, a Part D beneficiary reaches the limit on out-of-pocket costs immediately, causing the MA Plan to bear the brunt of the cost of Acthar.

## STANDING

50.     Plaintiffs' Assignors administer Medicare benefits for Medicare beneficiaries under Medicare Part C and/or Medicare Part D; whether said rights arise from: (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the Assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

51.     Although Plaintiffs seek recovery on behalf of each and every one of its Assignors, one representative assignment for each Plaintiff is alleged in detail in the Appendix to demonstrate standing. The assignments are valid and binding contracts. A copy of each representative assignment is attached hereto as Exhibits A1-A12 and are explained in more detail in the Appendix.[3]

52.     At all material times hereto, Plaintiffs' Assignors provided Medicare benefits to

---

[2] *Catastropic Coverage*, MEDICARE, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage (last accessed June 29, 2020).
[3] Plaintiffs have redacted confidential business information from the assignment agreements.

their enrollees, including payments for the enrollees' Acthar prescriptions.

## FACTUAL ALLEGATIONS

### I.     Background of Acthar

53.     Acthar was first developed by physicians at the Mayo Clinic in collaboration with a pharmaceutical division of Armour and Company, in the late 1940s.

54.     Acthar is an adrenocorticotrophic hormone ("ACTH"), which stimulates the adrenal cortex to secrete cortisol, corticosterone, aldosterone, and other androgenic substances.

55.     Acthar was approved by the U.S. Food and Drug Administration ("FDA") on April 29, 1952, as a slow-release injectable form of ACTH for the treatment of over fifty conditions. This approval was prior to the Kefauver Harris Amendment of 1962, which required drug manufacturers to provide proof of efficacy and safety.  Over time, the approved indications diminished to 19.

56.     Rhone-Poulenc Rorer (which later merged with Hoechst AG to form Aventis which subsequently merged with Sanofi S.A.) acquired the rights to Acthar from Armour and Company. Around the time of acquisition, a vial of Acthar cost $40.00.

57.     Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS"). IS is a serious condition in infants, but one with an annual patient population of less than 2,000 children per year. However, Acthar was not originally approved by the FDA to treat IS, further limiting its value. In 2010, the IS indication was approved by the FDA.

58.     In addition to treating IS, however, Acthar is approved as last-line treatment for relapses and flare ups of specific diseases (such as multiple sclerosis) in populations that cannot tolerate traditional therapy with corticosteroids and related drugs, or for whom such therapies

have not been successful.

59.     In 2001, Questcor acquired Acthar from Aventis for $100,000.00 plus a royalty

rate for sales over $10 million.

60.     Immediately after acquisition, Questcor increased the price of Acthar to $748.00

per vial. From 2001 until 2014, the end payer price of Acthar grew to $1,980.00 per vial.

61.     In 2014, Questcor was purchased by Mallinckrodt for $5.9 billion. At the time of

acquisition, Acthar comprised 98% of Questcor's sales.

62.     By 2017, Acthar was generating approximately $1.2 billion in sales, accounting

for 35% of Mallinckrodt's total revenue.

## II.     Acthar Distribution: Exclusive Distribution through Express Scripts and Affiliated Entities and the Price-Fixing and Monopolization Scheme

### A.  The Achar Support and Access Program ("ASAP") and Limited Distribution of Acthar

63.     Mallinckrodt (and previously Questcor) has exercised, and continues to exercise,

monopoly power in the U.S. with Acthar. The supra-competitive prices that Mallinckrodt

charges for Acthar and its restriction on Acthar's distribution, as outlined below, are evidence of

this monopoly power.

64.     For decades, Acthar was distributed to any doctor, hospital, wholesaler or

specialty pharmacy that requested the drug to treat seriously ill patients. After Questcor acquired

the rights to Acthar, it initially maintained that broad distribution network.

65.     Prior to 2007, Acthar was sold through a typical distribution chain. The chain of

distribution was as follows: Questcor would sell Acthar to multiple distributors who in turn sold

Acthar to pharmacies. The pharmacies placed orders with the distributors based on their

respective levels of sales and inventory practices. Physicians would write prescriptions for

Acthar which would be sent to the pharmacies and patients would purchase the drug directly

from the pharmacy of their choice. In fact, most of Questcor's products (and thus Acthar) were sold through three distributors which accounted for 91% of their business in 2006.

66.     On July 2, 2007, Questcor issued an Urgent Product Alert advising health care professionals that as of August 1, 2007, Acthar would be available exclusively through the specialty pharmacy distributor, CuraScript (owned by Express Scripts) and coordinated through the "Acthar Hub" which is operated by UBC (owned by Express Scripts at the time) and dispensed through a limited network of specialty pharmacy distributors (including Accredo).

67.     Acthar would no longer be available through traditional pharmaceutical wholesalers or retail pharmacies. At Mallinckrodt's direction, by 2012 the limited network of specialty pharmacies authorized to dispense Acthar was comprised of: Accredo; Aetna Specialty Pharmacy; Caremark Specialty Pharmacy; CIGNA Tel Drug; CuraScript SP Specialty Pharmacy; RX Solutions/OptumRX; Walgreen Specialty Pharmacy; and Special Care Pharmacy Services (Puerto Rico).

68.     Notwithstanding the limited number of specialty pharmacies authorized to dispense Acthar, Mallinckrodt, in concert with Express Scripts, ensured that the UBC-operated hub was set up to refer as many patients as possible to Express Scripts' specialty pharmacy, Accredo, for obtaining Acthar. *See* Ex. 1, MNK01455211 at *5 (██████████████████ ████████████████████████████████████████)

69.     According to Questcor's Interim President, Don Bailey, "the goal of Questcor's new strategy is to make manufacturing and distribution of Acthar economically viable on a stand-alone basis."[4]  In actual fact, the goal of this "new strategy" was to lock patients into

---

[4] Questcor Press Release, *Questcor Board Approves New Strategy and Business Model for H.P. Acthar Gel* (Aug. 27, 2007), www.businesswire.com/news/home/20070827005278/en/Questcor-Board-Approves-New-Strategy-Business-Model.

receiving Acthar through one distribution channel controlled by Mallinckrodt and Express Scripts, and to ensure prescription, distribution and payment through one source, Express Scripts. Mallinckrodt has maintained this exclusive arrangement with Express Scripts since 2007 up through the present. Throughout this time, title, dominion and risk for Acthar remained with Mallinckrodt.

70.     The new distribution system was supposed to provide "seamless support for Acthar" but came with a significant increase in the price of treatment. Questcor believed that the cost for one course of treatment could approach $80,000 to $100,000.[5]

71.     Instead of making the use of Acthar "economically viable," the new distribution system allowed Questcor and Express Scripts to conspire to increase the price of Acthar. Following the new agreement with Express Scripts, the price of Acthar was increased from $1,980.00 to $27,922.80 per vial. The vertical exclusive distribution agreement eliminated competition between wholesalers and amongst traditional pharmacies which would otherwise have exerted pressure for lower Acthar prices.

72.     As part of efforts to limit the Acthar distribution channel, Mallinckrodt, in concert with UBC, set up the Acthar Support & Access Progam ("ASAP").

73.     Under this new distribution scheme, a prescription for Acthar could only be obtained through ASAP.

74.     Once a physician determines that a prescription for Acthar is necessary, the physician must complete an "Acthar Start Form" ("AS Form") and fax the form to the "Acthar Hub."

75.     The AS Form requires the following information: (1) patient demographics; (2)

---

[5] *Id.*

insurance information; (3) health care provider information; (4) Acthar prescription information (*e.g.*, diagnosis, injection instructions); (5) prescription, consent, and statement of medical necessity; (6) diagnosis information; (7) history of corticosteroid use; (8) concurrent medications; (9) relevant treatment history; and (10) other relevant clinical information.

76.     The form requires multiple signatures from the prescribing physician. The physician must sign a statement of medical necessity authorizing "United BioSource LLC ("UBC"), the current operator of the Acthar Hub, and other designated operators of the Program to perform a preliminary assessment of benefit verification for this patient…"

77.     Each patient must acknowledge that by signing the AS Form, they are authorizing their insurance company, physicians, and pharmacy to "disclose to Mallinckrodt ARD Inc. ('Mallinckrodt'), the distributor and its agents, authorized designees and contractors, including Mallinckrodt reimbursement support personnel and United BioSource LLC ('UBC') or any other operator of the Acthar Hub on behalf of Mallinckrodt" health information relating to their medical condition, treatment, and insurance coverage. The authorization allows for "Mallinckrodt and its agents" to provide services to the patient including reimbursement and coverage support, medication shipment tracking, and home injection training.

78.     The "Acthar Hub" is managed by UBC, which assigns each patient a case manager. The case manager calls each patient to discuss insurance coverage, affordability of copayments, injection training, etc. Once the prescription is approved by the insurance company, the case manager arranges for the drug to be delivered by a specialty pharmacy selected by UBC within a limited network of specialty pharmacies authorized to dispense Acthar.

79.     The specialty pharmacy receives Acthar directly from CuraScript, as the exclusive

18

distributor of Acthar. The specialty pharmacy then sends a starter kit directly to the patient. This entire distribution process is coordinated by UBC.

80.     Patients who obtained Acthar prescriptions from August 2007 until November 2017 could not receive their prescription without going through at least two Express Scripts subsidiaries. In fact, if Accredo or CuraScript SP Specialty Pharmacy dispensed the drug, patients would go through Express Scripts subsidiaries for the entire process of obtaining the drug, namely CuraScript, UBC, and Accredo.

81.     Patients were required to participate in ASAP, which was operated by UBC, to obtain their prescriptions. Their Acthar prescriptions were distributed exclusively through CuraScript, which sent the product to the patients' specialty pharmacy.

82.     Since Express Scripts sold UBC, patients who have received Acthar from November 2017 to present still must go through an Express Scripts subsidiary to obtain their prescriptions, as CuraScript remains the exclusive distributor of the drug.

