**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, *et al.*, | Civil Action No.: 3:20-cv-50056 |
| Plaintiffs, | Judge John Z. Lee |
| v. | Magistrate Judge Lisa Jensen |
| MALLINCKRODT ARD INC., et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MALLINCKRODT ARD LLC
(F/K/A MALLINCKRODT ARD INC.) AND MALLINCKRODT PLC'S MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Table Of Authorities ............................................................................................... ii

Introduction ............................................................................................................. 1

Background .............................................................................................................. 4

Legal Standard ........................................................................................................ 7

Argument ................................................................................................................. 8

I.     Plaintiffs Still Do Not Plausibly Allege A Conspiracy Sufficient To Establish Antitrust Standing ............................................................................... 8

     A.     Plaintiffs' Allegations Concerning Payments to Accredo and CuraScript SP Are Insufficient to Confer Standing .................................... 9

     B.     Plaintiffs' Allegations Concerning Payments to Express Scripts' Pharmacy Benefits Management Business Are Insufficient to Confer Standing ................................................................................... 12

II.     Plaintiffs Still Fail To Allege Injury In Fact ......................................... 14

     A.     Plaintiffs Fail to Allege the Exclusive Distribution Agreement with CuraScript Caused Injury In Fact ............................................ 15

     B.     Plaintiffs Fail to Allege Injury In Fact Arising from the Synacthen Acquisition ................................................................................ 17

III.     The Court Should Dismiss the Plaintiffs' Claims For Failure to Allege Any Injury to Assignors, and Because Plaintiffs' Assignments Are Facially Invalid .................................................................................................... 19

IV.     Many of the Plaintiffs' State-Law Claims Fail for Additional Reasons ............... 24

     A.     Plaintiffs Lack Standing as Indirect Purchasers to Assert Claims Under the Antitrust Laws of Certain States .............................. 24

     B.     Plaintiffs Cannot Circumvent Illinois Brick by Asserting Antitrust Claims under Consumer-Protection Theories ............................ 26

     C.     The Complaint Fails to Adequately Plead Consumer-Protection Claims Under the Laws of 19 States ...................................... 26

Conclusion ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Andrx Pharm., Inc. v. Biovail Corp. Int'l,*
    256 F.3d 799 (D.C. Cir. 2001) ............................................................19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................10

*Bank of Am., N.A. v. Knight,*
    725 F.3d 815 (7th Cir. 2013) ..........................................................1, 10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................7, 10, 14

*Bigelow v. RKO Radio Pictures, Inc.,*
    327 U.S. 251 (1946)............................................................................14

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.,*
    3 N.Y.3d 200 (N.Y. 2004) ..................................................................28

*Brotech Corp. v. White Eagle Int'l Tech. Grp.,*
    No. 03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004)....................19

*Bubar v. Ampco Foods, Inc.,*
    752 F.2d 445 (9th Cir. 1985) ..............................................................17

*Ciardi v. F. Hoffman-La Roche, Ltd.,*
    762 N.E.2d 303 (Mass. 2002) .............................................................28

*Cont'l Ins. Co. v. Bahnan,*
    216 F.3d 150 (1st Cir. 2000)...........................................................27, 28

*Cont'l T.V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977)..............................................................................16

*Delacroix v. Lublin Graphics, Inc.,*
    993 F. Supp. 74 (D. Conn. 1997).........................................................22

*Duncan Place Owners Ass'n v. Danze, Inc.,*
    No. 15 C 01662, 2016 WL 3551665 (N.D. Ill. June 30, 2016), *aff'd in part,*
    *rev'd in part on other grounds and remanded*, 927 F.3d 970 (7th Cir. 2019).........................20

*E&L Consulting, Ltd v. Doman Indus. Ltd.,*
    472 F.3d 23 (2nd Cir. 2006)................................................................16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................21

*Frost v. LG Elecs. Inc.*,
  No. 16-CV-05206-BLF, 2017 WL 1425919 (N.D. Cal. Apr. 21, 2017) ................................13

*Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*,
  128 F.3d 1074 (7th Cir. 1997) ................................................................7

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ................................................................15

*Harrison v. E. I. DuPont de Nemours & Co.*,
  No. 13-cv-1180, 2016 U.S. Dist. LEXIS 77465 (N.D. Cal. June 13, 2016)...........................28

*Hydro-Mfg., Inc. v. Kayser-Roth*,
  640 A.2d 950 (R.I. 1994) ................................................................25

*Illinois Brick v. Illinois*,
  431 U.S. 720 (1977)................................................................ *passim*

*In re Actos End Payor Antitrust Litig.*,
  No. 13-CV-9244 RA, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015), *aff'd in*
  *part, vacated in part*, 848 F.3d 89 (2nd Cir. 2017)................................27

*In re Aftermarket Filters Antitrust Litig.*,
  No. 08 C 4883, 2009 WL 37534041 (N.D. Ill. 2009)................................28

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015)................................................................27

*In re Auto. Parts Antitrust Litig.*,
  No. 12-MD-02311, 2013 WL 2456612 (E.D. Mich. June 6, 2013).........................28

*In re Broiler Chicken Antitrust Litig.*,
  No. 16 C 8637, 2020 WL 4032932 (N.D. Ill. July 15, 2020) ................................25

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  MDL No. 1917, 2014 WL 1088256 (N.D. Cal. Mar. 13, 2014)............................28

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011)................................................................24

*In re Effexor Antitrust Litig.*,
  357 F. Supp. 3d 363 (D.N.J. 2018) ................................................................24, 25, 26

*In re Flonase Antitrust Litig.*,
  692 F. Supp. 2d 524 (E.D. Pa. 2010) ................................................................29

*In re Humira (Adalimumab) Antitrust Litig.*,
No. 19 CV 1873, 2020 WL 3051309 (N.D. Ill. June 8, 2020)..........................................26, 29

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*,
172 F. Supp. 3d 724 (D.N.J. 2016) ...........................................................................28

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019).....................................................................25, 26, 28

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) ......................................................................24

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) .......................................................................25

*In re Rezulin Prods. Liability Litig.*,
392 F. Supp. 2d 597 (S.D.N.Y. 2005).......................................................................28

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-md-01819 CW, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) ....................................25

*In re Terazosin Hydrochloride Antitrust Litig.*,
160 F. Supp. 2d 1365 (S.D. Fla. 2001) .....................................................................24

*In re TJX Cos. Retail Sec. Breach Litig.*,
564 F.3d 489 (1st Cir. 2009) ................................................................................27

*In re Wellbutrin XL Antitrust Litig.*,
260 F.R.D. 143 (E.D. Pa. 2009)..............................................................................29

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)...........................................................................................17

*Leider v. Ralfe*,
387 F. Supp. 2d 283 (S.D.N.Y. 2005).......................................................................29

*MAO-MSO Recovery II, LLC v. Am. Fam. Mut. Ins. Co.*,
No. 17-cv-175-jdp, 2018 WL 835160 (W.D. Wis. Feb. 12, 2018) ........................................21

*MAO-MSO Recovery II, LLC v. Progressive Corp.*,
No. 1:17CV686, 2018 WL 4075880 (N.D. Ohio Aug. 27, 2018) ..........................................21

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*,
No. 1:17-cv-01537-JBM-JEH, 2018 WL 3420796 (C.D. Ill. July 13, 2018) .............................22

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ...........................................................................11, 12

iv

*McCauley v. City of Chi.*,
  671 F.3d 611 (7th Cir. 2011) ............................................................. 10

*MCI Commc'ns Corp. v. AT&T Co.*,
  708 F.2d 1081 (7th Cir. 1983) ........................................................... 15

*Meijer, Inc. v. Biovail Corp.*,
  533 F.3d 857 (D.C. Cir. 2008) ..................................................... 17, 19

*MSP Recovery Claims, Series LLC v. New York Cent. Mut. Fire Ins. Co.*,
  No. 6:19-CV-00211, 2019 WL 4222654 (N.D.N.Y. Sept. 5, 2019) ....................... 23

*MSP Recovery Claims, Series LLC v. Tech. Ins. Co., Inc.*,
  No. 18 CIV. 8036 (AT), 2020 WL 91540 (S.D.N.Y. Jan. 8, 2020) ..................... 23

*MSP Recovery Claims, Series, LLC v. Zurich Am. Ins. Co.*,
  No. 18 C 7849, 2019 WL 6893007 (N.D. Ill. Dec. 18, 2019) ....................... 22

*MSPA Claims 1, LLC v. Nat'l Specialty Ins. Co.*,
  No. 16-20401, 2016 WL 4479372 (S.D. Fla. Aug. 25, 2016) ....................... 22