### B.  The Limited Acthar Supply Chain Resulted in Plaintiffs Submitting Payments for Acthar that Flowed Directly to Defendants

83.     There are two alternative but related ways in which the Acthar supply chain, as controlled by Defendants, resulted in harm to Plaintiffs' Assignors (MA Plans) that reimbursed for Acthar on behalf of their beneficiaries: 1) MA Plans that directly paid Express Scripts (as the pharmacy benefit manager of the MA Plan and patient) or Accredo and/or CuraScript SP Specialty Pharmacy (as specialty pharmacies authorized to dispense Acthar) for Acthar on behalf of their beneficiaries; and 2) MA Plans that paid other specialty pharmacies for Acthar, which in turn passed the payment back to Mallinckrodt through the tightly-controlled distribution chain. The two models are explained below.

**1. MA Plans that Paid Express Scripts, Accredo or CuraScript SP Specialty Pharmacy Directly for Acthar (Direct Purchasers)**

84.     Express Scripts is one of the largest pharmacy benefit management companies ("PBM") in the United States. Express Scripts has substantial buying power as a result of its representation of the largest number of buyers in the pharmaceutical marketplace. Wielding both the largest collection of patients in the United States and a direct shipment channel for specialty drugs, Express Scripts should be in a unique position to negotiate the most competitive, discount prices for specialty drugs in the United States. This bargaining power should allow Express Scripts to push back against attempts by pharmaceutical drug manufacturers that charge inflated prices for drugs above the actual market value of the drugs.

85.     Although Express Scripts styles itself as a PBM, it does more than simply process claims for prescriptions filled at retail pharmacies. In addition to "retail pharmacy claims processing, formulary management, utilization management and home delivery pharmacy services", Express Scripts offers "specialty services that deliver . . . high-cost injectable, infused, oral or inhaled drugs," and "compliance programs, . . . drug therapy management programs, [] data analysis, and [] distribution services."[6]

86.     Acting "either directly or through its subsidiaries", Express Scripts serves as a direct pipeline from a pharmaceutical manufacturer to the patient, facilitating the direct distribution of a prescription drugs from the factory to the patient's home.

87.     Express Scripts acts as Mallinckrodt's direct distributor of Acthar to patients

---

[6] Express Scripts Holding Company Annual Report on Form 10-K for the Fiscal Year Ending December 31, 2012.

because it provides what it calls "integrated specialty services."[7] These integrated services include a PBM (Express Scripts), a specialty pharmacy distributor (CuraScript), and a specialty pharmacy provider (Accredo). Express Scripts coordinates all of these functions through its so-called pharmaceutical support services unit, UBC.

88.     For those patients and MA Plans whose pharmacy benefits are managed by Express Scripts, UBC ensures that Acthar may be delivered to the patient by coordinating direct shipment through CuraScript and Accredo and direct payment through Express Scripts. "As one UBC executive has explained, "if UBC is the Hub and Accredo is the [specialty pharmacy] . . . we can send the patient's prescription over to Accredo, and they will not have to duplicate any of our efforts, which another pharmacy would be compelled to do because of risk. Accredo trusts us."

89.     Accredo provides specialty pharmacy and related services for patients with certain complex and chronic health conditions. Accredo's staff is comprised of a team of specialty-trained pharmacists, nurses, patient care advocates, social workers and insurance coordinators whom, among other things, "handle everything about" a patients' medications and/or specialty therapy.

90.     Along with UBC, Accredo provides: (a) support to orphan patient populations; (b) HUB employees to navigate insurance requirements, like prior authorizations, for patients and prescribers; (c) clinicians who are available 24/7 to address patient concerns and provide guidance on mitigating adverse events; and (d) an integrated solution allowing patients to start therapy twice as fast.

---

[7] *Corporate* Overview, CURASCRIPT, https://CuraScriptsd.com/corporate-overview (last accessed June 29, 2020).

91.     Accredo publicly represents that by using its specialty pharmacy services, health plans can save money by managing their specialty spend through Accredo. Accredo further promises patients the most effective and affordable medications while ensuring appropriate utilization, and that it will manage unit costs, drive out waste and reduce related medical expenses.

92.     In simple terms, through UBC's coordination with Accredo and CuraScript, Express Scripts delivers a prescription drug directly from the manufacturer to the patient, removing all impediments to delivery and payment, whether medical, logistical or financial.

93.     With respect to Acthar, Mallinckrodt has a contract with UBC to coordinate the delivery of Acthar through the ASAP Program. Beginning with its July 2, 2007 announcement, Mallinckrodt directed physicians to prescribe Acthar through the ASAP Program. In this announcement, Mallinckrodt directed physicians that all new Acthar prescriptions should be submitted to the ASAP Program. Prescriptions are submitted to the ASAP Program through the "Acthar Start Form." This form authorizes UBC to coordinate reimbursement with Express Scripts and direct the prescription to a "Express Scripts designated specialty pharmacy." This Express Scripts designated specialty pharmacy is Accredo. *See* Ex. 1, ██████████████████ ████████████████████████████████████████████████ ████████" Ex. 1, MNK01455211 at *5. Part of UBC's activities involve coordinating the shipment of Acthar from CuraScript through Accredo to the patient.

94.     Accordingly, MA Plans that receive PBM services from Express Scripts paid Express Scripts directly for Acthar that was distributed by CuraScript – pursuant to CuraScript's exclusive distribution agreement with Mallinckrodt – and dispensed by Accredo, as demonstrated by Figure 1 below.

22



95.     Figure 1 demonstrates how Acthar is prescribed, authorized, distributed and paid for through Express Scripts. Payment flows are represented by green arrows traveling from the payer MA Plan to Express Scripts to Mallinckrodt, while product flows are represented by brown, solid one-way arrows flowing from Mallinckrodt to the patient (beneficiary). Although these payments pass through Express Scripts, payment flows and Acthar flows are ultimately aligned between Mallinckrodt and UBC (Express Scripts' reimbursement hub) through a contract with Mallinckrodt to operate the ASAP Program, which ostensibly operates to confirm the medical necessity of the prescription (by Accredo), to arrange payment (directly to Express Scripts) for shipment of Acthar to patients. Through these contractual arrangements, Acthar

travels from Mallinckrodt directly to the patient, and payments from MA Plans are channeled back to Mallinckrodt from Express Scripts which only deducts its agreed-upon share of payments from MA Plans before transmitting the rest to Mallinckrodt.

96.    In this case, two of Plaintiffs' Assignors – EmblemHealth Services, LLC ("EmblemHealth") and ConnectiCare, Inc. ("CONC") – directly contracted with Express Scripts for pharmacy benefits. Pursuant to their respective contracts with Express Scripts, these Assignors directly paid Express Scripts for Acthar that was dispensed to their beneficiaries by Accredo. As demonstrated by the above Figure 1, the Acthar payment made by these Assignors flows directly back to Mallinckrodt through Express Scripts after Express Scripts deducts its agreed-upon share from the price paid by the Assignors set by Mallinckrodt.

97.    Moreover, eight of Plaintiffs' Assignors – Avmed, Inc. ("Avmed" or "AVDI"); Healthcare Advisor Services, Inc. ("HCAS"); Health First Health Plans, Inc. ("HFHP"); Hygea Health Holdings, Inc. ("HYG"); SummaCare, Inc. ("SMCR"); Verimed IPA LLC ("VMIL"); and Professional Health Choice, Inc. ("(PHCI") –  paid for Acthar that was dispensed to their beneficiaries by Accredo. Three of these assignors (HFHP; AvMed; and SMCR) – including assignor Network Health Plan ("NHP") – also paid for Acthar that was dispensed to their beneficiaries by CuraScript SP Specialty Pharmacy. Although these entities did not contract directly with Express Scripts for the purchase of Acthar, they submitted payment for Acthar to co-conspirators Accredo and/or CuraScript SP Specialty Pharmacy that flowed back to Mallinckrodt, as explained in the below section. It is not necessary for a MA Plan to contract with Express Scripts to obtain Acthar for its beneficiary from Accredo or CuraScript SP Specialty Pharmacy. In fact, one of the main responsibilities of UBC as administrator of the ASAP Program on behalf of Mallinckrodt is to direct as many patients as possible to Accredo,

thereby resulting in payers paying Accredo for Acthar on behalf of their beneficiaries, as with the eight above-mentioned Assignors.

### 2. MA Plans that Submitted Payment for Acthar to Specialty Pharmacies (Indirect Purchasers)

98.     The tightly controlled Acthar supply chain ensures that even those MA Plans that did not directly contract with Express Scripts or paid Accredo and/or CuraScript SP Specialty Pharmacy, submitted Acthar payments which uniformly flowed back to Mallinckrodt. This is illustrated by Figure 2 below.



99.     Figure 2 demonstrates how Mallinckrodt's exclusive distribution agreement with CuraScript and coordination of the ASAP Program by UBC ensures an uninterrupted flow of Acthar from Mallinckrodt to patients and an aligned flow of payments from MA Plans as the payers back to Mallinckrodt. The solid, brown line follows the flow of Acthar from Mallinckrodt through CuraScript, specialty pharmacy, and to the patient; the green line follows the flow of payments from the MA Plan back to Mallinckrodt, and the broken black two-way arrow marks the contracts between various levels of the supply chain:

a.     CuraScript obtains Acthar from Mallinckrodt pursuant to the 2007 exclusive distribution agreement.

b.     CuraScript, in turn, distributes Acthar to the limited network of specialty pharmacies. CuraScript bears no pricing risk for Acthar because it is guaranteed an adjustment in its acquisition costs if Mallinckrodt changes the price of Acthar. Furthermore, between 2007 and 2017, CuraScript was paid a fixed fee for each vial of Acthar that was sold by Mallinckrodt, so it did not incur any benefit or cost based on the price of Acthar. In 2009 that fixed fee was set at $230 per vial. However, as of 2017, CuraScript receives a percentage from the price at which Acthar is sold, thereby realizing a larger margin with increased Acthar prices. CuraScript bears no risk of holding Acthar in inventory because Mallinckrodt has agreed to accept returns of any unsold Acthar before its expiration date. With respect to sales of Acthar, CuraScript is completely controlled by Mallinckrodt and acts merely as its agent.

c.     Upon being deemed eligible for Acthar (a determination made at the central HUB administered by UBC), a MA Plan beneficiary may obtain Acthar from one of the

26

designated specialty pharmacies (*e.g.*, CVS, Caremark, Optum Rx, Accredo). As discovery obtained to date reveals, the "████████████████████ ████████████████████████████████████ ████████████" Ex. 1, MNK01455211 at \*5.

    d.    The MA Plan pays the specialty pharmacy for Acthar being dispensed to a beneficiary at the price established by Mallinckrodt.

    e.    Upon receiving payment from the MA Plan for Acthar, the specialty pharmacy deducts a service fee from the cost of the drug paid by the MA Plan before transmitting a chargeback to Mallinckrodt through CuraScript.