*MSPA Claims 1, LLC v. State Farm Mut. Auto. Ins. Co.*,
  No. 18-23165, 2019 WL 1055552 (S.D. Fla. Mar. 5, 2019) ....................... 22

*MSPA Claims 1, LLC v. United Auto. Ins. Co.*,
  204 F. Supp. 3d 1342 (S.D. Fla. 2016) ........................................... 23

*MSPA Claims I, LLC v. Tenet Fla., Inc.*,
  318 F. Supp. 3d 1349 (S.D. Fla. 2018), *aff'd sub nom. MSPA Claims 1, LLC v.
  Tenet Fla., Inc.*, 918 F.3d 1312 (11th Cir. 2019) ............................... 20

*Republic Tobacco Co. v. North Atl. Trading Co., Inc.*,
  381 F.3d 717 (7th Cir. 2004) ................................................... 16

*Roland Mach. Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ................................................... 16

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ......... 13

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
  737 F. Supp. 2d 380 (E.D. Pa. 2010) ......................................... 28, 29

*Staley v. Gilead Scis., Inc.*,
  No. 19-CV-02573-EMC, 2020 WL 1032320 (N.D. Cal. Mar. 3, 2020) ............ 25, 26

*Sullivan v. All Web Leads, Inc.*,
  No. 17C1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017) ............................. 7

*Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*,
    358 F. Supp. 3d 389 (D.N.J. 2018) ........................................................................19

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health*
    *& Welfare Fund v. Teikoku Pharma USA, Inc. (Lidoderm)*,
    74 F. Supp. 3d 1052 (N.D. Cal. 2014) ......................................................25, 26, 28

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000)..............................................................................................20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)..............................................................................................14

*Zerpol Corp. v. DMP Corp.*,
    561 F. Supp. 404 (E.D. Pa. 1983) ........................................................................27

## **Statutes**

740 Ill. Comp. Stat. § 10/7 ..........................................................................................24, 29

73 Pa. Stat. Ann. § 201-9.2 ................................................................................................27

15 U.S.C. § 15 ....................................................................................................................14

21 U.S.C. §§ 355(b) & (d) .................................................................................................18

Haw. Rev. Stat. § 480-1 .....................................................................................................27

Massachusetts General Law ch. 93A, Section 11 ........................................................27, 28

N.Y. Gen. Bus. Law § 349..................................................................................................28

P.R. Laws Ann. §§ 257-76 (2005) .....................................................................................25

R.I. Gen. Laws § 6-36-7(d)................................................................................................25

2013 R.I. Pub. Laws, ch. 365, § 2.17.................................................................................26

## **Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 338b (4th ed. 2020) .........................17

Mallinckrodt plc and Mallinckrodt ARD LLC (f/k/a Mallinckrodt ARD Inc.) (the "Mallinckrodt Defendants") submit this Memorandum in Support of their Motion to Dismiss the Second Amended Class Action Complaint ("SAC") filed by MSP Recovery Claims, Series LLC, MAO-MSO Recovery II, LLC, Series PMPI, and MSPA Claims 1, LLC ("Plaintiffs").

## INTRODUCTION

This Court dismissed Plaintiffs' two prior complaints after finding that Plaintiffs—to whom various Medicare Advantage ("MA") Plan Assignors (none of which ever purchased Acthar® Gel ("Acthar") directly from Mallinckrodt ARD LLC or its predecessor Questcor Pharmaceuticals, Inc. ("Questcor")) purportedly assigned antitrust claims—failed to allege the minimum facts necessary to demonstrate that Plaintiffs have standing under federal or state law. Plaintiffs' latest attempt to sue on behalf of the MA Plan Assignors remains fatally flawed. None of the changes in Plaintiffs' Second Amended Complaint ("SAC") cure the deficiencies identified in the Court's most recent opinion or the shortcomings in Plaintiffs' previous complaints. As the Seventh Circuit has instructed, "in court, as in baseball, three strikes and you're out." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818–19 (7th Cir. 2013).

Plaintiffs' core allegations in the SAC concerning the distribution of Acthar are the same as the allegations Plaintiffs advanced in their First Amended Complaint ("FAC") and do nothing to confer antitrust standing upon Plaintiffs. The unfortunate reality for Plaintiffs is that the MA Plan Assignors do not purchase Acthar directly from Mallinckrodt ARD LLC's exclusive distributor, CuraScript SD. Rather, as alleged in each of the complaints, the Assignors as MA Plans purchase Acthar directly or indirectly from one of multiple specialty pharmacies that are capable of appropriately handling the specialty medication and delivering it to the very sick patients to whom it is prescribed. No amount of artful pleading can change that.

For this reason, the Court has twice held that the link between the MA Plan Assignors and Plaintiffs' ill-pled conspiracy is too remote to confer antitrust standing. *See* Jan. 25, 2019 Order (ECF No. 154); Mar. 23, 2020 Order (ECF No. 320). In opposition to Mallinckrodt Defendants' motion to dismiss the FAC, Plaintiffs argued that they had plausibly alleged a conspiracy involving not only Mallinckrodt ARD LLC, CuraScript SD, and United BioSource LLC ("UBC") (an Express Scripts-affiliated patient assistance hub), but also an Express Scripts-affiliated specialty pharmacy called Accredo Health Group ("Accredo"). The Court disagreed, finding that Plaintiffs failed to allege facts that would "plausibly establish that Accredo was a co-conspirator in the alleged conspiracy, and thus not enough to plausibly argue that [the Assignors who purchased Acthar from Accredo] were entitled to sue the named Defendants for damages notwithstanding the applicability of *Illinois Brick*." Mar. 23, 2020 Order at 11. The Court did not otherwise address the plausibility of Plaintiffs' antitrust conspiracy allegations, which were premised entirely on Mallinckrodt ARD LLC's written agreements with CuraScript SD and UBC. *See id.* at 12 n.7.

Despite having the benefit of taking more than a year of additional discovery of all Defendants since filing their FAC—including obtaining nearly 3.5 million pages of additional documents from the Mallinckrodt Defendants—all Plaintiffs have mustered in terms of new conspiracy allegations are references to a 2015 document stating only that UBC showed a preference for the specialty pharmacy Accredo, another Express-Scripts affiliated entity. Any such preference, of course, does not restrain Accredo's ability to unilaterally set its own price for Acthar so as to compete with other specialty pharmacies in the sale of Acthar. Plaintiffs' remaining allegations concerning Accredo's supposed participation in an alleged conspiracy—and their new claims that a separate Express Scripts-affiliated specialty pharmacy, CuraScript SP, and the PBM Express Scripts were co-conspirators—consist entirely of legal conclusions, not facts. Plaintiffs'

failure to allege a plausible conspiracy involving Accredo—or otherwise—requires dismissal with prejudice of all of Plaintiffs' claims under federal and state law.

Plaintiffs' allegations of injury are likewise unchanged from the FAC. Plaintiffs still do not plausibly allege antitrust injury or the fact of injury to the Assignors from the allegedly anticompetitive acts. Exclusive distribution agreements are presumptively lawful. The number of distributors used affects *in no way* the ability of Mallinckrodt ARD LLC, the sole manufacturer of Acthar, to set Acthar's price. Plaintiffs also fail to allege facts making plausible the claim that the Assignors have been injured by the Synacthen transaction. This shortcoming is even more acute now than it was when the Mallinckrodt Defendants' previous motions to dismiss were filed—it has now been *three years* since Synacthen's development for key Acthar indications was sublicensed and the SAC is silent as to whether there has been *any* progress toward FDA approval. In short, the SAC—like Plaintiffs' two prior complaints—fails to plausibly allege the Assignors would have paid lower prices for Acthar but for the alleged conduct. Although Plaintiffs' lack of standing alone is dispositive, the stark deficiencies in Plaintiffs' substantive antitrust allegations provide an independent basis for dismissal of all of Plaintiffs' claims with prejudice under federal and state law.

In addition to the above fundamental flaws in Plaintiffs' SAC, Plaintiffs have failed to allege *any* facts to substantiate an alleged injury to the Assignors in whose shoes they purport to stand. The SAC contains *less* information about the Assignors' alleged purchases than the FAC. Plaintiffs also continue to rely on invalid assignments, failing even to provide documentation that the Court specifically identified as missing in its March 23, 2020 Order.

Having now failed *three* times to plead sufficient facts demonstrating that they have antitrust standing, let alone facts sufficient to state claims under federal or state antitrust law,

Plaintiffs should not be afforded a fourth opportunity. It is now abundantly clear that Plaintiffs are incapable of asserting viable claims. The Mallinckrodt Defendants respectfully request that the SAC be dismissed in its entirety, with prejudice and without leave to amend.