    100.    Thus, MA Plans are the only injured parties in a supply chain where the supracompetitive price of Acthar is controlled at every level of distribution by Mallinckrodt given that the specialty pharmacy is simply a conduit for dispensing the drug to patients; the specialty pharmacy deducts a service fee from the price paid for Acthar by MA Plans before the chargeback flows back to Defendants.[8]

    101.    Mallinckrodt recognized that this exclusive distribution model within a "████████████" of specialty pharmacies provides the "████████████████████",

---

[8] Figure 2 is consistent with Mallinckrodt's vision for the "Acthar Distribution Model" depicted in an internal 2015 presentation:



Ex. 2, MNK01465374 at \*4.

"████████████████████████", and, in the words of Mr. William Hillmer, Mallinckrodt's Senior Director of Strategic Pricing, ensures "████████████████████████" Ex. 1, MNK01455211 at \*5; Ex. 2, MNK01465374 at \*4.

102.     Some of Plaintiffs' Assignors paid for Acthar that was dispensed to their beneficiaries by non-Defendant controlled specialty pharmacies such as Caremark, LLC; Walgreens Specialty Pharmacy, LLC; Procare Pharmacy, LLC; and OptumRx. To be clear, these specialty pharmacies are unaffiliated with the Acthar price-fixing conspiracy (except for Accredo and CuraScript SP Specialty Pharmacy). They simply dispense Acthar to the patient, bill the MA Plan at the price established by Mallinckrodt in concert with Express Scripts, deduct a service fee from the price paid by the MA Plan and pass the chargeback to Mallinckrodt through CuraScript, pursuant to the specialty pharmacy's contract with Defendants. In other words, the fees charged by these specialty pharmacies is independent of the Acthar price. Thus, the specialty pharmacy incurs no harm from Acthar's supracompetitive price while Mallinckrodt reaps the benefits of the supracompetitive price paid by MA Plans because it flows back to Mallinckrodt within an aligned supply chain. As explained with Figure 2, this unique supply chain ensures that the product flows from Mallinckrodt to the beneficiaries of Plaintiffs' Assignors through co-conspirator CuraScript and a limited network of specialty pharmacies while UBC operates the Acthar HUB responsible for administering the shipment of Acthar to the beneficiary.

103.     The two models discussed above demonstrate that Mallinckrodt was able to leverage and enhance its market power by limiting the distribution – and thus restrict the output – of its sole specialty drug to just one specialty pharmacy distributor, CuraScript, and employing as its agents, Express Scripts' Accredo and UBC, to coordinate all aspects of the distribution and sales of Acthar: from prescription by the physician, to direct home delivery to the patient, to

direct reimbursement by the payer. This allowed Mallinckrodt to raise its prices tenfold initially, and nearly double over the ensuing years.

104.    Distributing Acthar though one distributor controlled by Mallinckrodt and making the drug available by a limited network of specialty pharmacies eliminated competition between wholesalers and amongst retailers that would otherwise have exerted pricing pressure on Mallinckrodt to keep the prices of Acthar at competitive levels. Thus, the restricted output and artificially inflated pricing of Acthar enabled by the exclusive distribution agreement harmed not only Plaintiffs' Assignors and the Class, but the market as a whole given that payers and consumers were deprived of the pro-competitive benefits of an open distribution network where Mallinckrodt would have less control over price and product.

105.    MA Plans such as Plaintiffs' Assignors had no choice but to continue paying for Acthar because, pursuant to Medicare regulations, MA Plans, unlike commercial payers, are not permitted to deny coverage of a drug. But for Defendants' illegal anticompetitive scheme described above, Plaintiffs' Assignors would not have paid artificially inflated prices for Acthar.

**III.    Express Script's Role in the Price-Fixing and Monopolization Scheme**

106.    As the largest PBM in the U.S., Express Scripts should be in a position wherein it can negotiate the most competitive, discount prices for specialty drugs. This power should allow Express Scripts to challenge attempts by drug manufacturers to charge inflated prices well above the market value.

107.    This bargaining power and ability to provide "cost containment" is one of the reasons a third-party payer hires Express Scripts as its PBM.

108.    In fact, Express Scripts asserts it helps control costs by:

    a.    "identifying products and offering solutions that focus on improving patient outcomes and assist in controlling costs";

b. "evaluating drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary";

c. "offering cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members";

d. "leveraging purchasing volume to deliver discounts to health benefit providers"; and

e. "promoting the use of generics and lower-cost brands."[9]

109. Express Scripts' Chief Medical Officer, Dr. Steve Miller, has touted the power of Express Scripts to obtain lower prices for its customers in multiple public forums. A selection of his comments regarding Express Scripts' power are below:

When I joined the company, we represented 12 million members. We're at 85 million today. That gives us extraordinary sway in the marketplace. If you think about any other aspect of health care, no one else has that many lives that they can represent.[10]

We have tremendous scale, which allows us to get the best deals for our plan sponsors from both the pharmaceutical manufacturers and also the pharmacies. If any pharmacy chain ever becomes too large, we're able to move our patients and … get the lowest cost.[11]

I think because of the continued escalation of cost, you need a PBM now more than ever. And what a best-in-class PBM like Express Scripts does really ensures great health outcomes and more affordable costs.[12]

---

[9] Express Scripts 2017 Annual Report, available for download at https://expressscriptsholdingco.gcs-web.com/financial-information/annual-reports.

[10] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma.

[11] *Business Insurance*, "Q&A: Dr. Steve Miller, Express Scripts Holding Co.," by Shelby Livingston, May 22, 2016, http://www.businessinsurance.com/article/00010101/STORY/305229991/Q&A-Dr-Steve-Miller,-Express-Scripts-Holding-Co.

[12] *Id.*

Pharma has shown that they feel very emboldened with their pricing power. We're using our clout in the marketplace to really tamp these down for our clients.[13]

There are pharma companies that recognize this is in their best interest…They, like us, want to get to a sustainable marketplace. They know if they're overcharging for drugs that have very little efficacy, that puts them in a competitive disadvantage.[14]

Discussions to control costs have never been more important, as recent estimates put global drug spend at $1.5 trillion by 2021, according to data from Quintiles IMS Holding. Yet sometimes, in the drug pricing debate, blame is placed on one part of the drug distribution system when, in fact, all of us – pharmaceutical companies, pharmacy benefit managers (PBMs), policymakers and payers – have a role to play in achieving better affordability and accessibility of medicine. As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with our industry partners to make that possible.[15]

…[I]t is incumbent upon the pharmacy benefits managers to more forcefully illustrate the critical role we play in making medicine more affordable and accessible. For example, we partnered with a drug maker who was willing to lower the price of its hepatitis C drug. In doing so, we were able to provide 50,000 patients affordable access to this medication.[16]

We are constantly trying to be vigilant and chase the bad actors out of the marketplace.[17]

110.    Through these statements, Express Scripts has acknowledged its ability to

influence the pharmaceutical market and its ability to lower the costs of drugs.

---

[13] *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases" by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07express-scripts-looks-to-limit-drug-price-increases/.

[14] *Medical Marketing and Media*, "Express Scripts' Steve Miller Takes on Drug Industry in Pricing Battle," by Jaimy Lee, February 1, 2015, http://www.mmm-online.com/payersmanaged-markets/express-scripts-steve-miller-takes-on-drug-industry-in-pricing-battle/article/460559/

[15] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Steve Miller, April 14, 2017, http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110550.html.

[16] *Id.*

[17] The New York Times, "Specialty Pharmacies Say Benefit Managers Are Squeezing Them Out," by Katie Thomas, January 9, 2017, https://www.nytimes.com/2017/01/09/business/specialty-pharmacies-say-benefit-managers-are-squeezing-them-out.html.

111.     Beginning in 2007, Express Scripts became the exclusive agent of Mallinckrodt for the distribution of Acthar.[18]

112.     In the time period following August 2007, Express Scripts was handling each and every aspect of Acthar distribution through the above-described functions. CuraScript was the exclusive specialty pharmaceutical distributor, Accredo was the specialty pharmacy provider, and UBC coordinated both the product and money flows through the ASAP Program. As Mallinckrodt's exclusive agent, Express Scripts had no interest in lowering the price for Acthar because it was making money off all aspects of its exclusive arrangement with the manufacturer.

113.     The higher the price for Acthar the more money Express Scripts stands to make as the sole distributor, as demonstrated by the fact that in 2017 CuraScript's exclusive distribution agreement with Mallinckrodt was amended to give CuraScript a percentage of the price at which Acthar is sold, thereby growing CuraScript's margin with increased prices. In other words, by helping Mallinckrodt maintain and enhance its monopoly power in the ACTH market, Express Scripts along with Mallinckrodt realized greater profits at the expense of payers, like Plaintiffs' Assignors and the market as a whole.

114.     In the spring of 2017, Express Script's Senior Vice President, Supply Chain and Specialty Pharma, Everett Neville, stated "I don't think [Acthar is] a very great [drug] – it's a pretty poor drug with a very limited need and certainly [Express Scripts Chief Medical Officer, Dr,] Steve[Miller] could comment." He went on to say, "I think [Dr. Miller] and I both would agree, and *I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value*." (emphasis added). Mr. Neville went on to state that he "personally told

---

[18] Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008 (titled The Middleman's Markup in New York Print Ed.).

[Mallinckrodt's] management team that their drug is hugely overpriced and that he "know[s] [Dr. Miller] has as well."

115.     While Express Scripts management has now acknowledged Acthar to be overpriced, the company has done nothing to reduce the price for patients. Instead, the price for Acthar remains outrageously high.