## BACKGROUND

**Plaintiffs' Claims and Allegations Are Largely Unchanged from the FAC.** In their SAC, Plaintiffs continue to allege that Questcor agreed to distribute Acthar exclusively through a specialty distributor, Priority Healthcare Distribution, Inc., d/b/a CuraScript SD Specialty Distribution,[1] and to engage UBC to manage the "Acthar Support & Access Program" ("ASAP"), and they claim that those entities—and Accredo—conspired to control the price of Acthar. *See* SAC ¶¶ 11, 97, 102, 190-91. The SAC also continues to allege that Questcor improperly restricted competition by acquiring the rights to, and then failing to obtain FDA approval for, Synacthen. *See id.* ¶ 12. Based on these allegations, Plaintiffs assert that their Assignors paid an inflated price for Acthar "due to Mallinckrodt's illegal maintenance of monopolization and anticompetitive conduct in concert with Express Scripts and its subsidiaries." *Id.* ¶ 14.

Plaintiffs are three Delaware limited liability companies that allege they are "assignees of recovery rights originally held by Medicare Advantage ('MA') Plans . . . all of whom are third-party payers, providing Medicare benefits to their beneficiaries." *Id.* ¶ 1. Plaintiffs allege that the "Assignors provided Medicare benefits to their enrollees, including payments for the enrollees' Acthar prescriptions." *Id.* ¶ 52.

---

[1]    *See* ECF No. 218-20 (MNK00000001) in Case No. 3:17-cv-50107 (consolidated with this action for discovery purposes).

As in the FAC, Plaintiffs allege in the SAC that certain Assignors[2] paid for Acthar that was dispensed to their beneficiaries by Accredo, SAC ¶ 193, and that certain Assignors "paid for Acthar that was dispensed to their beneficiaries by non-Defendant controlled specialty pharmacies such as Caremark, LLC; Walgreens Specialty Pharmacy, LLC; Procare Pharmacy, LLC; and OptumRx," all of which Plaintiffs concede are "specialty pharmacies [that] are unaffiliated with the [alleged] Acthar price-fixing conspiracy." *Id.* ¶ 102.

**The Court Dismissed the FAC for Lack of Standing.** On March 23, 2020, the Court granted Defendants' motions to dismiss the FAC. ECF No. 320. The Court observed that "five of the seven assigners purchased Acthar from entities that have no affiliation with Defendants, including Caremark, LLC; Walgreens Specialty Pharmacy, LLC; Procare Pharmacy, LLC; and OptumRx, Inc.," and thus held that it "cannot determine whether Plaintiffs have satisfied the proximate causation requirement under *Associated General Contractors* or some relevant lesser state standard." Mar. 23, 2020 Order at 10.

The Court acknowledged that two Assignors purchased Acthar from Accredo, but held that Plaintiffs failed to allege facts that would "plausibly establish that Accredo was a co-conspirator in the alleged conspiracy," and that the facts were "not enough to plausibly argue that [Assignors who purchased Acthar from Accredo] were entitled to sue the named Defendants notwithstanding the applicability of *Illinois Brick*." *Id.* at 10-11. The Court further held that "Plaintiffs must provide more information as to Accredo's role in supplying Acthar" to Assignors "as well as Accredo's role vis-à-vis the named Defendants, before the Court can determine whether standing

---

[2]  Avmed, Inc. ("Avmed" or "AVDI"); Healthcare Advisor Services, Inc. ("HCAS"); Health First Health Plans, Inc. ("HFHP"); Hygea Health Holdings, Inc. ("HYG"); SummaCare, Inc. ("SMCR"); Verimed IPA LLC ("VMIL"); and Professional Health Choice, Inc. ("PHCI").

plausibly exists under *AGC* or any other proximate-cause test." *Id.* The Court thus dismissed Plaintiffs' federal and state antitrust claims. *See id.*

Finally, the Court held that "Plaintiffs' state consumer-protection claims suffer from the same shortcomings" and dismissed those claims because "Plaintiffs have not pleaded sufficient facts to meet even the least stringent state's proximate-cause test." *Id.* at 11-12.

**Plaintiffs' New Allegations.** In an effort to plead facts demonstrating Accredo's alleged participation in the alleged conspiracy, Plaintiffs rely on two documents that were produced during discovery, both of which are attached to the SAC. Quoting from a 2015 presentation that was produced during this litigation, Plaintiffs allege that the hub, UBC, ███████████████

███████ *Id.* ¶ 68 (citing Ex. 1); *see also id.* ¶¶ 93, 99, 203 (same). The only reference to Accredo in the second document on which Plaintiffs rely is that it is identified as one of "Multiple Distributors" along with other specialty pharmacies such as CVS SP, Walgreens SP, and Optum Rx. SAC Ex. 2 at 6. The document says nothing further about Accredo at all.

Plaintiffs identify in the SAC two additional categories of Assignors that allegedly paid for Acthar. Plaintiffs allege that "two of Plaintiffs' Assignors—EmblemHealth Services, LLC ("EmblemHealth") and ConnectiCare, Inc. ("CONC")—directly contracted with Express Scripts for pharmacy benefits," and that pursuant to their contracts, these Assignors "directly paid Express Scripts for Acthar that was dispensed to their beneficiaries." *Id.* ¶¶ 96, 190-92.[3] Plaintiffs further allege that certain Assignors[4] paid for Acthar that was dispensed to their beneficiaries by CuraScript SP, a specialty pharmacy. *Id.* ¶¶ 97, 193-95.

---

[3] In their FAC, Plaintiffs alleged that EmblemHealth and CONC paid Accredo, not Express Scripts, for Acthar. *See* Mar. 23, 2020 Order at 10.

[4] HFHP, Avmed, SMCR, and Network Health Plan ("NHP").

Plaintiffs also now claim that CuraScript SP and Express Scripts are co-conspirators. *See* SAC ¶¶ 97, 102, 190-91. Apart from identifying CuraScript SP as a specialty pharmacy from which certain Assignors purchased Acthar, the SAC does not contain any other allegations concerning that entity.[5] And, as in the FAC, the SAC asserts wide-ranging allegations and legal conclusions against "Express Scripts" as an undifferentiated group of entities,[6] and also identifies Express Scripts as a PBM that contracted with certain Assignors for pharmacy benefits.[7] The SAC does not, however, allege any facts concerning Express Scripts' participation in any conspiracy whatsoever. Plaintiffs also now acknowledge explicitly that, with the exception of Accredo and CuraScript SP, all other specialty pharmacies that dispense Acthar, "such as Caremark LLC; Walgreens Specialty Pharmacy, LLC; Procare Pharmacy LLC; and Optum Rx," are "unaffiliated with the Acthar price-fixing conspiracy." *Id.* ¶ 102.

## LEGAL STANDARD

A complaint is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) if it fails to "state a claim to relief that is plausible on its face" or "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). In other words, "[a] plaintiff must allege that all elements of [the] claim are satisfied, but cannot survive a Rule 12(b)(6) motion to dismiss by alleging only legal conclusions." *Sullivan v. All Web Leads, Inc.*, No. 17C1307, 2017 WL 2378079, at *4 (N.D. Ill. June 1, 2017). A complaint should be dismissed with prejudice where, as here, further amendment would be futile. *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997).

---

[5]     *See id.* ¶¶ 67, 97-98, 102, 193-94, 203, 212-13, 218.

[6]     *See id.* ¶¶ 4, 13-14, 31, 68-69, 71, 86-87, 93-95, 102, 111-13, 155, 178-84, 186, 189, 192, 195, 198-99, 204-07, 212-13.

[7]     *See id.* ¶¶ 83-84, 88, 96-97, 106-10, 114-16, 190-91, 200-02, 211.

## ARGUMENT

## I.  PLAINTIFFS STILL DO NOT PLAUSIBLY ALLEGE A CONSPIRACY SUFFICIENT TO ESTABLISH ANTITRUST STANDING

Like their FAC, Plaintiffs' SAC lacks allegations of fact making plausible a price-fixing conspiracy so broad in reach so as to include the entities from whom the Assignors purchased Acthar. Because none of the Assignors purchased Acthar directly from Mallinckrodt ARD LLC or CuraScript SD, Plaintiffs lack standing to pursue antitrust damages under federal law based on a conspiracy among Mallinckrodt ARD LLC, CuraScript SD, and UBC only. *See* Mar. 23, 2020 Order at 9, 11 (citing *Illinois Brick v. Illinois*, 431 U.S. 720, 737 (1977) (holding that indirect purchasers are prohibited from seeking damages under federal antitrust law)). Plaintiffs further acknowledge that many of the specialty pharmacies that dispensed Acthar to their Assignors' beneficiaries were not a part of any alleged conspiracy. SAC ¶ 102 ("[N]on-Defendant controlled specialty pharmacies . . . are unaffiliated with the Acthar price-fixing conspiracy . . . ."). As the Court recognized in its March 23, 2020 Order, Plaintiffs' standing to assert antitrust damages claims under federal law rests on their allegation that *certain* Assignors paid for an Acthar prescription from an entity that participated in the alleged conspiracy, thereby establishing standing under a "co-conspirator" exception to *Illinois Brick*. Mar. 23, 2020 Order at 10-11. Plaintiffs' vague and conclusory allegations in the SAC still fail to establish that this exception applies such that Plaintiffs have standing to pursue damages claims under federal law, as described below.