116.     With Acthar, "[y]ou have nothing but increased drug prices," due in large part to Express Scripts' decision to withhold its market power to effectuate cost containment through lower prices.

### IV.     Medical Use of Acthar and Other Adrenal Hormone Drugs

117.     Corticotropin, the active ingredient in Acthar, is classified by United States Pharmacopeia (USP) in its Drug Classification system under "Hormonal Agents, Stimulant/ Replacement/ Modifying (Adrenal)." Among the other drugs in this category are prednisone, hydrocortisone, dexamethasone, and other corticosteroids. Each of these drugs affects the levels of the hormone cortisol in the body. This broad class of drugs is the one from which medical providers may choose a drug with the same basic biological mechanism of action.

118.     For example, with the sole exception of infantile spasms,[19] prednisone is approved by the FDA to treat all of the same diseases and disorders as Acthar. Therefore, it is not surprising that when Acthar is compared with other drugs by the medical research community,

---

[19] Only one other drug, Sabril (vigabatrin), has FDA approval for treatment of infantile spasms. Sabril is not a steroid but is instead in a class of anticonvulsant drugs that are used to treat epilepsy. Sabril works by inhibiting the breakdown of a particular neural transmitter. Sabril may be used in combination with long-acting ACTH drugs, or it may be suitable where long-acting ACTH drugs have been ineffective at controlling infantile spasms or were not well tolerated by the patient. Although long-acting ACTH drugs and Sabril may both be used to treat infantile spasms, they are not medical substitutes for one another because of their different biological mechanisms of action.

those comparisons are almost universally made to corticosteroids. Indeed, Mallinckrodt prominently references a comparative study between Acthar and prednisone for the treatment of infantile spasms on its website. Additionally, Acthar has been compared to intravenous methylprednisolone for treatment of multiple sclerosis ("MS") relapses and to prednisone for treatment of sarcoidosis.

119.    Acthar has similar pharmacodynamic effects as corticosteroids, but it must be administered through an injection, as opposed to a pill, and it must be refrigerated. Although this difference alone would be enough to make Acthar an undesirable substitute for corticosteroids, its astronomical cost is also a major factor in the medical community's preference for corticosteroids over Acthar. Prednisone, which is available as a generic medication made by many manufacturers, can cost as little as $0.20 per pill (less than $20 for a typical course of treatment) as compared to the $39,000 per-vial cost of Acthar (or $117,000 for a three-vial treatment).

120.    Despite its classification within a broad group of "Hormonal Agents" acting on the adrenal system by USP, Acthar is considered to be distinct from the corticosteroid drugs within the classification for several reasons. First, Acthar's mechanism of action is slightly different from that of corticosteroids. As Mallinckrodt describes in its marketing literature for Acthar: "Acthar is not a steroid. But one of the ways it is thought to work is by helping your body produce its own natural steroid hormones." Second, studies funded by Mallinckrodt have been published that claim to show clinical evidence supporting the superiority of Acthar compared with corticosteroid drugs.

121.    Third, Acthar is supposed to be a last-line treatment alternative for certain conditions that may be tried after corticosteroids have failed in the hope that Acthar, through its

slightly different mechanism of action, may be effective where similar drugs have not been. In language on Acthar's label required by the FDA, it was noted that "corticosteroid therapy is considered to be the treatment of choice" relative to Acthar, unless the condition is unresponsive to corticosteroid therapy. Mallinckrodt further explains to its investors that Acthar "may not be prescribed unless a clear benefit in efficacy or safety is demonstrated or until alternatives have failed to provide positive patient outcomes or are not well tolerated by the patient."[20]

122.     These distinctions are further evidenced by Acthar's assignment to a different Standard Therapeutic Class than corticosteroids in the widely used First Data Bank (FDB) drug database. Corticosteroids like prednisone are in FDB's "Glucocorticoids" Standard Therapeutic Class. In contrast, FDB classifies Acthar in the "Adrenocorticotrophic Hormones" Standard Therapeutic Class. The only other drugs in the "Adrenocorticotrophic Hormones" Standard Therapeutic Class are Synacthen and several short-acting (non-depot) formulations of natural and synthetic ACTH which are approved by the FDA only for use in the testing of adrenal function.[21]

## V.     Monopoly Power, Synacthen Acquisition, and Relevant Market

### A.  Monopoly Power

123.     Mallinckrodt has exercised monopoly power in the United States with Acthar.

---

[20] The only exception is that Acthar may be considered the most effective, "first-line" treatment for infantile spasms.

[21] These short-acting ACTH drugs (Acthrel and Cortrosyn) are not appropriate medical substitutes for Acthar because there is no overlap in the medical conditions that the drugs are approved to treat or diagnose. Acthar is not indicated to diagnose adrenal insufficiency and the short-acting ACTH drugs are indicated only for use in that diagnosis. Moreover, the short-acting nature of these drugs makes them impractical for treatment of the chronic or persistent conditions that long-acting ACTH drugs are designed to treat. Short-acting ACTH drugs would need to be given intravenously or at frequent intervals in order to have the same effect. Therefore only long-acting ACTH drug formulations can be considered medically appropriate substitutes for Acthar.

Ever since its acquisition of marketing rights in 2001, Mallinckrodt has charged supracompetitive prices for the drug.

124.   The supracompetitive and exorbitant prices that Mallinckrodt charges for Acthar, and its limitations on distribution through the entry into an exclusive distribution arrangement with CuraScript in 2007 are direct evidence of Mallinckrodt's monopoly power and actions to maintain and enhance such monopoly power, in violation of antitrust laws.

125.   Immediately after acquiring the rights to sell Acthar, Mallinckrodt's predecessor company Questcor increased the price from approximately $40 per vial to nearly $750 per vial.

126.   By the end of 2006, Acthar accounted for 94 percent of Questcor's net sales. On August 27, 2007, Questcor increased the price of Acthar by more than 1,300% overnight, from $1,650 to $23,269 per vial. The decision to charge tens of thousands for a vial of Acthar was spearheaded by Questcor's chief executive, Don Bailey, who spent most of his career as an executive with a defense contractor, not in the pharmaceutical industry.

127.   Questor has since raised the price of Acthar on multiple occasions since 2011 to $38,892 in 2018.

128.   Acthar net sales increased from $218 million in 2011 to more than $1 billion in 2015.

129.   Medicare spending on Acthar increased geometrically from 2011 to 2015, with total spending of nearly $2 billion and more than $600 million in 2016 alone.

130.   Several factors constitute further evidence of Mallinckrodt's monopoly power.

131.   **Lack of Competition**. Mallinckrodt does not set the price of Acthar by reference to other adrenal hormone drugs prescribed to treat the same indications that Acthar treats. Acthar is priced substantially higher than corticosteroid drugs used to treat the same indications. This

suggests that there is no competitive constraint on Mallinckrodt's ability to set prices. Indeed, Acthar represents 100% of the sub-market for long-acting ACTH drugs available in the United States.

132.     Although Acthar may face limited competition at the margin from other drugs in the broader adrenal hormone class, in practice it competes almost entirely in a separate market (or submarket) for long-acting ACTH drugs. In the United States, Acthar is the only long-acting ACTH drug approved by the FDA. Mallinckrodt acknowledges this in its financial filings, stating that "Acthar Gel has limited direct competition due to the unique nature of the product." Acthar may have some medical similarity to other drugs in the adrenal hormone class, but economically it is in a distinct market.

133.     This lack of competition is further evidenced by Acthar's low rates of substitution for other adrenal hormone drugs. Data on prescriptions of Acthar show that from 2011 to 2019, the price of Acthar increased 59% while the price of Glucocorticoid drugs decreased by 5%. During the same period, the quantity of Acthar reimbursed by third-party payers increased substantially while the quantity of Glucocorticoid drugs reimbursed decreased. This shows that while Glucocorticoid drugs got cheaper relative to Acthar, the amount of Acthar prescribed increased. If Acthar were viewed as an economic substitute for Glucocorticoid drugs, users of Acthar would have switched as Glucocorticoids became relatively cheaper. In practice, it appears that there was little or no substitution from Acthar to Glucocorticoid drugs as a result of Acthar's rising prices. Glucocorticoid drugs are Acthar's closest medical substitute but Acthar's use grew completely independently of their pricing, indicating that Glucocorticoids operate as part of a separate economic market.

134.     This measure of substitution is expressed in economic terms as the cross-price

elasticity of demand. In order for products to be considered close economic substitutes, they should have a cross-price elasticity above the value 2.0 (positive). Values close to zero or negative indicate little or no economic substitution. The cross-price elasticity demand for Acthar versus the Standard Therapeutic Class of Glucocorticoids is negative 0.1, showing a very low degree of substitution between Acthar and Glucocorticoid drugs.

135.    Acthar also has a low cross-price elasticity of demand with the short-acting ACTH diagnostic agents included in its Standard Therapeutic Class. These short-acting drugs are also rarely used.

136.    One of the main reasons for the absence of competition with Acthar is the unavailability of Synacthen, a close medical and economic substitute. Mallinckrodt's conduct with respect to Synacthen is addressed further below.

137.    **Enhanced Profitability**. Acthar's price increases were effective, however, at increasing Mallinckrodt's profits because they did not result in much, if any, loss of volume to drugs that are potential medical substitutes such as Glucocorticoids. Mallinckrodt's revenues on Acthar grew from $218 million in 2011 to $953 million in 2019. Mallinckrodt's profits on Acthar likewise increased by hundreds of millions of dollars per year during the period from 2011 to 2019. Mallinckrodt therefore exercised its monopoly power by profitably pushing through significant and durable price increases on Acthar.

138.    Mallinckrodt restricted output of Acthar – through its 2007 vertical integration with CuraScript – in order to achieve and maintain this pricing. Had Acthar been offered at a lower price, similar to the price Synacthen is sold at in other countries or similar to the price Acthar used to be sold at by Aventis, demand for the product would increase because more people who want long-acting ACTH drugs would be able (or willing) to afford them. Instead,

Mallinckrodt has upped the price of Acthar each year such that its price increased by nearly 60% since 2011, suppressing uninfluenced market demand and output of Acthar relative to what it would have been if Synacthen or Acthar were widely available at competitive prices.