Indeed, Plaintiffs' conspiracy allegations appear to rely entirely on written agreements, but those agreements on their own, or otherwise, do not support the existence of a conspiracy that would give rise to an antitrust claim under federal or state law. Plaintiffs allege that Mallinckrodt ARD LLC has entered into written agreements only with CuraScript SD (to distribute Acthar), and

with UBC (to operate the Acthar Support & Access Program), *see, e.g.*, SAC ¶¶ 11, 13, 93-94, but they fail to allege facts showing that the agreements themselves are anticompetitive. Neither do they allege communications or other conduct that otherwise would support the existence of an antitrust conspiracy among these entities, *see generally* SAC.

### A. Plaintiffs' Allegations Concerning Payments to Accredo and CuraScript SP Are Insufficient to Confer Standing

Plaintiffs' SAC does not plead a plausible conspiracy to raise or maintain Acthar's price involving Accredo or CuraScript SP. The SAC's allegations concerning Accredo are almost entirely the same as they were in the FAC. For example, Plaintiffs still allege that Accredo is a subsidiary of Express Scripts. *Compare* FAC ¶ 128, *with* SAC ¶¶ 33, 88. Plaintiffs still allege that Express Scripts, through its related entities, performs integrated distribution services. *Compare* FAC ¶ 125, *with* SAC ¶¶ 87, 88, 94, 95, 112. Plaintiffs also continue to admit that Accredo is one of multiple specialty pharmacies that dispense Acthar to patients and that there is no exclusive distribution through Accredo. *Compare* FAC ¶ 132, *with* SAC ¶¶ 11, 66, 67, 98, 164. After receiving more than 2 million documents produced by the Defendants, and participating in multiple depositions of Defendants' current and former employees, Plaintiffs still fail to plausibly allege that Accredo was part of any conspiracy to inflate Acthar's price. Plaintiffs cite repeatedly the same statement in the 2015 document attached to the SAC, which says ███████████████

███████████████████████████████████████████████████████████████

███████████████████████ *See* SAC Ex. 1 (cited in SAC ¶ 93). This statement, however, says nothing about whether the Mallinckrodt Defendants entered into a conspiracy with Accredo to fix or otherwise influence Accredo's resale price for Acthar or payers' ability to insist on using a different pharmacy if Accredo did not offer the lowest price. Plaintiffs point to no facts suggesting that any such conspiracy has ever existed.

Similarly, Plaintiffs do not allege facts showing that CuraScript SP Pharmacy entered into any agreement with the Mallinckrodt Defendants, let alone a conspiracy to fix CuraScript SP's resale price for Acthar. Plaintiffs allege only that CuraScript SP is a specialty pharmacy from which certain Assignors purchased Acthar.[8] That of course is not enough to plead a conspiracy.

To be sure, Plaintiffs baldly refer to Accredo and CuraScript SP throughout the SAC as "co-conspirators," but such conclusory statements are insufficient to establish involvement in a conspiracy. The Court may not credit such "threadbare recitals" supported by only "conclusory statements" to plead involvement in a conspiracy. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 680–82 (2009). The complaint must provide "more than labels" or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. At the pleading stage, it is "essential to show that a particular defendant joined the conspiracy and knew of its scope." *Bank of Am.*, 725 F.3d at 818. And "[t]he required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chi.*, 671 F.3d 611, 616-17 (7th Cir. 2011). Plaintiffs' threadbare labeling of Accredo and CuraScript SP as "co-conspirators" in the SAC does nothing to cure the defects that led to dismissal of the FAC.

The SAC's remaining allegations fare no better. Plaintiffs allege that "Mallinckrodt recognized that this exclusive distribution model within a 'controlled network' of specialty pharmacies provides the ████████████████████████████████████████████ ████████████████████████████████████████ SAC ¶ 101 (purporting to quote SAC Exs. 1 and 2), but these innocuous statements do not support the existence of any agreement, let alone a conspiracy to fix the price of Acthar involving Accredo or CuraScript SP. For one, the statements—and Plaintiffs' allegations relying on them—do not differentiate Accredo or

---

[8]     *See* SAC ¶¶ 67, 97-98, 102, 193-94, 203, 212-13, 218.

CuraScript SP from the multiple specialty pharmacies that Plaintiffs acknowledge are "unaffiliated" with the alleged conspiracy. SAC ¶ 102. And Plaintiffs acknowledge in the SAC that limiting the distribution of Acthar through a limited number of specialty pharmacies has a legitimate and procompetitive business justification that is independent of Plaintiffs' ill-pled conspiracy. *See* SAC ¶ 164(i) ("Acthar is distributed only through a limited network of specialty pharmacies (*e.g.*, Accredo, BriovaRx, Senderra), while other adrenal hormone drugs are widely available through tens of thousands of retail and other mainstream pharmacies throughout the country. *Acthar requires special handling that retail pharmacies are not well equipped to provide*.") (emphasis added).

Plaintiffs also allege that specialty pharmacies are "simply a conduit for dispensing the drug to patients; the specialty pharmacy deducts a service fee from the price paid for Acthar by MA Plans before the chargeback flows back to Defendants." SAC ¶ 100. This vague claim also fails to establish antitrust standing. The fact that a specialty pharmacy "deducts a service fee" does not plausibly allege that any specialty pharmacy agreed to participate in any agreement or conspiracy to inflate Acthar's price or restrict the specialty pharmacy's discretion to set a resale price for Acthar in competition with other specialty pharmacies. The SAC is entirely devoid of such allegations.

The Seventh Circuit recently upheld the dismissal of a complaint based on a similar failure to allege facts demonstrating that all relevant entities within the chain of distribution participated in the alleged conspiracy. *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832 (7th Cir. 2020). *Marion Healthcare* involved an alleged agreement between a manufacturer and group purchasing organization ("GPO") to inflate the price of medical products. *See id.* at 842. The plaintiffs purchased the products, not from the manufacturer or the GPO, but instead through

distributors that plaintiffs claimed agreed to distribute the products pursuant to anticompetitive terms, "enforced" the anticompetitive terms against the healthcare provider, and made payments to a co-conspirator. *Id*. at 842-43. The court found the allegations insufficient, observing that the complaint failed to allege the "distributors played any role in setting the anticompetitive pricing or that there was any *quid pro quo* according to which [the manufacturer] compensated them for participating the alleged antitrust conspiracy." *Id*. at 843.

The analysis in *Marion Healthcare* is directly on point here. Although this Court required Plaintiffs to "provide more information as to Accredo's role in supplying" Acthar to Assignors' beneficiaries and "Accredo's role vis-à-vis the named Defendants," Mar. 23, 2020 Order at 11, Plaintiffs have not alleged facts showing that Accredo or CuraScript played any role in setting anticompetitive pricing or showing a quid pro quo between Mallinckrodt and those entities, *see generally* SAC.

**B.    Plaintiffs' Allegations Concerning Payments to Express Scripts' Pharmacy Benefits Management Business Are Insufficient to Confer Standing**

Plaintiffs also claim they have standing to bring their sweeping claims on the basis that two Assignors—EmblemHealth and CONC—allegedly paid "Express Scripts" for Acthar prescriptions dispensed to their beneficiaries by Accredo. SAC ¶ 96. The assignments for those entities, however, took place five months *after* this case was filed on October 30, 2017. SAC Ex. A2, A3. Those assignments are facially insufficient to convey prudential standing to Plaintiffs. *See infra* Part III (citing cases).

Setting aside this fatal flaw, Plaintiffs' claims that rely on these two Assignors also fail because the SAC is devoid of any specific allegations that Express Scripts, Inc. participated in any conspiracy. Throughout the SAC, Plaintiffs make sweeping allegations about "Express Scripts" that completely ignore the reality that each Express Scripts-affiliated entity is separate and distinct.