139.   **High Barriers to Entry.**  Despite the lack of patent protection for Acthar, the U.S. ACTH market is still characterized by high barriers to entry. This includes FDA approval, which is required to market drugs to U.S. consumers. Drugs sold outside of the U.S. are therefore not viable substitutes.

140.   Furthermore, developing a safe, effective, and reliable substitute would require substantial investments of resources and time, with no guarantee of success. One would have to source the active ingredient, develop a sustained-release depot-injection formulation, scale production, and conduct clinical trials, particularly because Acthar is derived from a biological and not a chemical process. Mallinckrodt's CEO has assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

### B.   Mallinckrodt Engaged in Anticompetitive Conduct by Acquiring the Only Competitor, Synacthen

141.   By 2013, Mallinckrodt had identified a competitive threat to Acthar's dominance of the ACTH market. Novartis had developed Synacthen Depot (cosyntropin depot) ("Synacthen"), a synthetically derived ACTH medication, which, like Acthar, could be injected intra-muscularly to treat the range of indications for which Acthar is approved, including first and foremost, IS.

142.   Synacthen is a synthetic ACTH drug with similar biological activities and pharmacological effects as Acthar. In Europe, Canada, and other parts of the world, doctors treat patients with Synacthen for the same conditions that are treated with Acthar in the U.S.

143.    Questcor considered the drugs so similar that it submitted Synacthen information to support its application to the FDA to expand the label indications for Acthar. It also cited Synacthen studies in its Acthar marketing materials.

144.    Before June 2013, Novartis marketed and sold Synacthen abroad. For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly. Questcor therefore sought to acquire the rights to Synacthen as a defensive move to prevent competitors from acquiring it and developing it as a competitor to Acthar.

145.    In late 2011, Novartis decided to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

146.    Each of the three firms planned to develop and use Synacthen to compete directly with Acthar, and to price Synacthen well below Acthar. The three firms had the necessary expertise and financing, as well as sufficient business and regulatory plans, to develop Synacthen for the U.S. market.

147.    The Synacthen asset package sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process. Because Synacthen had a long history of safe and effective use abroad, a buyer would not need to begin the research, development, testing, or manufacturing process from scratch. The asset package would therefore substantially lower the barriers to entry in the U.S. market.

148.    The bidding process occurred in late 2012 and early 2013. Questcor signed a confidentiality agreement with Novartis and submitted an offer for Synacthen. Novartis

40

negotiated with the three alternative bidders in parallel with Questcor, and each company had exchanged deal terms with Novartis and had submitted a formal offer. The offers by the three alternative bidders were comparable to each other in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales. Unlike the three alternative bidders, however, Questcor had only inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. It nevertheless submitted a bid several multiples higher than the other bidders, offering Novartis $135 million compared to one of the other bidders' (Retrophin) $16 million.

149.     On June 11, 2013, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements"), that gave Questcor exclusive rights to develop, market, and sell Synacthen in the United States. Under the Agreements, Questcor was obligated to pay a minimum of $135 million to Novartis for Synacthen.

150.     On information and belief, Novartis knew and understood that Questcor did not intend to develop Synacthen. This may be inferred from the fact that Questcor's bid for Synacthen was substantially higher than that of its competitors, even though Questcor had done far less, and was in a worse position, to bring Synacthen to market. In addition, Novartis was not naïve, and could be expected to understand that Questcor would have little interest in developing the only synthetic competitor to Acthar, its extraordinarily lucrative non-synthetic product.

151.     Questcor claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the drugs' similarities, any therapeutic indication that Questcor might have pursued with Synacthen could have been pursued with Acthar.

152.     Fourteen months after acquiring Synacthen, Mallinckrodt acquired Questcor for

$5.6 billion, an amount almost entirely attributable to the value of Acthar.

153.    Neither Questcor nor Mallinckrodt made more than superficial efforts to pursue commercialization of Synacthen, however. Instead Mallinckrodt chose to shelve the asset and thereby protect Acthar monopoly pricing. This scheme resulted in harm not only to Plaintiffs' Assignors and the Class, but the market as a whole given that consumers and payers were deprived of the pro-competitive benefits that the introduction of Synacthen would have brought as an alternative, cheaper medication to Acthar.

154.    Mallinckrodt's conduct led the U.S. Federal Trade Commission ("FTC"), joined by the states of Alaska, Maryland, New York, Texas, and Washington, to bring an action against Mallinckrodt under the FTC Act, Section 2 of the Sherman Act, and state antitrust laws. On January 18, 2017, the FTC announced that Mallinckrodt had agreed to pay $100 million to settle the suit. The parties also filed, and the court approved, a stipulated court order requiring Questcor to grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC. On July 14, 2017, the FTC announced that it had approved a sublicense granting West Therapeutic Development, LLC certain rights to develop and market Synacthen in the United States.

155.    Moreover, Mallinckrodt's decision to exclusively contract with Express Scripts to provide limited distribution for Acthar removed Express Scripts' competitive pressure in the marketplace to cause Acthar prices to be lower. Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present. This illegal exercise of monopoly power was only consolidated and continued by Mallinckrodt's acquisition and shelving of Acthar's direct competitor, Synacthen.

### C. The Relevant Market

156.    **Product Market**. The relevant product market is long-acting ACTH drugs, consisting of Acthar and Synacthen. During the relevant time period, Acthar was the only long-acting ACTH drug approved by the FDA for sale in the United States.

157.    Alternatively, long-acting ACTH drugs are a valid submarket within a broader market for adrenal hormone drugs.

158.    **Public Recognition** – Long-acting ACTH drugs are recognized by Mallinckrodt, medical providers, and the public as differentiated from other adrenal hormone drugs:

> i.  Acthar is publicly touted by Mallinckrodt as being "unique" and facing limited competition from other drugs, including corticosteroids. Additionally, medical providers and the public generally view Acthar as distinct from other adrenal hormone drugs such as corticosteroids. One basis for such a view may be that certain medical researchers, mostly funded by Mallinckrodt, have published studies that recognize long-acting ACTH drugs as medically distinct from corticosteroids.

> ii. The FTC recognized "ACTH drugs" as a relevant antitrust market when evaluating Mallinckrodt's acquisition of Synacthen. The FTC alleged in its complaint against Mallinckrodt related to that acquisition that Acthar had "a 100% share of the market for ACTH drugs in the United States" because "[n]o other ACTH drug is FDA-approved for therapeutic use."

> iii. Mallinckrodt's predecessor identified Synacthen as a potential competitive threat in its SEC filings before it licensed the rights to sell that drug in the United States. Mallinckrodt has relied upon studies using Synacthen to

43

support its requests for certain label indications to the FDA.

159.     **Product characteristics and uses** – Long-acting ACTH drugs' composition and method of action are distinct from other adrenal hormone drugs:

      i.   Long-acting ACTH drugs' biological mechanism of action is distinct from other drugs in that they stimulate the adrenal gland to produce cortisol. Glucocorticoid drugs are synthetic forms of cortisol that do not work through the adrenal gland.

     ii.   Long-acting ACTH drugs are believed by some medical providers to be differentiated from other adrenal hormone drugs because of this distinction in its biological method of action. Certain medical research, sponsored by Mallinckrodt, also claim that Acthar achieves superior results to corticosteroids and/or support differing effects of Acthar on the body relative to corticosteroids.

160.     **Unique production facilities** – Long-acting ACTH drugs are made in different facilities and using different processes than other adrenal hormone drugs:

      i.   Acthar is produced at only one facility in Prince Edward Island, Canada. Acthar is produced using a complex, biologic process that is difficult to replicate.

     ii.   Glucocorticoid drugs are synthesized by manufacturers of chemicals for pharmaceuticals in a variety of facilities throughout the world. These facilities are not equipped to produce Acthar, nor could they be easily modified in order to do so.

161.     **Distinct Customer**s – Long-acting ACTH drug customers are distinct from

customers for other adrenal hormones:

      i.   Users of Acthar are distinct from users of other adrenal hormone drugs because those drugs have either failed to treat their conditions, or those drugs are contraindicated for that patient. Therefore, corticosteroid drugs are not a viable option for that patient.

      ii.   The FDA has instructed that Acthar be labeled as "having limited therapeutic value in those conditions responsive to corticosteroid therapy." Plaintiffs' Assignors limit approved use of Acthar (other than for infantile spasms) under their policies to patients who have "contraindications or intolerance to corticosteroids that are not expected to also occur with" Acthar. Other insurers impose very similar restrictions on Acthar's use. Mallinckrodt acknowledges that Acthar "may not be prescribed unless a clear benefit in efficacy or safety is demonstrated or until alternatives have failed to provide positive patient outcomes or are not well tolerated by the patient."

      iii.   Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

162.   **Distinct Prices** – Prices for long-acting ACTH drugs are distinct from prices for other adrenal hormone drugs:

      i.   Acthar's price is distinct from that of other adrenal hormone drugs. Prices of drugs to payers, such as Plaintiffs' Assignors, are the full cost of the drug, less any portion of the cost for which the member is responsible. Acthar's price to Plaintiffs' Assignors is significantly higher than the

average prescription price for a Glucocorticoid drug.

    ii.   Acthar's price to patients in the form of co-insurance or co-payments is substantially higher than the price for other adrenal hormone drugs. For Medicare members, co-insurance amounts average in the thousands, whereas, co-insurance for Glucocorticoid prescriptions are less than $10.

   iii.   Even if a Medicare beneficiary's co-payment was subsidized by a co-payment charity, the amount the beneficiary and payer were responsible for remains unchanged.

   iv.   Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

163.   **Sensitivity to price changes** - Prices and quantities of long-acting ACTH drugs are not sensitive to changes in prices of other adrenal hormone drugs:

    i.   The price of Acthar has increased repeatedly and substantially while the price of other Glucocorticoid drugs has decreased.

    ii.   The cross-price elasticity between Acthar and Glucocorticoid drugs is extremely small. The cross-price elasticity between Acthar and short-acting adrenocorticotrophic hormones is extremely small.

   iii.   The cross-price elasticity between Synacthen and Acthar is believed to be highly significant (above 2.0).

   iv.   Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

164.   **Distinct vendors** - Long-acting ACTH drugs are sold by vendors that are distinct from those that sell other adrenal hormone drugs.

    i.   Acthar is distributed only through a limited network of specialty pharmacies (*e.g.*, Accredo, BriovaRx, Senderra), while other adrenal hormone drugs are widely available through tens of thousands of retail and other mainstream pharmacies throughout the country. Acthar requires special handling that retail pharmacies are not well equipped to provide.

    ii.   Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

165.    **Geographic Market**. The relevant market is the entire United States.