Plaintiffs allege, for instance, that beginning in 2007, "Express Scripts became the exclusive agent of Mallinckrodt for the distribution of Acthar." *See id.* ¶ 111. But Plaintiffs have concurrently alleged that Express Scripts is a PBM, not a distributor, and Plaintiffs have never alleged that a Mallinckrodt Defendant has ever had an exclusive agreement with any PBM. As previously stated, the SAC alleges that Mallinckrodt ARD LLC entered into two agreements only, one with CuraScript SD, and another with UBC. *See, e.g.*, SAC ¶¶ 11, 13.

The Court warned Plaintiffs to cure this "group pleading" defect. Jan. 25, 2019 Order at 2 n.4 ("'[G]roup pleading'—where a plaintiff's allegations simply lump defendants together without describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct—is insufficient at the motion-to-dismiss stage."). Simply alleging in general terms that a corporate family made up of several distinct related legal entities joined a conspiracy is not sufficient to plead that any single one of the related entities was, in fact, a co-conspirator. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ("The fact that two separate legal entities may have a corporate affiliation does not alter the pleading requirement to separately identify each defendant's involvement in the conspiracy."); *Frost v. LG Elecs. Inc.*, No. 16-CV-05206-BLF, 2017 WL 1425919, at *1 (N.D. Cal. Apr. 21, 2017) (holding factual allegations of conspiracy "must still be sufficient to draw a plausible conclusion that the individual defendant joined the conspiracy and played some role"). Plaintiffs have done nothing to cure this group pleading defect in the SAC.

Plaintiffs do allege that Mallinckrodt ARD LLC's agreements with CuraScript SD and UBC caused Express Scripts Inc.—a PBM that never takes possession of Acthar—to lose its incentive to negotiate lower prices for Acthar on behalf of its customers. SAC ¶¶ 106-16. But even accepting the inference of such incentive—despite Plaintiffs' allegation that CuraScript SD

received a fixed fee on all vials for the first ten years of the alleged conspiracy, *see id.* ¶ 99—at the pleading stage plaintiffs must allege facts "plausibly suggesting (not merely consistent with) agreement," and the SAC is devoid of factual allegations that any Mallinckrodt Defendant agreed with Express Scripts, Inc. to raise or maintain prices of Acthar or limit its distribution. *Twombly*, 550 U.S. at 557.

*          *          *

In short, Plaintiffs have failed to allege the existence of any conspiracy, let alone a conspiracy involving Accredo, CuraScript SP, or Express Scripts. The Court should dismiss with prejudice all of Plaintiffs' claims for failure to establish antitrust standing and for failure to state a claim.

## II.    PLAINTIFFS STILL FAIL TO ALLEGE INJURY IN FACT

Even if their purchases conferred standing on Plaintiffs (they do not), the Assignors must have been "injured in [their] business or property by reason of [some]thing forbidden in the antitrust laws" for Plaintiffs to recover damages or other monetary relief under their federal or state antitrust claims. 15 U.S.C. § 15; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9, 125-29 (1969) (requiring a showing that anticompetitive conduct be a "material cause" of plaintiff's injury); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946) (requiring that "proof of defendants' wrongful acts and their tending to injure plaintiffs' business" in ways "not shown to be attributable to other causes"). The same is true for Plaintiffs' state court claims. *See* Appendix A.

While courts give an antitrust plaintiff some flexibility in proving the amount of damages, on the issue of the "fact" of injury, "the courts have been consistent in requiring plaintiffs to prove in a reasonable manner the link between the injury suffered and the illegal practices of the defendant." *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1161-65 (7th Cir. 1983)

14

(reversing damage award because plaintiff "attributes all losses to a defendant's illegal acts, despite the presence of significant other factors"); *see also Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993) (affirming summary judgment where "plaintiffs have failed to show with a fair degree of certainty that 'but for' the alleged antitrust violation, the plaintiffs would not have suffered the injuries of which they complain").

Plaintiffs fail to allege facts making plausible that the Assignors have suffered an antitrust injury from either CuraScript SD's exclusive distribution agreement or Questcor's acquisition of certain rights to Synacthen.[9]

A.    **Plaintiffs Fail to Allege the Exclusive Distribution Agreement with CuraScript Caused Injury In Fact**

Plaintiffs' supposition that the Assignors paid higher prices for Acthar because of Questcor's shift in 2007 to an exclusive distribution model rests on an economically and legally flawed premise. Plaintiffs contend that the corresponding elimination of price competition among Acthar distributors and retailers is what "allowed Mallinckrodt to raise its prices tenfold initially, and nearly double over the ensuing years." SAC ¶ 103; *see also id.* ¶ 104 (alleging that the agreement "eliminated competition between wholesalers and amongst retailers that would otherwise have exerted pricing pressure on Mallinckrodt to keep the prices of Acthar at competitive levels"); *id.* ¶ 183 (alleging that "an open distribution channel [ ], by nature, would result in greater

---

[9]    The Court declined to address these arguments in Defendants' last round of motions to dismiss. March 23, 2020 Order at 12 n.7. The Mallinckrodt Defendants recognize that Judge Kapala held that the City of Rockford stated viable claims under the Sherman Act. *See* Jan. 25, 2019 Order (ECF No. 178 in Case No. 3:17-cv-50107). The passage of more than a year and half since Judge Kapala's decision regarding the plausibility of injury in connection with the Synacthen transaction warrants renewed consideration and a different conclusion today.

access to Acthar at lower prices"). But as a matter of basic economics and established law, that is not so.

A manufacturer's prices are not checked by distributors and retailers competing to distribute the *same* manufacturer's products (*intra*-brand competition); rather, they are checked by competition from *other* manufacturers' products (*inter*-brand competition). *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54-55 (1977). Plaintiffs admit that Mallinckrodt is the only maker of Acthar and allege that, from as far back as 2001, Mallinckrodt had monopoly power with Acthar in a market for ACTH drugs. SAC ¶ 123. Thus, according to Plaintiffs' own allegations, Mallinckrodt had the power to set prices and output for Acthar, *without the exclusive distribution agreement*. An exclusive distribution arrangement "provides no monopolistic benefit to [a monopolist] that it does not already enjoy." *E&L Consulting, Ltd v. Doman Indus. Ltd.,* 472 F.3d 23, 29 (2nd Cir. 2006).

Exclusive distribution agreements are presumptively lawful because manufacturers use them to *enhance* the competitiveness of their products. *Republic Tobacco Co. v. North Atl. Trading Co., Inc.*, 381 F.3d 717, 736 (7th Cir. 2004); *Roland Mach. Co. v. Dresser Indus., Inc*., 749 F.2d 380, 395 (7th Cir. 1984). In the SAC, Plaintiffs admit that Questcor *enhanced* Acthar's competitiveness through the revamped limited distribution model it implemented for Acthar, including the efficient and quick delivery of a perishable and urgently needed specialty pharmaceutical on demand at a fixed fee (SAC ¶ 99(b)) and the provision of patient services from insurance claims processing to assistance administering an injection (*id.* ¶¶ 32-34, 78-79, 99(b), 182). These enhancements to Acthar's competitiveness and any resulting impact on Acthar's price were not the result of anything forbidden by the antitrust laws. *Cf. Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 895–96 (2007) (noting that even though vertical price restraints

can lead to higher prices, "prices can be increased in the course of promoting pro-competitive effects").

**B.    Plaintiffs Fail to Allege Injury In Fact Arising from the Synacthen Acquisition**

The Assignors could suffer no antitrust injury in fact from Questcor's acquisition of rights to Synacthen until such time as another purchaser: (1) would have secured FDA approval (Synacthen is not FDA-approved (SAC ¶ 132)); (2) entered a relevant antitrust market in competition with Acthar at a lower price than Acthar; and (3) gained acceptance among doctors, thereby causing Acthar's price to be reduced to compete, resulting in a reduction in the prices that the Assignors would have paid for Acthar.  *See Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008) (holding that drug purchaser did not suffer antitrust injury because it failed to show that "but for [the] alleged misuse of [a] patent, the FDA would have granted [a competitor] final approval in February 2001"); *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450-52 (9th Cir. 1985); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 338b (4th ed. 2020) ("[A] plaintiff cannot be injured in fact by private conduct excluding [a competitive product] from the market when a statute prevents the [product] from entering that market in any event.").

Plaintiffs attempt to plead each of these steps in the chain of causation by alleging that: (1) three other prospective buyers "planned to develop and use Synacthen to compete directly with Acthar" (SAC ¶ 146); (2) in other countries "doctors treat patients with Synacthen for the same conditions that are treated with Acthar in the U.S." (*id*. ¶ 142); (3) the use of Synacthen abroad means that it would have obtained quick approval by the FDA (*id*. ¶ 147); and (4) Synacthen would have competed with Acthar as a lower-priced alternative (*id.* ¶ 153).