## CLASS ALLEGATIONS

166.    Plaintiffs bring this action on behalf of themselves and the following classes:

**Class 1**: All MA Plans and related entities in the United States and its territories who purchased, paid, provided reimbursement, and/or possess the recovery rights to reimbursement, for some or all of the purchase price of Acthar pursuant to Medicare Part C contracts offering Medicare Part B services from August 2007, to present.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; and (c) any judges or justices involved in this action and any members of their immediate families.

**Class 2**: All MA Plans, MA-PD, or PDP sponsors and related entities in the United States and its territories who purchased, paid, provided reimbursement, and/or possess the recovery rights to reimbursement, for some or all of the purchase price of Acthar pursuant to Medicare Part D contracts providing services from August 2007, to present.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; and (c) any judges or justices involved in this action and any members of their immediate families.

167.    Plaintiffs bring this action pursuant to Rule 23, both individually and on behalf of

(a) a national injunctive class and/or (b) a national damages class and/or (c) various state-wide damages sub-classes, during the period from August 1, 2007 to present.

168.    As discussed in this Class Action Complaint, Defendants have enjoyed ill-gotten gains from the sales of Acthar at the expense of Class Members, who suffered damages to their property and business. Such damages apply to all Class Members (and Plaintiffs as the rightful assignees of those organizations). Class action law has long recognized that, when a company engages in conduct that has uniformly harmed many claimants such as Plaintiffs, other direct payers, third-party payers, and consumers, class resolution is an effective tool to redress the harm.

169.    Here, the Class Members have been deprived of property and money by being forced to purchase prescriptions of Acthar at unlawfully elevated prices as a direct result of Defendants engaging in anticompetitive conduct, as alleged throughout this Complaint.

170.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy shown as follows:

   a.    Numerosity: Joinder of all Class Members is impracticable. Upon information and belief, there are many hundreds of MA Plans and related entities throughout the United States that were forced to pay artificially inflated, anticompetitive prices for Acthar. Thus, the numerosity element for class certification is met.

   b.    Commonality: Questions of law and fact are common to all members of the Class. Specifically, Defendants' misconduct was directed at all Class Members, their affiliates, and those respective organizations that provide prescription benefits. Defendants' illegal pattern of anticompetitive conduct had a common, adverse

effect on all purchasers of Acthar. All members of the Class have common questions of fact or law. Each Class Member shares the same needed remedy, *i.e.*, reimbursement for the inflated prices and lost money due to Defendants' monopolistic actions, and imposition of injunctive and equitable relief to stop Defendants from continuing in their anticompetitive activities.

c. <u>Typicality</u>: Plaintiffs' claims are typical of the Class Members' claims, as all have been damaged in the same manner. Plaintiffs' and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, and share the same legal theory. As the putative class representatives, Plaintiffs possess the same interests and suffered the same injury as the other Class Members, which demonstrates a legal sufficient nexus between Plaintiffs' claims and the Class Members' claims. Plaintiffs' claims are typical of the Class Members' claims because Defendants monopolistic and anti-competitive behavior caused Plaintiffs to pay inflated prices for Acthar. Plaintiffs, like the Class Members, have a right to reimbursement for prescriptions of Acthar at anticompetitive prices. Plaintiffs' and Class Members' claims are based on the same statutes, regulations, legal theories and factual situations. Defendants' business practices, acts and omissions are materially the same with respect to Plaintiffs' and the Class Members' claims, as will be Defendants' legal defenses. Plaintiffs' claims are, therefore, typical of the Class.

d. <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests in vindicating these claims are shared with all members of the Class and there are no conflicts between the named Plaintiffs and

the putative Class Members. In addition, Plaintiffs are represented by counsel

who are competent and experienced in class action litigation and also have no

conflicts.

e. <u>Ascertainability</u>: Locating members of the Classes would be relatively simple. For

MA Plans, CMS maintains records of all MAOs, *i.e.*, those entities that have

contracted directly with CMS pursuant to Medicare Part C and D and providing

notice to such entities could be accomplished by direct communication.

171.     The Class is properly brought and should be maintained as a class action under

Rule 23(b) because a class action in this context is superior. Pursuant to Rule 23(b)(3), common

issues of law and fact predominate over any questions affecting only individual members of the

Class.

172.     Proceeding with a class action is superior to other methods for fair and efficient

adjudication of this controversy because, *inter alia*, such treatment will allow a large number of

similarly-situated third-party payers to litigate their common claims simultaneously, efficiently,

and without the undue duplications of effort, evidence, and expense that individual actions would

induce; individual joinder of the individual members is wholly impracticable; the economic

damages suffered by the individual class members may be relatively modest compared to the

expense and burden of individual litigation; and the court system would benefit from a class

action because individual litigation would overload court dockets and magnify the delay and

expense to all parties. The class action device presents far fewer management difficulties and

provides the comprehensive supervision by a single court with economies of scale.

173.     A class action is superior in that the prosecution of separate actions by individual

members of the Class would create a risk of inconsistent or varying adjudications with respect to

individual members of the Class. These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

174.    The Class is properly brought under Rule 23(b)(2) as Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class.

## CAUSES OF ACTION

175.    Plaintiffs and the putative Class allege that Defendants participated in a vertical price fixing scheme and their monopolistic, anti-competitive behavior caused Plaintiffs' Assignors to suffer harm by paying inflated prices for Acthar prescriptions for their beneficiaries.

176.    The collusion and monopolistic activity between Defendants created an atmosphere which drove up the costs of Acthar, resulting in Class damages.

## COUNT I
## MAINTENANCE OF MONOPOLIZATION
## OF THE ACTH MARKET (15 U.S.C. § 2)

177.    Plaintiffs re-allege and incorporate herein by reference each of the preceding allegations as if fully set forth herein and further allege as follows.

178.     Mallinckrodt has, and at all relevant times, had, monopoly power in the market for long-acting ACTH drugs in the United States. While the genesis of this monopoly power may be natural, since 2007 Mallinckrodt has acted and conspired with Express Scripts to maintain and enhance its monopoly power.

179.    In 2007, Mallinckrodt announced a "New Strategy" in order to maintain and enhance its monopoly. This new strategy could not have succeeded without the involvement of Express Scripts as Mallinckrodt's exclusive agent.

51

**Anticompetitive Act 1: Restricted Distribution**

180.    On July 2, 2007, Mallinckrodt decided to restrict distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to CuraScript, a subsidiary of Express Scripts. The goal of this strategy was to lock patients into receiving Acthar through one channel and prevent otherwise natural competition between multiple wholesalers and pharmacies from exerting pricing pressure on Acthar.

181.    When Mallinckrodt began its new strategy on July 16, 2007, it established the ASAP Program. The ASAP Program allowed Mallinckrodt to limit its direct distribution of the drug to the patient through just one avenue: Express Scripts. Mallinckrodt entered an exclusive arrangement with Express Scripts to provide Acthar directly to patients, and to receive payments for Acthar directly from payers.

182.    Express Scripts was Mallinckrodt's exclusive agent to operate the ASAP Program. Through ASAP, Defendant UBC facilitated all aspects of Acthar's distribution and payment. UBC utilized Express Script's pharmacy arrangement services (Accredo), specialty drug distribution and specialty pharmacy (CuraScript SD and CuraScript SP Specialty Pharmacy) and direct billing and payment (Express Scripts) functions to allow Mallinckrodt to maintain and enhance its monopoly power.

183.    Mallinckrodt has willfully maintained its monopoly power in the U.S. market through its exclusive arrangement with Express Scripts from 2007 through present time. Having Express Scripts as its exclusive agent, Mallinckrodt was able to raise its prices tenfold initially, and nearly double in the ensuing years. This restriction of output and artificial inflation of Acthar prices resulted in harm to Plaintiffs' Assignors, the Class and the market as a whole given that payers and consumers were deprived of the pro-competitive benefits of an open distribution

channel that, by nature, would result in greater access to Acthar at lower prices. *See* Ex. 2, MNK01465374 at *4 (recognizing that closed network of specialty pharmacies supplied by CuraScript ensured "no competition between pharmacies").

**Anticompetitive Act 2: The Synacthen Acquisition**

184.    By 2013, Mallinckrodt had identified a competitive threat to its monopoly power, despite its exclusive arrangements with Express Scripts. When Novartis decided to sell Synacthen Depot to a competitor, Mallinckrodt acted to protect its monopoly. Recognizing that the entry of Synacthen to the U.S. would threaten its monopoly power, Mallinckrodt purchased the exclusive rights to Synacthen.

185.    Mallinckrodt disrupted the Synacthen bidding process by intervening at the last minute to pay multiple times what had been offered by other bidders. Paying $135 million, Mallinckrodt licensed the U.S. rights to Synacthen from Novartis but did not bring this viable synthetic alternative to market. Instead, it acted only to eliminate the nascent competitive threat to its monopoly posed by an independently owned Synacthen.

186.    This conduct contributed to Mallinckrodt's maintenance of monopoly power. Both anticompetitive acts – the exclusive arrangement with Express Scripts and the Synacthen acquisition – had the purpose and effect of suppressing rather than promoting competition in the market. Mallinckrodt was able to raise prices at will.

187.    Mallinckrodt used its enhanced monopoly power to inflate the prices of Acthar as set forth herein. Today the prices stand at over $43,000.

188.    The challenged conduct caused Plaintiffs' Assignors and the Class to pay artificially inflated prices for Acthar, but also harmed the market by depriving payers and consumers from a cheaper alternative product deemed to be as effective as artificially priced

Acthar.