These generalized and superficial allegations regarding Synacthen's potential effect on the market power of Acthar, a pharmaceutical with 19 different FDA-approved indications, fails to sketch an outline of injury to the Assignors.  Plaintiffs effectively present Synacthen as if it were

a generic version of Acthar that would have been immediately approved and available to replace Acthar for any and all prescriptions. Yet Plaintiffs admit that Acthar is an ACTH analogue produced from pig pituitary glands (SAC ¶ 5), whereas Synacthen is a synthetic ACTH created in a lab (*id.* ¶ 141). As such, the two products cannot be presumed to have identical effects on the human body, and for Synacthen to be marketed to doctors as an alternative to Acthar for any of its 19 FDA-approved indications, a necessary first step is clinical trials to establish the safety and efficacy of Synacthen for that indication. *See* 21 U.S.C. §§ 355(b) & (d). The clinical trial process is lengthy and uncertain. Yet Plaintiffs make no specific allegations regarding Synacthen's potential use and effectiveness as to any particular Acthar indication, let alone any specific indication from which Acthar may derive alleged market power and thus one for which the introduction of Synacthen could affect competition. Plaintiffs would leave the Court to guess as to whether, for example, Synacthen is a plausible replacement for Acthar as the standard of care for infantile spasms ("IS") in the United States (SAC ¶ 57), and whether, for other indications, it would be one of several alternatives for "first line" treatment or an alternative to Acthar as a "last line" treatment (*id.* ¶ 58).

Nor do Plaintiffs plead facts making plausible that, had another firm purchased the Synacthen "asset package," the alleged competitive product would be approved for use in the United States today, let alone back in 2007 (the supposed beginning of the relevant period for the antitrust claims (*id.* ¶ 167)), which predates by over six years Questcor's acquisition of Synacthen. Moreover, although (as Plaintiffs admit (*id.* ¶ 154)) Mallinckrodt agreed to divest its rights to develop Synacthen for IS and nephrotic syndrome and sublicensed those rights to West Therapeutic Development, LLC in July 2017 (*id.* ¶ 154), Plaintiffs still have pled no facts regarding any indications for which the sublicensee plans to secure FDA approval or the sublicensee's

progress in doing so. The fact that Synacthen has in the real world been in the hands of an FTC-approved sublicensee for the last three years, yet Plaintiffs offer no facts as to the status or timing of *any* FDA approval, renders Plaintiffs' conclusory allegations of harm to competition and injury to Plaintiffs' Assignors implausible.

Plaintiffs' failure to allege facts making plausible that all of the steps in this chain of events (including FDA approval for Synacthen) would have occurred by the time the Assignors purchased Acthar requires dismissal of their claim. *See Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807-08, 815 (D.C. Cir. 2001) (upholding dismissal of an antitrust claim because plaintiff failed to allege facts demonstrating that FDA approval was probable); *Brotech Corp. v. White Eagle Int'l Tech. Grp.*, No. 03-232, 2004 WL 1427136, at *6 (E.D. Pa. June 21, 2004) (dismissing complaint where plaintiff failed to alleged facts showing timeframe for required FDA approval for product to enter market); *see also Meijer, Inc.*, 533 F.3d at 862 (holding that drug purchaser did not suffer antitrust injury because it failed to show that "but for [the] alleged misuse of [a] patent, the FDA would have granted [a competitor] final approval in February 2001"); *compare Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*, 358 F. Supp. 3d 389, 398 (D.N.J. 2018) (holding that plaintiff had sufficiently pled antitrust injury by alleging that "the FDA indicated to Zydus that it was prepared to approve Zydus' [Abbreviated New Drug Application]").

III.    **THE COURT SHOULD DISMISS THE PLAINTIFFS' CLAIMS FOR FAILURE TO ALLEGE ANY INJURY TO ASSIGNORS, AND BECAUSE PLAINTIFFS' ASSIGNMENTS ARE FACIALLY INVALID**

Plaintiffs' status as assignees is not a valid basis for them to avoid their basic pleading obligations. As purported assignees, Plaintiffs "must establish that the *assignors* have sustained or are immediately in danger of sustaining some direct injury." *Duncan Place Owners Ass'n v. Danze, Inc.*, No. 15 C 01662, 2016 WL 3551665, at *7 (N.D. Ill. June 30, 2016) (emphasis added), *aff'd in part, rev'd in part on other grounds and remanded*, 927 F.3d 970 (7th Cir. 2019); *see Vt.*

*Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor."). Without information concerning the Assignors' Acthar purchases, the Court has no basis for evaluating whether the Assignors sustained an injury in fact. *See, e.g.*, *MSPA Claims I, LLC v. Tenet Fla., Inc.*, 318 F. Supp. 3d 1349, 1355 (S.D. Fla. 2018), *aff'd sub nom. MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312 (11th Cir. 2019) (concluding that assignee had "failed to demonstrate an injury in fact that would confer . . . standing upon the Assignor," and, "by extension, [to] the Assignee Plaintiff"). For example, Assignors that paid for Acthar only prior to the alleged conspiracy, or only after the Plaintiffs' original complaint, would be uninjured. But Plaintiffs have not alleged *any* facts concerning the Assignors' purchases or payments for Acthar, including dates of payment, how much was paid, if anything, by whom and to whom, or when the beneficiary received Acthar. Indeed, Plaintiffs *removed* from the SAC details concerning the alleged purchases of the Assignors that were included in the FAC. *Compare* SAC, *with* FAC ¶¶ 64, 68, 74, 78, 82, 86, 90. The Court should dismiss the SAC in its entirety for failure to plead facts that would establish injury in fact to the Assignors. *See MSPA Claims I, LLC*, 318 F. Supp. 3d at 1355.

Plaintiffs also continue to rely on purported assignments without demonstrating that the assignments are valid and confer standing. The Court should dismiss Plaintiff MSPA from the action, and it should hold that remaining Plaintiffs lack standing to pursue claims based on assignments from Emblem, CONC, HCHF, AvMed, PHCI, and HYG.

**MSPA assignment.** Plaintiffs' SAC does not identify any entity from which Plaintiff MSPA Claims 1, LLC ("MSPA") received an assignment, *see* SAC ¶ 26, apparently relying on a purported assignment from PHCI based on an agreement attached to the SAC. *See* SAC Ex. A7. However, the attached PHCI Agreement—the exclusive basis on which MSPA's standing

depends—does not identify the claims that PHCI assigned. The agreement states that PHCI "assign[s] and transfer[s] . . . the rights and causes of action set forth" in Exhibit A to the Agreement, but Plaintiffs have not provided Exhibit A. SAC Ex. A7 at 1. This deficiency is not new: Plaintiffs previously omitted Exhibit A when filing their First Amended Complaint, *see* ECF No. 165-6, FAC Ex. F at 1, as the Court observed in its dismissal order, *see* Mar. 23, 2020 Order at 7-8 n.5. Accordingly, because Plaintiffs have failed again to adequately plead facts showing the existence of a valid assignment to MSPA, the Court should dismiss MSPA for lack of standing. *See MAO-MSO Recovery II, LLC v. Progressive Corp.*, No. 1:17CV686, 2018 WL 4075880, at *4 (N.D. Ohio Aug. 27, 2018) (dismissing complaint for lack of standing because "[p]laintiffs have merely made conclusory allegations in their Complaint that they have been assigned rights of recovery"); *MAO-MSO Recovery II, LLC v. Am. Fam. Mut. Ins. Co.*, No. 17-cv-175-jdp, 2018 WL 835160, at *6 (W.D. Wis. Feb. 12, 2018) (dismissing claims for lack of standing, while explaining that because MSPA Claims 1, LLC "has a history of failing to prove they have valid assignments[,] . . . the concerns raised by defendants about the existence and scope of plaintiffs' assignments are more than theoretical").