189.    There is no procompetitive justification for the conduct of Mallinckrodt and Express Scripts in collaboration with Express Scripts' subsidiaries CuraScript, UBC, and Accredo. These companies combined to lock Acthar into a restricted distribution model, overseen by the ASAP Program, to ensure enhanced monopoly profits for Mallinckrodt and Express Scripts. The Synacthen acquisition only prevented competition and preserved the enhanced monopoly power Mallinckrodt enjoyed due to Express Scripts' collusion. But for this anticompetitive conduct, Plaintiffs' Assignors would not have paid as much for Acthar.

**Plaintiffs Represent the Interests of Assignors that Directly Purchased Acthar from Co-Conspirators and Were Harmed by Defendants' Anticompetitive Conduct**

**A. EmblemHealth and ConnectiCare**

190.    As described in preceding sections of this Complaint, two of Plaintiffs' Assignors – specifically EmblemHealth ("Emblem") and ConnectiCare ("CONC") – reimbursed for Acthar on behalf of their beneficiaries by submitting payment directly to Express Scripts (pursuant to these Assignors' PBM contracts with Express Scripts) in order for their beneficiaries to be dispensed Acthar by Accredo. Express Scripts and Accredo are co-conspirators in the anticompetitive scheme described herein.

191.    The product ships from Mallinckrodt's agent (CuraScript) to co-conspirator Accredo (after UBC administers the patient's coverage determination) that ships it directly to the patient. Payments flow directly from Plaintiffs' Assignors to Express Scripts, for the benefit of Mallinckrodt. Express Scripts only deducts its agreed-upon share of payments from Plaintiffs' Assignors before forwarding the rest to Mallinckrodt.

192.    These assignors are also direct purchasers because of the conspiracy between

Express Scripts and Mallinckrodt, given that Emblem and ConnectiCare are direct purchasers from co-conspirator Express Scripts.

### B. Avmed, Inc.; HCAS; HFHP; HYG; SMCR; PHCI; VMIL; and NHP

193.    Plaintiffs also represent the interests of Assignors – namely Avmed, Inc. ("Avmed" or "AVDI"); Healthcare Advisor Services, Inc. ("HCAS");  Health First Health Plans, Inc. ("HFHP"); Hygea Health Holdings, Inc. ("HYG"); SummaCare, Inc. ("SMCR"); Verimed IPA LLC ("VMIL"); and Professional Health Choice, Inc. ("PHCI") – that paid for Acthar that was dispensed to their beneficiaries by Accredo.  Three of these assignors (HFHP; AvMed; and SMCR) – including assignor Network Health Plan ("NHP") – also paid for Acthar that was dispensed to their beneficiaries by CuraScript SP Specialty Pharmacy.  These assignors directly paid co-conspirators Accredo and/or CuraScript SP Specialty Pharmacy for the Acthar dispensed to their beneficiaries.

194.    The product flows from Mallinckrodt's agent (CuraScript) to the patient through Accredo or CuraScript SP Specialty Pharmacy; Plaintiffs' Assignors paid Accredo or CuraScript SP Specialty Pharmacy that merely charge a set fee – pursuant to contract with Mallinckrodt – upon receiving the Acthar payments by these Assignors and passed the payments back to Mallinckrodt.

195.    Accordingly, Plaintiffs' Assignors have been directly injured in their businesses and property by reason of Mallinckrodt's unlawful monopolization in concert with Express Scripts. The injuries sustained by Plaintiffs' Assignors consist of paying higher prices to purchase Acthar than they would have paid absent the conduct of Mallinckrodt and its exclusive agent, Express Scripts. Such injuries are the type of harm that antitrust laws were designed to prevent and flow from Mallinckrodt's and Express Scripts' unlawful conduct.

196.     As described herein, Defendants' acts and practices constitute monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT II**
**ANTICOMPETITIVE AGREEMENTS IN UNREASONABLE**
**RESTRAINT OF TRADE (15 U.S.C. § 1)**

197.     Plaintiffs re-allege and incorporate herein by reference each of the preceding allegations as if fully set forth herein and further allege as follows.

198.     As set forth above, Mallinckrodt has entered into exclusive distribution agreements with Express Scripts. These agreements preserved and extended Mallinckrodt's monopoly power and allowed both Mallinckrodt and Express Scripts to raise the prices for Acthar paid by Plaintiffs' Assignors.

199.     The maintenance of Mallinckrodt's monopoly over the relevant market would not be possible without its agreement in restraint of trade with Express Scripts.

200.     Express Scripts is the largest buying agent of pharmaceuticals in the country. It has substantial buying power as a result of its position as the largest representative of pharmaceutical purchasers.

**Express Scripts' Agreement with Mallinckrodt to Fix Prices for Acthar**

201.     There was no legitimate business justification on the part of Express Scripts to agree to charge the inflated end payer prices set by Questcor to its clients, but it so agreed. As alleged above, Express Scripts was profiting from the illegal exclusive distribution through the activities of its subsidiaries (CuraScript, Accredo, and UBC) involved in the distribution of Acthar.

202.     Two of Plaintiffs' Assignors – EmblemHealth and ConnectiCare, contracted with Express Scripts to provide pharmacy benefit services for these Assignors. Instead of exercising

its mighty power as one of the country's largest PBMs to negotiate for lower prices of Acthar on behalf of payers such as EmblemHealth and ConnectiCare, Express Scripts accepted the inflated end payer prices set by Mallinckrodt (which were in part enabled by Mallinckrodt's distribution of Acthar through exclusive distributor CuraScript), forcing Emblem and ConnectiCare to pay supracompetitive prices for Acthar on behalf of their beneficiaries that flowed through Express Scripts back to Mallinckrodt.

203.    Moreover, eight of Plaintiffs' Assignors – Avmed, Inc.; Healthcare Advisor Services, Inc.; Health First Health Plans, Inc.; Hygea Health Holdings, Inc.; SummaCare, Inc.; and Verimed IPA LLC – paid co-conspirator Accredo for Acthar purchases on behalf of their beneficiaries.  Three of these assignors (HFHP; AvMed; and SMCR) – including assignor Network Health Plan ("NHP") – also paid for Acthar that was dispensed to their beneficiaries by CuraScript SP Specialty Pharmacy. The payments by these Assignors to Accredo and/or CuraScript SP Specialty Pharmacy was a direct result of the illegal conspiracy between Mallinckrodt and Express Scripts that UBC direct as many patients as possible to Accredo (or CuraScript SP Specialty Pharmacy) and to only use other specialty pharmacies "when Accredo cannot fill."  Ex. 1, MNK01455211 at *5.  Accredo and CuraScript SP Specialty Pharmacy, of course, charged these Assignors the end payer price agreed to by Mallinckrodt and Express Scripts and routed the payments back to Mallinckrodt through CuraScript. As a result, the Mallinckrodt-Express Scripts agreement to fix prices preserved and enhanced Mallinckrodt's monopoly power and injured payers like Plaintiffs' Assignors by being charged artificially inflated prices for Acthar.

204.    At all relevant times, Mallinckrodt's exclusive agreements with Express Scripts assisted Mallinckrodt in: (a) eliminating competition within the Acthar distribution channel that

would otherwise have precluded Acthar from being priced at supracompetitive levels; (b) maintaining Mallinckrodt's dominant market share and monopoly power in the long-acting ACTH market; (c) maintaining prices at artificially high levels for Acthar; and (d) otherwise reaping the benefits of Mallinckrodt's enhanced monopoly power.

205.     There is no procompetitive justification for the conduct of either Mallinckrodt or Express Scripts and the market as a whole was deprived of natural competition between multiple wholesalers and amongst pharmacies that would otherwise have ensured the greater availability of Acthar at competitive prices.

206.     Plaintiffs' Assignors have been injured in their businesses and property by reason of the alleged collusion and conspiracy between Mallinckrodt and Express Scripts, its exclusive agent, which had the purpose and effect of raising and stabilizing inflated prices for Acthar. Express Scripts facilitated, enabled, assisted, and furthered Mallinckrodt's substantial foreclosure and exclusion of competition and monopolization of the market.

207.     The injuries of Plaintiffs' Assignors consist of paying higher prices to purchase Acthar than they would have paid absent the unlawful conduct of Mallinckrodt and Express Scripts. Plaintiffs' Assignors' injuries are the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

208.     Defendants' acts and practices constitute anticompetitive agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

209.     **WHEREFORE,** Plaintiffs demand that judgment be entered in their and the Classes favor and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT III
## VIOLATION OF STATE ANTITRUST LAWS

210.     Plaintiffs re-allege and incorporate herein by reference each of the preceding

allegations as if fully set forth herein and further allege as follows.

211.     In the event that that the Court finds that the Acthar purchases by Emblem and

ConnectiCare were indirect as to Mallinckrodt, they remain direct as to Express Scripts, and

Emblem and ConnectiCare's aforesaid federal antitrust claims may be maintained against

Express Scripts. In such event, alternatively, Plaintiffs and the Class seek relief as indirect

purchasers as allowed by state and federal law. Under federal antitrust law, as indirect

purchasers, Plaintiffs and the Class are allowed to seek an injunction against both Mallinckrodt

and Express Scripts for their anticompetitive conduct. And, under certain state antitrust laws, as

indirect purchasers, Plaintiffs and the Class are allowed to seek monetary damages against both

Mallinckrodt and Express Scripts for their anticompetitive conduct.

212.     In the event that the Court finds that the Acthar purchases by Avmed, Inc.;

Healthcare Advisor Services, Inc.; Health First Health Plans, Inc.; Hygea Health Holdings, Inc.;

SummaCare, Inc.; Professional Health Choice; Network Health Plan; and Verimed IPA LLC

were indirect as to Mallinckrodt, they remain direct as to co-conspirators Accredo and/or

CuraScript SP Specialty Pharmacy (and thus, Express Scripts as the parent corporation of

Accredo and CuraScript) and the aforesaid federal antitrust claims of these Assignors may be

maintained against Express Scripts, Accredo, and CuraScript. In such event, alternatively,

Plaintiffs and the Class seek relief as indirect purchasers as allowed by state and federal law.