**EmblemHealth, CONC, HFHP, and AvMed post-complaint assignments.** Plaintiffs' purported assignments from Emblem, CONC, AvMed, and HFHP cannot confer prudential standing because those assignments post-date the filing of this case. Standing is assessed as of the time a case is filed. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Plaintiffs filed this case on October 30, 2017. *See* ECF No. 1. As noted above, Plaintiff MSPRC did not receive assignments from Emblem and CONC until five months later, on April 4, 2018. SAC Ex. A2 at 14; Ex. A3 at 4. HFHP assigned its claims on June 1,

2018[10], *see* Ex. A10 at 15-16, and AvMed assigned its claims on August 16, 2019, *see* SAC Ex. A8 at 3. Accordingly, those assignments are insufficient to convey prudential standing to Plaintiffs. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 1:17-cv-01537-JBM-JEH, 2018 WL 3420796, at *3 (C.D. Ill. July 13, 2018) (assignment agreement "cannot confer Article-III standing in this case because [it] was entered into on May 12, 2017, *after* this lawsuit was filed"); *see also MSPA Claims 1, LLC v. State Farm Mut. Auto. Ins. Co.,* No. 18-23165, 2019 WL 1055552, at *4 (S.D. Fla. Mar. 5, 2019) (dismissing complaint because post-complaint assignment did not confer standing); *MSPA Claims 1, LLC v. Nat'l Specialty Ins. Co.,* No. 16-20401, 2016 WL 4479372, at *2 (S.D. Fla. Aug. 25, 2016) (same); *Delacroix v. Lublin Graphics, Inc.*, 993 F. Supp. 74, 83 (D. Conn. 1997) (same). The Court should hold that Plaintiffs lack standing to pursue claims based on any assignment received after October 30, 2017.

**EmblemHealth, CONC, SummaCare, PHCI, and AvMed's limited-scope assignments.** The EmblemHealth, CONC, and SummaCare assignments contain specific date restrictions on the assigned claims, and the SAC does not contain any allegations showing whether the Assignors' claims fall outside of those date restrictions. *See* Ex. A2; Ex. A3; Ex. A1 at 19. Similarly, the EmblemHealth, CONC, PHCI, and AvMed assignments contain restrictions on the scope of matters assigned, and the SAC does not contain any allegations showing whether the Assignors' claims fall outside those substantive restrictions. *See* Ex. A2; Ex. A3; Ex. A7; Ex. A8. Courts have repeatedly dismissed Plaintiffs' claims for failure to allege facts showing that they assert claims within the scope of their assignments. *See, e.g., MSP Recovery Claims, Series, LLC v. Zurich Am. Ins. Co.*, No. 18 C 7849, 2019 WL 6893007, at *2 (N.D. Ill. Dec. 18,

---

[10]     MSRPC received an assignment from a distinct entity, Health First Administrative Plans, on June 12, 2017. *See* Ex. A10 at 19.

2019) (dismissing complaint for failure to allege facts showing claims fell outside enumerated exclusions in assignment); *MSP Recovery Claims, Series LLC v. Tech. Ins. Co., Inc.*, No. 18 CIV. 8036 (AT), 2020 WL 91540, at *3-4 (S.D.N.Y. Jan. 8, 2020) (same); *MSP Recovery Claims, Series LLC v. New York Cent. Mut. Fire Ins. Co.*, No. 6:19-CV-00211, 2019 WL 4222654, at *5-6 (N.D.N.Y. Sept. 5, 2019) (same).

**EmblemHealth, SummaCare, PHCI, HYG, and VMIL assignments that articulate conditions on further assignment or claims.** The EmblemHealth, SummaCare and PHCI assignments condition any further assignment on approval of the assignor, and those assignments were made initially to parties other than Plaintiffs. *See* A2 at 5; Ex. A1 at 7; Ex. A7 at 5.[11] Yet the SAC alleges no facts showing that SummaCare and PHCI agreed to subsequent assignments to Plaintiffs. Addressing such provisions, courts have dismissed Plaintiffs' claims for failure to allege facts showing approval by the original assignor. *See, e.g.*, *MSPA Claims 1, LLC v. United Auto. Ins. Co.*, 204 F. Supp. 3d 1342, 1345 (S.D. Fla. 2016) (dismissing complaint for failure to allege facts satisfying assignment provision conditioning further assignment on MAO's approval).

**NHP unsubstantiated assignment.** Plaintiffs allege that NHP purchased Acthar but have not alleged facts or attached an agreement showing an assignment from NHP to any of the Plaintiffs. The Court should hold that Plaintiffs lack standing to pursue claims based on any purported assignment from NHP.

---

[11]     Similarly, the HYG assignment limits the entities to which a subsequent assignment may be made to a "wholly-owned entity, affiliate, subsidiary, or other related entity of MSP Recovery," *see* Ex. A11 at Section 1.4(a)(vii), and VMIL assignment permits MSP Recovery to assert assigned claims "in its own name or in the name of an affiliated entity," *see* Ex. A12 at 3. Yet Plaintiffs do not allege any facts showing that they satisfy those limitations.

IV.    MANY OF THE PLAINTIFFS' STATE-LAW CLAIMS FAIL FOR ADDITIONAL
       REASONS

    While all of Plaintiffs' state-law claims fail for the reasons stated in Parts I-III above, many

of Plaintiffs' state-law claims are deficient as a matter of law for additional reasons particular to

the law of the state under which they are brought.

    A.    Plaintiffs Lack Standing as Indirect Purchasers to Assert Claims Under the
          Antitrust Laws of Certain States

    Just as *Illinois Brick* bars indirect purchasers from seeking damages under federal law,

many states bar indirect purchasers from seeking damages under their state laws.[12]  Plaintiffs assert

claims under the laws of three such states that bar indirect purchasers from asserting antitrust

damages claims, such that those claim must be dismissed.

    **Illinois.**  The Illinois Antitrust Act prohibits indirect purchasers from bringing antitrust-

related class actions; only the state's Attorney General may do so.  740 Ill. Comp. Stat. § 10/7(2)

("[N]o person shall be authorized to maintain a class action in any court of this State for indirect

purchasers asserting claims under this Act, with the sole exception of this State's Attorney General,

who may maintain an action parens patriae . . . .").  The court "must apply the Illinois Brick Act

and dismiss with prejudice [plaintiffs'] indirect purchaser claim brought under Illinois law." *In re*

*Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016); *see also Staley v. Gilead*

*Scis., Inc.*, No. 19-CV-02573-EMC, 2020 WL 1032320, at *37 (N.D. Cal. Mar. 3, 2020) (granting

motion to dismiss Illinois Antitrust Act claim); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363,

---

[12]    Since the Supreme Court's decision in *Illinois Brick*, some states passed statutes
expressly allowing indirect purchasers to recover damages for antitrust violations under state law,
so-called *Illinois Brick* repealer statutes.  Indirect purchasers, however, "cannot assert antitrust
claims under the law of states which have not passed such repealers."  *In re Nexium*
*(Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 409 (D. Mass. 2013) (citing *In re Digital*
*Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011)); *see also In re Terazosin*
*Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1372 (S.D. Fla. 2001).

391 (D.N.J. 2018) (same); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc. (Lidoderm)*, 74 F. Supp. 3d 1052, 1083-84 (N.D. Cal. 2014) (same).  As noted below, because Plaintiffs do not plead a claim under the Illinois antitrust statute, the Complaint's claim under the Illinois consumer-protection act also fails.

**Puerto Rico.**  *Illinois Brick* also applies to the Puerto Rican Anti-Monopoly Act because the legislature has not passed an *Illinois Brick* repealer statute.  *See, e.g.*, 104 P.R. Laws Ann. §§ 257-76 (2005); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020) (dismissing PRAA claim because the statute "does not permit claims by indirect purchasers"); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 373 (D.R.I. 2019); *Opana ER*, 162 F. Supp. 3d at 723 (same); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819 CW, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8, 2010) (same).

**Rhode Island.**  The Rhode Island Antitrust Act bars antitrust suits by indirect purchasers for conduct occurring prior to July 15, 2013, the date on which the state enacted an *Illinois Brick* repealer statute.  R.I. Gen. Laws § 6-36-7(d).  Under Rhode Island law, "[i]t is well established . . . that statutes and their amendments are presumed to apply prospectively."  *Hydro-Mfg., Inc. v. Kayser-Roth*, 640 A.2d 950, 954 (R.I. 1994) (citation omitted).  The Rhode Island legislature provided that the *Illinois Brick* repealer statute "shall take effect upon passage." 2013 R.I. Pub. Laws, ch. 365, § 2.17.  Thus, any Rhode Island Antitrust Act claim for damages based on conduct prior to July 15, 2013 must be dismissed.  *See, e.g.*, *Staley*, 2020 WL 1032320, at *39; *Effexor*, 357 F. Supp. 3d at 393; *Lidoderm*, 74 F. Supp. 3d at 1087.