Under federal antitrust law, as indirect purchasers, Plaintiffs and the Class are allowed to seek an

injunction against both Mallinckrodt and Express Scripts for their anticompetitive conduct. And,

under certain state antitrust laws, as indirect purchasers, Plaintiffs and the Class are allowed to

seek monetary damages against both Mallinckrodt and Express Scripts for their anticompetitive conduct.

213. The remainder of Plaintiffs' Assignors that did not purchase Acthar directly from Mallinckrodt, Express Scripts, Accredo, or CuraScript SP Specialty Pharmacy, Plaintiffs and the Class seek relief as indirect purchasers as allowed by state and federal law. Under federal antitrust law, as indirect purchasers, Plaintiffs and the Class are allowed to seek an injunction against both Mallinckrodt and Express Scripts for their anticompetitive conduct. And, under certain state antitrust laws, as indirect purchasers, Plaintiffs and the Class are allowed to seek monetary damages against both Mallinckrodt and Express Scripts for their anticompetitive conduct.

214. Plaintiffs incorporate the preceding factual allegations of anticompetitive conduct by the Defendants and assert claims pursuant to the following state antitrust laws:

**Alabama**. Ala. Code § 6-5-60, *et seq.*

**Arizona**. Ariz. Rev. Stat. Ann. § 44-1401, *et seq.* ("The Arizona Uniform Antitrust Act").

**California**. Cal. Bus. & Prof. Code §§ 16700, *et seq.* ("The Cartwright Act"). Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in California.

**District of Columbia**. D.C. Code Ann. §§ 28-4501, *et seq*.

**Hawaii**. Haw. Rev. Stat. §§ 480-1, *et seq.*

**Illinois**. 740 Ill. Comp. Stat. 10/ *et seq.* ("Illinois Antitrust Act"). Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Illinois.

**Iowa**. Iowa Code §§ 553.1, *et seq.* ("Iowa Competition Law").

**Kansas.** Kan. Stat. Ann. §§ 50-101, *et seq.* Plaintiffs' analysis of its Assignors' data

identified one or more purchases of Acthar in Kansas.

**Maine.** Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

**Maryland**. Md. Code Ann., Com. Law §§ 11-201, *et seq.* ("Maryland Antitrust Act").

**Michigan**. Mich. Comp. Laws Ann. §§ 445.771, *et seq.* ("Michigan Antitrust Reform Act"). Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Michigan.

**Minnesota**. Minn. Stat. Ann. §§ 325D.49, *et seq.* ("Minnesota Antitrust Law of 1971").

**Mississippi**. Miss. Code Ann. §§ 75-21-1, *et seq.*

**Nebraska**. Neb. Rev. Stat. §§ 59-801, *et seq.* ("Junkin Act").

**Nevada**. Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* ("Nevada Unfair Trade Practices Act").

**New Hampshire**. N.H. Rev. Stat. Ann §§ 356:1, *et seq.*

**New Mexico**. N.M. Stat. Ann. §§ 57-1-1, *et. seq.* ("New Mexico Antitrust Act").

**New York**. N.Y. Gen. Bus. Law §§ 340, *et seq.* ("Donnelly Act"). Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in New York.

**North Carolina**. N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

**North Dakota**. N.D. Cent. Code. Ann. §§ 51-08.1-01, *et seq.* ("Uniform State Antitrust Act").

**Oregon**. Ore. Rev. Stat. §§ 646.705, *et seq.*

**Puerto Rico**. P.R. Laws Ann. tit 10 §§ 257, *et seq.* Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Puerto Rico.

**Rhode Island**. R.I. Gen. Laws §§ 6-36-1, *et seq.* ("Rhode Island Antitrust Act").

**South Dakota**. S.D. Codified Laws §§ 37-1-1, *et seq.*

**Tennessee**. Tenn. Code Ann. §§ 47-25-101, *et seq.* Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Tennessee.

**Utah**. Utah Code Ann. §§ 76-10-3101, *et seq.* ("Utah Antitrust Act").

**Vermont**. Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

**West Virginia**. W. Va. Code Ann. §§ 47-18-1, *et seq.* ("West Virginia Antitrust Act").

**Wisconsin**. Wis. Stat. Ann. §§ 133.01, *et seq.*

**COUNT IV**
**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**

215.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

216.    During the Class Period, Defendants engaged in continuing unfair, false, unconscionable, or deceptive acts or practices with respect to the sale of Acthar, in violation of various state consumer protection statutes, as set forth below.

217.    The unfair, false, unconscionable, or deceptive acts or practices consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anticompetitive prices for Acthar in the U.S. Moreover, Defendants concealed their agreements from Plaintiffs, Class Members, and the public.

218.    Specifically, Mallinckrodt conspired with Express Scripts to limit the distribution channel of Acthar in order to artificially inflate the end prices paid by payers such as Plaintiffs' Assignors. This illegal scheme was achieved in concert with Express Scripts entities CuraScript (as the exclusive distributor of Acthar and operator of specialty pharmacy CuraScript SP Specialty Pharmacy), UBC (as operator of the HUB responsible for administering the ASAP Program and coordinating the patient's Acthar prescription with a specialty pharmacy, specifically endeavoring to prioritize Accredo as the specialty pharmacy of choice), and Accredo

(as Express Scripts' specialty pharmacy responsible for shipping Acthar directly to patients).

219.    Additionally, Mallinckrodt further limited competition and was able to raise the price of Acthar to supracompetitive levels by purchasing and shelving Acthar's direct competitor, Synacthen.

220.    Defendants' anticompetitive conduct described above was knowing, willful and constituted flagrant violations of several state consumer protection statutes as identified below

221.    Plaintiffs and other similarly situated payers in the Class in each of the below states have been injured in their business and property due to Defendants' unfair, false, unconscionable, or deceptive acts or practices. Plaintiffs and other similarly situated payers in the Class have paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct. In addition, Defendants have profited significantly from the aforesaid unlawful behavior. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of Plaintiffs' Assignors, other similarly situated payers in the Class, and the market as a whole that would otherwise have benefited from the greater availability of Acthar at lower prices in light of an open distribution channel and competition from lower priced alternatives such as Synacthen. But for Defendants' illegal conduct, Plaintiffs' Assignors and the Class would not have paid as much for Acthar.

222.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek damages (including statutory damages where applicable), in each of the below jurisdictions, to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws:

**Alaska**.  Alaska Stat. §§ 45.50.471, *et seq*. ("Alaska Unfair Trade Practices and

Consumer Protection Act).

**Arkansas**.  Ark. Code Ann. §§ 4-88-101, *et seq.* ("The Arkansas Deceptive Trade Practices Act").

**Delaware**.  Del. Code Ann. tit 6, §§ 2511, *et seq.*  Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Delaware.

**Florida**.  Fla. Stat. §§ 501.201, *et seq.* ("The Florida Deceptive and Unfair Trade Practices Act").  Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Florida.

**Georgia**.  Ga. Code Ann. §§ 10-1-370, *et seq.* ("Uniform Deceptive Trade Practices Act").

**Illinois**.  815 Ill. Comp. Stat. Ann. 501/1, *et seq*. ("Consumer Fraud and Deceptive Business Practices Act").

**Idaho**.  Idaho Code Ann. §§ 48-601, *et seq.* ("Idaho Consumer Protection Act").

**Maine.**  Me. Rev. Stat. Ann. tit. 10 §§ 1211, *et seq.* ("Uniform Deceptive Trade Act").

**Massachusetts**.  Mass. Gen. Laws ch. 93A, § 1, *et seq.* Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Massachusetts.

**Minnesota**.  Minn. Stat. Ann. §§ 325F.68, *et seq.*

**Nebraska**.  Neb. Rev. Stat. §§ 59-1601, *et seq.* ("Consumer Protection Act").

**Nevada**.  Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

**New Hampshire**.  N.H. Rev. Stat. Ann §§ 358-A:1, *et seq*.

**New Mexico**.  N.M. Stat. Ann. §§ 57-12-1, *et seq.* ("Unfair Practices Act").

**New York**.  N.Y. Gen. Bus Law § 349.

**North Dakota**.  N.D. Cent. Code. Ann. §§ 51-15-01, *et seq.*

**Pennsylvania**. 73 Pa. Stat. Ann. §§ 201-2, *et seq.* ("Unfair Trade Practices and Consumer Protection Law"). Plaintiffs' analysis of its Assignors' data identified one or more purchases of Acthar in Pennsylvania.

**South Dakota**. S.D. Codified Laws §§ 37-24-1, *et seq.*

**Wisconsin**. Wis. Stat. §§ 100.18, *et seq.*

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, individually and on behalf of the Class described herein, pray for the following relief:

a. Certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3);

b. Designate Plaintiffs as representatives for the respective Class and Plaintiffs' undersigned counsel as Class Counsel for the respective Class;

c. Enter a judgment against Defendants for the violations alleged herein;

d. Enjoin and restrain Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anti-competitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anti-competitive practices set forth above;

e. Award to Plaintiffs and Class Members actual damages incurred as a result of the wrongful acts complained of herein, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

f. Award statutory damages set forth herein under the statutory claims alleged;

g.   Award Plaintiffs the costs of this action, including reasonable attorneys' fees;

h.   Grant Plaintiffs and Class Members alleged herein such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs and the Class demand a trial by jury of all issues so triable in this cause.

DATED:        July 2, 2020                    Respectfully submitted by,

*/s/ Pedram Esfandiary*
Pedram Esfandiary
Adam M. Foster
BAUM HEDLUND ARISTEI
& GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
Phone: (310) 207-3233
Fax: (310) 820-7444
pesfandiary@baumhedlundlaw.com
afoster@baumhedlundlaw.com


David M. Hundley
PENDLEY, BAUDIN & COFFIN, LLP
2505 Energy Center
1100 Poydras St.
New Orleans, LA 70163
Phone: (504) 355-0086
Fax: (504) 249-5459
dhundley@pbclawfirm.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Pedram Esfandiary, hereby certify that, on July 2, 2020, I electronically filed the

foregoing with the Clerk for the United States District Court for the Northern District of Illinois

using the CM/ECF system, which shall send electronic notification to counsel of record.


/s/ Pedram Esfandiary
Pedram Esfandiary, Esq.