### B. Plaintiffs Cannot Circumvent *Illinois Brick* by Asserting Antitrust Claims under Consumer-Protection Theories

The SAC attempts to circumvent *Illinois Brick* by recasting antitrust claims as consumer-protection claims. Courts routinely reject such end-runs. *See, e.g.*, *In re Humira (Adalimumab) Antitrust Litig.,* No. 19 CV 1873, 2020 WL 3051309, at *27 (N.D. Ill. June 8, 2020) (dismissing Alaska consumer protection claims because permitting them "would allow plaintiffs to circumvent Alaska's partial indirect purchaser bar by proceeding under Alaska's more general consumer protection statute"); *id.* at *29 (dismissing plaintiffs' Illinois consumer protection claims based on alleged anticompetitive conduct as an "end run around the Illinois legislature's determination that such actions should not be permitted") (quotation marks and citation omitted); *Loestrin*, 410 F. Supp. 3d at 372 (same); *Effexor*, 357 F. Supp. 3d at 396 (same); *Lidoderm*, 74 F. Supp. 3d at 1089-90 (dismissing claims under laws of Alaska, Delaware, Georgia, Illinois and other states as an impermissible attempt to circumvent *Illinois Brick*). Plaintiffs' consumer-protection claims under the laws of **Alaska**, **Delaware**, **Georgia**, and **Illinois** must fail.

### C. The Complaint Fails to Adequately Plead Consumer-Protection Claims Under the Laws of 19 States

The consumer-protection claims under the laws of 19 states in Count IV of the Complaint are entirely undifferentiated—providing no information on how the claims at issue satisfy the particular requirements of each state's individual consumer protection statutes—and thus fail to meet Plaintiffs' pleading burden. *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) (dismissing similarly-undifferentiated claims on this basis); *In re Actos End Payor Antitrust Litig.*, No. 13-CV-9244 RA, 2015 WL 5610752, at *28 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part*, 848 F.3d 89 (2nd Cir. 2017) (same).

The consumer-protection claims must also be dismissed for these additional reasons:

*First*, a plaintiff may sue only in its capacity as a "consumer" in **Hawaii** (Haw. Rev. Stat. § 480-1 ("consumers" may bring suit, defined as a "natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services"); *see also id.* § 2(d) ("unfair or deceptive practices" claims may only be brought by "a consumer, the attorney general or the director of the office of consumer protection")); and **Pennsylvania** (73 Pa. Stat. Ann. § 201-9.2) (claims permitted only by those who purchase goods "primarily for personal, family or household purposes"); *see also Zerpol Corp. v. DMP Corp.*, 561 F. Supp. 404, 415 (E.D. Pa. 1983). Because the Assignors are Medicare Advantage Organizations, not consumers, their claims under the consumer protection laws of Hawaii and Pennsylvania must be dismissed.

The consumer protection laws of **Massachusetts** and **New York** have similar limitations. In **Massachusetts**, business entities can assert claims under the Consumer Protection Act, but not if they are indirect purchasers. In Massachusetts, an entity engaged "in the conduct of any trade or commerce" may assert consumer protection claims only under Section 11 of Massachusetts General Law ch. 93A. *Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000); *see also In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 495 (1st Cir. 2009). However, Section 11 has not been extended to indirect purchasers: under Section 11, "the court shall . . . be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act." Because "the *Illinois Brick* approach is taken under the Massachusetts Antitrust Act and [Section 11 of the Massachusetts Consumer Protection Act]," *Ciardi v. F. Hoffman-La Roche, Ltd.*, 762 N.E.2d 303, 321 (Mass. 2002), business entities that are indirect purchasers are barred from proceeding under Section 11. In this case, because the Assignors are Medicare Advantage Organizations, not consumers, they are indirect purchaser

whose Section 11 claim is subject to dismissal.[13] *See, e.g.*, *Loestrin*, 410 F. Supp. 3d at 373; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2014 WL 1088256, at *3 (N.D. Cal. Mar. 13, 2014); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612, at *29 (E.D. Mich. June 6, 2013).

In **New York**, the consumer protection statute covers only deceptive acts that were "consumer-oriented," or directed at consumers. *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 417-18 (E.D. Pa. 2010). It is not enough for a plaintiff to show that a defendant's alleged misconduct eventually affected consumers. Indeed, a plaintiff's claim must fail when there is a disconnect between the alleged misconduct and consumer impact. *See id.* This true where, as is the case here, the claim is made by a "sophisticated business entity" that was acting in an intermediary role between the defendant and consumers. *See In re Rezulin Prods. Liability Litig.*, 392 F. Supp. 2d 597, 614 (S.D.N.Y. 2005).

***Second***, to recover under the consumer protection statute in **New York**, a plaintiff must show that the defendant engaged in *deceptive* conduct that was misleading in a material way, and therefore allegations of anticompetitive conduct alone are insufficient to state a claim. N.Y. Gen. Bus. Law § 349; *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.*, 3 N.Y.3d 200, 205-06 (N.Y. 2004); *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 752-53 (D.N.J. 2016) (citing *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 37534041, at *10 (N.D. Ill. 2009)); *see also Harrison v. E. I. DuPont de Nemours & Co.*, No. 13-cv-1180, 2016 U.S. Dist. LEXIS 77465, at *23-24 (N.D. Cal. June 13, 2016); *Sheet*

---

[13] Whereas Section 11 is reserved for business entities, Section 9 of Mass. Gen. Law ch. 93A is reserved for individual consumers and "affords no relief to persons engaged in trade or commerce." *Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000); *accord Ciardi v. F. Hoffman La Roche, Ltd.*, 762 N.E.2d 303, 311-12, 320 (Mass. 2002); *United Food*, 74 F. Supp. 3d at 1085-86.

*Metal Workers*, 737 F. Supp. 2d at 417; *Leider v. Ralfe*, 387 F. Supp. 2d 283, 295-96 (S.D.N.Y. 2005). Here, the SAC alleges no such deceptive conduct, and dismissal is thus required under the consumer protection laws of New York.

**Third**, Plaintiffs seek class-action treatment under the **Illinois** state consumer-protection law, but, as noted above, while the Illinois Consumer Fraud & Deceptive Business Practices Act does not explicitly bar class actions, the statute may not be used to bring indirect purchaser class action antitrust claims that would have been prohibited under the Illinois Antitrust Act. *See* 740 Ill. Comp. Stat. § 10/7; *Humira.*, 2020 WL 3051309, at *29; *see also In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 162 (E.D. Pa. 2009); *see also In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 539 (E.D. Pa. 2010).

**CONCLUSION**

The Court should, respectfully, dismiss the SAC with prejudice in its entirety.

  _/s/  Scott Collins Sullivan_
  Matthew M. Wolf (*pro hac vice*)
  Laura S. Shores (*pro hac vice*)
  Sonia K. Pfaffenroth (*pro hac vice*)
  Michael B. Bernstein (*pro hac vice*)
  Ryan Z. Watts (*pro hac vice*)
  Barbara H. Wootton (*pro hac vice*)
  Adam M. Pergament (*pro hac vice*)
  Sean P. Hennessy (*pro hac vice*)
  Wrede H. Smith III (*pro hac vice*)
  Dylan S. Young (*pro hac vice*)
  Keron J. Morris (*pro hac vice*)
  ARNOLD & PORTER KAYE SCHOLER
  LLP
  601 Massachusetts Avenue, NW
  Washington, DC 20001
  (202) 942-5000
  matthew.wolf@arnoldporter.com
  laura.shores@arnoldporter.com
  sonia.pfaffenroth@arnoldporter.com
  michael.b.bernstein@arnoldporter.com
  ryan.watts@arnoldporter.com
  barbara.wootton@arnoldporter.com
  adam.pergament@arnoldporter.com
  sean.hennessy@arnoldporter.com
  wrede.smith@arnoldporter.com
  dylan.young@arnoldporter.com
  keron.morris@arnoldporter.com

  Debra E. Schreck (*pro hac vice*)
  ARNOLD & PORTER KAYE SCHOLER
  LLP
  250 West 55th Street
  New York, NY 10019
  (212) 836-8000
  debra.schreck@arnoldporter.com

  Scott Collins Sullivan
  WILLIAMSMCCARTHY LLP

120 West State St.
P.O. Box 219
Rockford, IL 61105-0219
(815) 987-8900
ssullivan@wilmac.com

***Attorneys for Mallinckrodt ARD LLC
(f/k/a Mallinckrodt ARD, Inc.) and
Mallinckrodt plc***

## CERTIFICATE OF LAWYER

The undersigned herby certifies that on August 14, 2020, I electronically filed the foregoing instrument with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

> */s/ Scott Collins Sullivan*
> Scott Collins Sullivan
> WILLIAMSMCCARTHY LLP
> 120 West State St.
> P.O. Box 219
> Rockford, IL 61105-0219
> (815) 987-8900
> ssullivan@wilmac.com
>
> **Attorney for Mallinckrodt ARD LLC (f/k/a Mallinckrodt ARD, Inc.) and Mallinckrodt plc**