# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>MALLINCKRODT PLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br>(Jointly Administered) |
| MALLINCKRODT PLC, *et al.*,<br>Plaintiffs,<br>v.<br>STATE OF CONNECTICUT, *et al.*,<br>Defendants. | Adv. Pr. No. 20-50850 (JTD)<br><br>**Hearing Date: November 23, 2020 @ 2:00 p.m. ET**<br>**Obj. Deadline: November 16, 2020 @ 4:00 p.m. ET** |

## ACTHAR PLAINTIFFS' MOTION FOR RELIEF FROM THE AUTOMATIC STAY

The Acthar Plaintiffs[2] hereby seek relief from the automatic stay because the Defendant-Debtors, Mallinckrodt plc and Mallinckrodt ARD, LLC,[3] are actively engaged in ongoing violations of the federal and state antitrust laws, federal RICO, and the consumer fraud laws of various states. Three (3) federal district courts, and two (2) state courts have so ruled in denying Mallinckrodt's Motions to Dismiss the Acthar Plaintiffs' claims and allowing discovery to

---

[1] Debtors claim that a "complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt." *See* Debtors' Supplemental Motion for Injunctive Relief Pursuant to 11 U.S.C. § 105 at 1, n.1.

[2] The "**Acthar Plaintiffs**" consist of the following: the City of Rockford ("**Rockford**"), Steamfitters Local Union No. 420 ("**Steamfitters Local 420**"), the International Union of Operating Engineers Local 542 ("**IUOE Local 542**"), United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("**Plumbers Local 322**") and Acument Global Technologies ("**Acument**"), individually and on behalf of the classes of third party payors ("**TPPs**") and their beneficiaries that Rockford, Steamfitters Local 420 and Plumbers Local 322 seek to represent in their respective cases currently pending in federal district courts in the Northern District of Illinois, the Eastern District of Pennsylvania, and the District of New Jersey, respectively. Rockford alone was named in Debtor's original Adversary Complaint.

[3] As used herein, "**Mallinckrodt**" refers to two Debtors, Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. ("**Mallinckrodt ARD**"), and its parent company, Mallinckrodt plc. These two entities will also be referred to as the "**Debtor-Defendants**" as they are the only Debtors named as defendants in the Acthar Plaintiffs' lawsuits.

proceed.  Debtors concede that the *Rockford* litigation "is furthest along and deep in discovery".  Amended Adversary Complaint [Adv. Pro. D.I. 15] at 60.  But, they fail to point out to the Court that the case had just 60 days left to the close discovery, and all major deadlines have been set by the Northern District of Illinois for over a year.  Debtor-Defendants' bankruptcy filing was a willful attempt to avoid such court-ordered deadlines.

Debtor-Defendants have chosen to not settle with the Acthar Plaintiffs, as they have with all the other major groups who have sued them or who have substantial liens against them.  Unlike with the opioid litigation – where Debtors have agreed to cease their unlawful promotion of opioids and to address "future claims" – Debtors' plan of reorganization includes no change in Mallinckrodt's Acthar business practices which violate the federal and state antitrust laws, federal RICO, and the consumer fraud laws of various states.  Instead, under the proposed plan of reorganization, Mallinckrodt's unlawful business practices continue.  Accordingly, the Acthar Plaintiffs' claims for declaratory and injunctive relief, and for present and future damages, will not be resolved or abated.  Instead, the Acthar Plaintiffs will have to await some future date to adjudicate Mallinckrodt's continuing violations of the law; unless, the stay is lifted.

Mallinckrodt has been violating the antitrust laws since 2007, when it contracted directly with the largest pharmaceutical benefits manager (PBM) in America to take advantage of this country's most vulnerable patient population – infant babies.  By written agreement, Mallinckrodt and Express Scripts raised the price of Acthar 1,300 percent, and restricted the output of Acthar via an exclusive distribution arrangement, which continues to this day.  Express Scripts has claimed that Mallinckrodt must indemnify it under this 2007 agreement for the Acthar Plaintiffs' more than $10 billion in damages.  *See* October 15, 2012 ESI Letter at Declaration of William H. Platt II, Esquire in Support of Motion to Lift Stay ("**Platt Declr**."),

**Exhibit A**.[4]  Express Scripts' has further advised the *Rockford* Court that the automatic stay **does not apply** to the Acthar Plaintiff's claims against them.  *See* Platt Declr. **Exhibit B**.

That is why relief from the stay should be granted now, to allow the Acthar Plaintiffs to adjudicate both the Debtor-Defendants' willful, wrongful conduct, and the separate, unlawful conduct of Express Scripts and United BioSource.  Only by allowing the Acthar Plaintiffs' claims against these parties to be resolved at one time can the Debtor-Defendants hope to address Express Scripts' substantial claim for indemnification under the plan of reorganization.

## I.    PRELIMINARY STATEMENT

1.    The Acthar Plaintiffs, and their beneficiaries, are the only parties in this bankruptcy who actually purchased, and continue to purchase, Mallinckrodt's flagship product, H.P. Acthar Gel ("**Acthar**") for their personal use and consumption.  With nearly $1 billion in 2019 sales, Acthar represents forty percent (40%) of the Debtors' Specialty Brands business, and one-third (1/3) of their overall business.[5]  The Acthar Plaintiffs' claims exceed $10 billion, and as such, these claims represent the largest group of unsecured creditors outside of the "Restructuring Support Agreement" ("RSA").[6]  Yet, the Acthar Plaintiffs were completely shut out from the RSA.

---

[4] In so acting, Express Scripts has conceded that Rockford's antitrust claims arising out of the 2007 agreement have merit.  However, Express Scripts fails to cite the language of its 2019 agreement with Mallinckrodt (entered while Mallinckrodt was preparing for this bankruptcy).  Mallinckrodt also has failed to counter-claim for indemnification by Express Scripts for its willful conduct, which indemnification claim represents a substantial asset of the estate.  These issues will be the subject of the Acthar Plaintiff's discovery in support of the instant motion.

[5] *See* Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions ("**Welch Declaration**") at 14-15; Oct. 14, 2020 Hrg. Tr. at 15 ("Today, the brands business accounts for about 75% of the company's overall sales, and generics the other 25 percent").

[6]  *See* Oct. 14, 2020 Hrg. Tr. at 45 ("the antitrust case is worth over $10 billion"); *see also*, Welch Declaration at 9 (stating "fourteen other Acthar related litigations collectively could result in more than $15 billion in alleged damages and penalties"); 36-37 (same).

2.      Confronting the Debtors' deliberate exclusion of the Acthar Plaintiffs from the negotiations to date will be critically important to the potential success of this bankruptcy proceeding.  Debtor-Defendants seek to "reorganize" and move forward, but they want to continue to sell Acthar as they always have, using the substantial revenues from such sales to fund a planned reorganization without any material change in the unlawful conduct at issue in the Acthar Plaintiffs' cases.

3.      At the First-Day Hearing, Debtors' counsel advised the Court:

It is critical to note that Mallinckrodt's capital structure is not really the reason we are here today.

As I noted at the outset, addressing litigation exposure is a central objective for the company.  The company has been hit with significant litigation on two primary fronts: Specialty generics opioid products **and specialty brands Acthar Gel**.

\*\*\*
In recent years, Acthar has, unfortunately been the subject of controversy concerning its **pricing**…. Mallinckrodt understands that pricing on products like Acthar… may create **barriers to access** and is committed to removing those barriers.

\*\*\*
With the substantial support of the company's restructuring embodied in the RSA, the logical question is: where do we go from here?

Oct. 14, 2020 Hrg. Tr. at 18, 20, 27 (emphasis supplied).

4.      Mallinckrodt understands that its price fixing agreement with Express Scripts is unlawful. It has admitted in this Court that its exorbitant pricing of Acthar as a result of such agreement presents a "barrier" for patients who need it.  It was directly advised of the unlawfulness of its 2007 agreement in 2014 by its same counsel here, prior to Mallinckrodt agreeing to the acquisition of Questcor.[7]  Yet, Mallinckrodt chose to proceed with its $5.9 billion

---

[7] Due to the multiple, debilitating conflicts of interest of Mallinckrodt's counsel, in advising the company on the lawfulness of the conduct at issue in the Acthar Plaintiff's cases and the federal government's Acthar cases, these lawyers are material fact witnesses whom the Acthar Plaintiffs may seek to depose and may seek to bar from the further representation of the Debtors.  Their failure to disclose such conflicts undermines their present

acquisition of Questcor.  That purchase has strained Mallinckrodt's revenues, such that it has led

to this bankruptcy.  Mallinckrodt does not to end its antitrust conduct, because it likely cannot

afford to do so, having overpaid for the formerly $40 drug.  Only a judge and a jury can force

compliance with the antitrust laws by Mallinckrodt.[8] The company has never changed its

unlawful agreement with Express Scripts, and in fact renewed such agreement just last year, even

while it was consulting with the same lawyers representing it in this bankruptcy.

5.    Having chosen to ignore the Acthar Plaintiffs from the "careful balance struck by

all these agreements" embodied in the RSA, Welch Decl. ¶ 26, Debtors excluded those who have

funded, and will continue to fund, a large portion of the Debtors' planned revenues upon which

the reorganization plan relies.  If any proposed reorganization is to be approved, it must with be

done with the involvement of the Acthar Plaintiffs.[9] Without such involvement, the only way the

proposed plan of reorganization can be approved is by this Court, over the objections of the

Acthar Plaintiffs,[10] and with the further affirmation of both the District of Delaware and the

Court of Appeals for the Third Circuit on appeal.

---

representation. Bankruptcy Rule 2014 sets forth a procedure for a debtor's attorney retained under § 327 to make
certain disclosures. Fed. R. Bankr. P. 2014.  Specifically, Bankruptcy Rule 2014 requires that the debtor's
application to employ counsel shall state, "to the best of the applicant's knowledge," the attorney's "connections with
the debtor, creditors, [and] any other party in interest."  *In re Radnor Holdings Corp.*, 629 F. Appx. 277, 279 (3d
Cir. 2015); Fed. R. Bankr. P. 2014(a).  This Court has held that "[d]isclosure 'goes to the heart of the integrity of the
bankruptcy system.' Therefore, the duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct."  *In re
eToys*, 331 B.R. 176, 189 (Bankr. D.Del. 2005) (quoting *B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 236 (Bankr.
E.D. Cal. 1998)).

[8] The Acthar Plaintiffs have a constitutional right to a trial by jury on their claims, which may not be abridged by the
bankruptcy laws.  Further, the *Rockford* court has exclusive jurisdiction over Mallinckrodt as to Rockford's claim
for declaratory and injunctive relief to put an end to Mallinckrodt's ongoing, antitrust conduct.

[9] Since the Acthar Plaintiffs were never consulted by Debtors during the more than "a year preceding the filing of
the filing of their Chapter 11 cases" during which "the Debtors [] worked to craft a restructuring", the Acthar
Plaintiff's voices must be heard now, and going forward, as they represent the largest group of unsecured creditors
with whom no restructuring agreement has been reached.

[10] In their Amended Adversary Complaint, the unsecured creditors who are also pursuing litigation against the
Debtors and have signed off on the Debtors' "Restructuring Support Agreement" ("RSA") are governmental entities.
They consist of two major groups"

6.     As the largest stakeholders of the Debtors' Acthar business, the stakes are too great for the Acthar Plaintiffs to not continue to seek to force the Debtor-Defendants to do the right thing. That is why they initially brought suit against Mallinckrodt, after the Federal Trade Commission and the Department of Justice sued Mallinckrodt for the same unlawful conduct. The Federal Government has settled; the Acthar Plaintiffs have not. Because the Federal Government did not mandate changes in the Debtor-Defendants' business practices that are at the heart of the Acthar Plaintiffs' claims, only the Acthar Plaintiffs can continue to pursue declaratory and injunctive relief against the Debtor-Defendants. The hope to do so with this Court lifting the stay. If not, they will have to wait until after this bankruptcy is resolved. Ongoing conduct which violates the federal and state antitrust laws, federal RICO, and state consumer fraud laws cannot be permitted by this Court.

## II.     **BACKGROUND**

### 1.     **The Acthar Plaintiffs' Cases in Which the Stay Should Be Lifted.**

7.     Prior to the Debtors-Defendants' bankruptcy filings on October 12, 2020, the Acthar Plaintiffs filed complaints against them, and others, in three (3) federal district courts and (2) state courts.

8.     The Acthar Plaintiffs seek relief from the automatic stay to continue to prosecute the following actions pending in federal court (collectively, the "Federal Court Actions"):

    a.     *City of Rockford v. Mallinckrodt ARD, LLC, et. al.*, (N.D. Ill) (*Rockford*);

    b.     *Steamfitters Local 420 v. Mallinckrodt ARD, LLC,* (E.D. Pa) (*Steamfitters Local 420*); and

    c.     Plumbers Local 322 v. Mallinckrodt ARD, LLC, (D.N.J.) (*Plumbers Local 322*).

9.     The Acthar Plaintiffs also seek relief from the automatic stay to continue to prosecute the following actions pending in state court: (collectively, the "State Court Actions")

    a.   *International Union of Operating Engineers, Local 542 v. Mallinckrodt ARD, LLC* (Montgomery Cty, Pa.) (*IUOE Local 542*); and

    b.   Acument Global Technologies v. Mallinckrodt ARD, LLC (Shelby Cty., TN) (*Acument*).

    **a.   The *Rockford* Case in the Northern District of Illinois for Violations of Federal and State Antitrust Laws Against Debtor-Defendants, Express Scripts and United BioSource.**[11]

10.    As the patients and payors who purchase Acthar, Acthar is not just any prescription drug product: it "is a game changer for those who need it." Oct. 14, 2020 Hrg. Tr. at 20.

11.    For the nearly 2,000 infants born each year with a disease known as "Infantile Spasms" or "IS", "Acthar is a highly-effective treatment." *Id*.

12.    For decades, Acthar has been the "gold standard" for the treatment of IS. Without treatment, afflicted babies can die.

13.    As a result, patients who purchase Acthar suffered more directly and more severely than any other "creditor" of the Debtors' estate.

14.    Such patients, and the TPPs who provide them coverage for prescription drugs, did not just purchase any drug; they purchased a drug which used to cost $40 when it was

---

[11] (i) The Steamfitters Local 420 case is pending in the Eastern District of Pennsylvania for Violations of RICO and Consumer Fraud Laws Against Debtor-Defendants and United BioSource; (ii) The Plumbers Local 322 case is pending in the District Court of New Jersey for violations of state antitrust laws against Debtor-Defendants; (iii) The IUOE Local 542 case is pending in the Court of Common Pleas of Montgomery County, Pennsylvania for violations of consumer fraud laws, and breach of contract against Debtor-Defendants, Express Scripts and United BioSource; and (iv) the Acument case is pending in Shelby County, Tennessee for violations of Tennessee antitrust laws, unjust enrichment, and conspiracy against Express Scripts, United BioSource and Dr. James Tumlin.

acquired by Debtor Mallinckrodt ARD, Inc. (f/k/a Questcor Pharmaceuticals, Inc)[12] in 2001 and now costs over $43,000.00.[13]

15.    Why does Acthar cost so much?  Because Mallinckrodt deliberately chose to exploit the most needy patient population in this country – infant babies.

16.    Mallinckrodt has claimed it was near bankruptcy in 2007, and it needed to raise the price "[t]o keep Acthar on the market and ensure its long-term supply to treat children afflicted with infantile spasms…".  Testimony of Mark C. Trudeau, October 1, 2020, before the House Committee on Oversight and Reform (Platt Declr. **Exhibit D**) at 7.

17.    In reality, Mallinckrodt did so simply to make more than 100 millionaires out of its corporate executives.  Debtors' counsel so advised the United States Congress last year.

18.    The City of Rockford had the misfortune of having two (2) infants afflicted with IS in 2015.  These were not just any infants, they were the babies of Rockford's first responders, its police officers.  Oct. 14, 2020 Hrg. Tr. at 47: 14-15.

19.    The Acthar prescribed to the treat the Rockford babies cost nearly $500,000.00, depriving the city of much-needed city services and equipment.  Marks Declr. at ¶ 6, Exhibit E.

20.    Rockford's story was featured in a 2018 expose' by the CBS News Program "60 Minutes".  https://www.cbsnews.com/news/the-problem-with-prescription-drug-prices/ Mallinckrodt's "story", contrast, was the subject of a recent Congressional report titled, "Drug Pricing Investigation, Mallinckrodt – H.P. Acthar Gel."[14]

---

[12] Dkt. No. 1, Case 20-12551, "Voluntary Petition for Non-Individuals for Bankruptcy" filed by Debtor Mallinckrodt ARD, LLC.

[13] *See* Declaration of Elizabeth Marks in Support of Debtors' Motion for Injunctive Relief ("**Marks Decl**.") (Adv. Dkt. No. 5) at ¶ 6, Exhibit E (attaching a copy of Rockford's Second Amended Complaint (SAC)) at ¶¶ 38, 89-92.

[14] *See* Haviland Decl. Ex. "E".   The House Report concluded that Mallinckrodt has engaged in "uninhibited price increases" intended to drive corporate profits  ("Mallinckrodt generated nearly $6 billion in net sales of Acthar from 2014 through 2019"), meet revenue goals ("the vast majority of the projected growth for Acthar in 2017 will come

21.     But, Rockford did not sit back and allow Mallinckrodt to gouge American patients.  It stepped up and sued Mallinckrodt and its co-conspirator, Express Scripts[15], in April 2017, for itself and all similarly-situated payors and patients.[16]  *See* Marks Decl. Ex. E. Rockford was later joined by Acument, who spent nearly $900,000 for Acthar to treat just one employee.  *Id*. at ¶ 10.

22.     Mallinckrodt's counsel committed to the Court in the *Rockford* case that if Rockford defeated its Motion to Dismiss, it would discuss settling the case.  *See* Excerpt of Tr. of Hrg. dated Aug. 8, 2017 at 13-14.

23.     Rockford defeated Mallinckrodt's and Express Scripts' Motions to Dismiss its antitrust claims in January 2019.  *See City of Rockford v. Mallinckrodt ARD, LLC, et. al*., 360 F.Supp. 3d 730 (N.D. Ill. Jan. 25, 2019).

24.     Rockford also defeated Express Scripts' Motion for Reconsideration. *See City of Rockford v. Mallinckrodt ARD, LLC, et. al*., (N.D. Ill. April, 2019).

25.     The Court wrote at the time that the *Rockford* case was a "bet the company" case for Mallinckrodt.  *See City of Rockford v. Mallinckrodt ARD, LLC, et. al*., 326 F.R.D. 489, 495 (Aug. 7, 2018) ("The cases contain racketeering and antitrust claims, which, if successful, could lead to huge damage awards.  In today's legal vernacular, these are 'bet the company' cases.").

26.     Since that time, Mallinckrodt has refused to engage in meaningful settlement talks, pushing off such discussion until class certification was decided.  Now, we know why.

---

from price appreciation"), and fund executive compensation ("Mr. Trudeau's overall compensation has more than doubled since Mallinckrodt acquired Questcor.  Over that same period, Mallinckrodt increased the price of Acthar by more than $8,000 per vial").  *Id.* at i-ii.

[15] **Express Scripts**" refers to Express Scripts Holding Company and Express Scripts, Inc. (collectively "**ESI**"), and their three (3) wholly-owned subsidiaries, CuraScript, Inc., doing business as CuraScript, SD ("**CuraScript SD**"), Curascript Specialty Pharmacy n/k/a Accredo ("**Curascript SP**"), and United BioSource Corporation ("**UBC**").

[16] Rockford's lawsuit followed the January 2017 settlements by Mallinckrodt with the Federal Trade Commission (FTC) (for $100 million) and its competitor, Retrophin (for $15.5 million).  *Id.* at ¶¶ 150, 155.

Mallinckrodt was simply delaying the *Rockford* case so it could reach settlements with everyone

but the patients and payors who alone have funded Mallinckrodt's growth and alone with fund

the proposed plan of reorganization.[17]

27.    For three and one-half years, Rockford has battled Mallinckrodt and Express

Scripts under a Court-ordered discovery scheduled to which Mallinckrodt stipulated each time.

*See, e.g.,* Platt Declr. Exhibit "F" (Order dated September 23, 2020, granting in part

Mallinckrodt's motion to set deadlines for class certification briefing and expert discovery).

28.    On October 14, 2020, Express Scripts made a demand of Mallinckrodt for

indemnification.  Platt Declr. Exhibit "A".

29.    Express Scripts cited three (3) purported contracts with Mallinckrodt in support of

its claim for indemnification.

30.    First, it cited the 2007 exclusive distribution agreement with Questcor, the

predecessor of Mallinckrodt ARD.

31.    Second, it cited a 2018 data agreement between Express Scripts' Accredo

specialty pharmacy and Mallinckrodt.

32.    Third, it cited a 2014 "Work Order" between its former subsidiary United

BioSource and Mallinckrodt.

---

[17] It is clear form Mallinckrodt's financial disclosure that the company does not sell opioids any longer.  As a result, Mallinckrodt's liability exposure for opioid governmental plaintiffs is for past conduct.  Nevertheless, the proposed RSA seeks to fund the settlement with "Supporting Government Opioid Claimants" with the anticipated $1 billion in revenues generated form future sales of Acthar without regard to the ongoing antitrust and RICO conduct that is fueling such sales.  In other words, under the reorganization plan, if approved, Acthar patients will be victimized over and over again simply to pay the governmental creditors who have agreed to the RSA.  Acthar patients will be denied their rights to enjoin Mallinckrodt's unlawful conduct for which the government has already been paid, twice.  *See* Marks Declr. At ¶ 155 ($100 million FTC settlement); *see also*, "Drug Maker Mallinckrodt Agrees to Pay Over $15 million to Resolve Alleged False Claims Act Liability for 'Wining and Dining' Doctors", Dept. of Justice, Public Affairs, Sept. 4, 2019 at Haviland Decl. Ex. "G".

33.     Express Scripts claims for indemnification are questionable, at best.  Discovery is needed before this Court can rule on the viability of such claim in the context of ruling on any stay or injunction.

34.     The 2007 exclusive distribution agreement was amended twelve times between 2007 and 2016.  It was then completely replaced with an agreement signed last year.  Express Scripts' failure to account for these amendments, and the 2019 agreement, raise questions about the viability of its indemnification claim for which discovery is needed.

35.     The 2018 data agreement with Accredo was signed a year *after* Rockford sued. Express Scripts fails to explain how a subsequent agreement can provide retroactive indemnity for antitrust conduct dating from 2007.  Again, discovery is needed.

36.     Finally, there are at least two problems with the 2014 "Work Order".  First, the Work Order is not the contract.  Second, and more importantly, Express Scripts divested its ownership in United BioSource in 2017.

37.     Debtor-Defendants' falsely claim in their Amended Adversary Complaint that the Acthar Plaintiffs allege Mallinckrodt "conspired and agreed with the exclusive distributor of Acthar, Express Scripts, Inc., **and certain of its affiliates**."  Adv. Pro. D.I. 15 at ¶ 30 (emphasis supplied).

38.     Debtor-Defendants' well know that Express Scripts divested United BioSource in 2017, shortly after Rockford sued.

39.     They know this because of Express Scripts' Answer to the *Rockford* Complaint. Marks Declr. Exhibit "E".

40.     Mallinckrodt conceded the same in its own Answer to the *Rockford* Complaint, which Debtor-Defendants have put in the court file.  Marks Declr. Exhibit "E".

41.     As a result, the *Rockford* case involves two sets of Defendants other than Mallinckrodt – Express Scripts and United BioSource.[18]

42.     Further, United BioSource is the only defendant named in the *Steamfitters Local 420* case, other than Mallinckrodt.  Express Scripts is not named as a defendant.

43.     Express Scripts fails to explain how it can assert a right of indemnification for a company it no longer owns.[19]

### III.     **ARGUMENT**

44.     Bankruptcy is available to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934)); *Perlin v. Hitachi Capital America Corp.*, 497 F. 3d 364 (3d Cir. 2007). The Defendant-Debtors manifestly do not qualify.

45.     Defendant-Debtors are not unfortunate; they are calculating.

46.     In 2007, they threatened bankruptcy to the young patients who need Acthar in order conspire and agree with Express Scripts to raise and fix the price of Acthar to an exorbitant level that could not be achieved without Express Scripts obtaining the exclusive right to distribute Acthar to prevent competition.

47.     A debtor must act in compliance with all state and federal laws. 28 U.S.C. §959 (b); see *also In re PSA, Inc.,* 335 B.R. 580, 586–87 (Bankr. D. Del. 2005) (holding that "[i]mplicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for

---

[18] The same is true of both the *IUOE Local 542* and *Acument* cases, where the Acthar Plaintiffs named as defendants Express Scripts and its former subsidiary, United BioSource.

[19] It is also noteworthy that due to Express Scripts' divestiture of United BioSource, Debtors were obligated to expressly name United BioSource as a defendant in its Amended Adversary Complaint.  It failed to do so.  It further failed to serve United BioSource with notice of its adverse proceeding.  Given Express Scripts' notice to the *Rockford* Court that it does not believe the automatic stay applies to Rockford's antitrust claims against it, there has been a failure of due process by Debtors' failures in this regard.

the operation of the business even if the continued operation of the business would be thwarted by applying state laws." ); *In re Trans World Airlines, Inc.,* 275 B.R. 712, 722 (Bankr.D.Del.2002) ("A debtor which continues to operate post-petition is obligated to do so in accordance with its other legal obligations. To fail to do so may subject the debtor to suit.").

48.     Here, Debtor-Defendants are currently in violation of federal and state antitrust laws, federal RICO, and various states' consumer fraud laws.  Five (5) different courts have so found.  Those five courts rejected Debtor-Defendants' Motions to Dismiss.

49.     Debtor-Defendants acknowledge their obligation to comply with applicable, non-bankruptcy laws in seeking bankruptcy protection from this Court.  *See, e.g., Mallinckrodt Injunctive Relief Draft Term Sheet,* Case No. 12522, Dkt. 128 at 241 of 256 (committing to compliance with "state consumer protection and unfair trade practices acts").

50.     Allowing a corporation to keep in place an exclusive distribution scheme for Acthar while operating under bankruptcy court protection is inappropriate.  Similarly, allowing Debtors to continue to engage in conduct that violates federal RICO and state consumer fraud laws, while agreeing to comply with those some laws in the context of the settlement of the opioid cases, places Debtors in a position of making material misrepresentations to this Court, and seeking to have this court rely on such misrepresentations in granting them relief.

51.     Worse, Debtor-Defendants seek to have this Court allow the Opioid Plaintiffs to take a 19.99% interest in the ownership of Mallinckrodt, so they can continue to run the antitrust scheme, RICO enterprise and conduct in violation of the same consumer fraud laws that such plaintiffs negotiated for compliance with.

52.     The Opioid Plaintiffs negotiated important changes in Mallinckrodt's business.

53.     They did not do so with respect to the Acthar business.

54.     Neither did the federal government, which sued Debtor-Defendants for false claims in the Eastern District of Pennsylvania.  In their settlement, they've sought no changes in Debtor-Defendants' Acthar business practices.

55.     This Court would never allow a debtor in possession in a chapter 11 case to continue to pollute the environment, to continue to serve tainted food or continue to commit willful violations of other laws.  *See PSA and Transworld Airlines, supra*.

56.     For these Debtor-Defendants to come before this Court to seek to continue their antirust scheme, RICO enterprise and consumer fraud turns the bankruptcy process on its head.

57.     The Acthar Plaintiffs assert that relief from the stay will allow them to pursue changes to the Debtor-Defendants' Acthar business practices, as well as pursue appropriate damages against the Debtor-Defendants and their co-defendants – Express Scripts and United BioSource.

58.     Relief from the automatic stay is warranted so that each of the Acthar Plaintiffs may proceed with the Federal Court Actions and State Court Actions, which relief will allow the parties in those cases to remedy ongoing violations of federal and state law.

59.     The Acthar Plaintiffs have not been provided all policies of insurance coverage available to the Debtors, the director and officer defendants, and all co-defendants such that Plaintiff cannot determine if insurance coverage is adequate.

60.     Relief should be granted to: (a) pursue all legal and equitable claims in the forum of Plaintiff's choice to liquidate the claims; (b) to recover against all applicable insurance policies; (c) to pursue all co-defendants regardless of relationship to the Debtor; and (d) if insurance coverage is insufficient, come back to this Court for further recovery from the estate.

61.     Relief is also requested to seek equitable relief to prevent further post-petition misconduct by the Debtors.

## PROCEDURAL HISTORY

62.     On October 12, 2020, the Debtor-Defendants, and many other debtors, each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

63.     The Debtors are operating their businesses as debtors in possession.  A fee examiner or chapter 11 trustee has not been appointed in the cases.

## JURISDICTION AND VENUE

64.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are section 362(d)(1) of the Bankruptcy Code, Rule 4001(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## REQUEST FOR RELIEF

65.      By this Motion, the Acthar Plaintiffs request relief from the automatic stay of section 362(a) of the Bankruptcy Code to pursue the State Court Actions to: (a) pursue all legal and equitable claims in the fora of the Acthar Plaintiff's choice to liquidate the claims; (b) to recover against all applicable insurance policies, (c) to pursue all co-defendants regardless of relationship to the Debtor, including Express Scripts and United BioSource; and (d) if insurance coverage is insufficient, come back to this Court for further recovery from the estate.  Relief is also requested to seek equitable relief to prevent further post-petition misconduct by Debtors.

**<u>BASIS FOR RELIEF REQUESTED</u>**

*<u>The Acthar Plaintiffs Are Entitled to Relief from the Automatic Stay</u>*
*<u>Under Section 362(d)(1) of the Bankruptcy Code</u>*

66.    The Acthar Plaintiffs are entitled to relief from the automatic stay under section

362(d) of the Bankruptcy Code.  Subsection (d)(1) provides:

> (d)    On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay . . .
>
> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest.

11  U.S.C. § 362(d)(1).

67.    At a hearing for relief from the automatic stay under Bankruptcy Code Section

362(d), the party opposing stay relief bears the burden of proof on all issues except the debtor's

equity in property.  *See In re Domestic Fuel Corp.*, 70 B.R. 455, 462-63 (Bankr. S.D.N.Y. 1987);

11 U.S.C. § 362(g).  If a creditor seeking relief from the automatic stay makes a *prima facie* case

of "cause" for lifting the stay, the burden of going forward shifts to the trustee pursuant to

Bankruptcy Code section 362(g).  *See In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 756 (Bankr.

S.D.N.Y. 1997).

68.    The term "cause" is not defined in the Bankruptcy Code, and whether cause to lift

the stay exists should be determined on a case-by-case basis.  *See Izzarelli v. Rexene Prod. Co.*

*(In re Rexene Prod. Co.),* 141 B.R. 574, 576 (Bankr. D. Del. 1992); *Sonnax Indus. v. Tri*

*Compoenent Prod. Corp. (In re Sonnax Ind., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990).  "Cause"

for modification of the automatic stay "is an intentionally broad and flexible concept that permits

. . . [a] [b]ankruptcy [c]ourt, as a court of equity, to respond to inherently fact-sensitive

16

situations." *See In re Texas State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995).

Accordingly, courts determine what constitutes "cause" based on the totality of the

circumstances in each particular case. *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir.

1997) (*citing Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd.

P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995)).

69.     Under the totality of circumstances standard, courts often consider the hardship or

prejudice to the non-debtor in determining whether to lift the automatic stay. *See In re Bock

Laundry Mach. Co.*, 37 B.R. 564, 566 (Bankr. N.D. Ohio 1984).  The court in *Bock* pointed out

that "[c]ourts have developed a balancing test, whereby the interests of the estate are weighed

against the hardships that will be incurred by the creditor-plaintiff." *Id.* at 566.  *See also Milne v.

Johnson (In re Milne)*, 185 B.R. 280, 283 (N.D. Ill. 1995) (stating that a court should look into

whether, *inter alia,* there will be injury to the debtor and other creditors if the stay is modified,

injury to the movant if the stay is not modified, and weigh the proportionality of harms).

70.     The legislative history to section 362(d)(1) indicates that cause may be

established by a single factor such as "a desire to permit an action to proceed . . . in another

tribunal," or "lack of any connection with or interference with the pending bankruptcy case." *In

re Rexene Products Co.*, 141 B.R. at 576 (*citing* H.R. Rep. No. 95-595, 95th Cong., 1st Sess.,

343-344 (1977) U.S. Code Cong. & Admin. News pp. 5787, 6300).

71.     This Court has previously applied an equitable balancing test to determine, if

"cause" exists to lift the automatic stay.  *In re Rexene Products Co.*, 141 B.R. at 576.  Under the

equitable balancing test, the Court reviews three factors:

> (1)     whether prejudice will be caused to either the bankrupt
> estate or the debtor,

(2)    whether the hardship to the movant by maintenance of the automatic stay outweighs the hardship caused to the debtor;

(3)    whether the movant has a reasonable probability of prevailing on the merits of the suit. *Id*.

72.    Application of the equitable balancing test to the present case clearly demonstrates that relief from the automatic stay is warranted here.

***The Estates Will Not Be Prejudiced if Relief***
***From the Automatic Stay Is Granted***

73.    The estates will not be prejudiced if the automatic stay is lifted to permit the Acthar Plaintiffs to pursue their claims in the Federal Court Actions and the State Court Actions. The Debtor-Defendants are actively engaged in an ongoing antitrust scheme and conspiracy with their flagship product, Acthar. Such unlawful conduct has artificially inflated the price of Acthar. As a result, the current revenue projections for the Acthar franchise are premised on unlawful conduct.

74.    That the Debtor-Defendants seek protection from this Court is a travesty. The Debtor-Defendants will seek to liquidate their claims against all the Debtor-Defendants' co-defendants, including Express Scripts and United BioSource, and only seek redress from the Debtor-Defendants to the extent insurance coverage exists and assets of the co-defendants are not sufficient.

***Balancing the Hardships Weighs Heavily in Favor of Modifying***
***the Stay to Allow the Acthar Plaintiffs to Pursue the Federal Court and State Court Actions***

75.    Permitting the Acthar Plaintiffs to pursue their claims in the Federal Court Actions and the State Court Actions will not cause any hardship to the Debtors, as the Debtors' commencement of the above-captioned cases has spurred the need to liquidate the Acthar

Plaintiffs' claims.  Accordingly, the Debtor-Defendants will suffer no hardship if the automatic stay is lifted to grant the Acthar Plaintiffs relief for the aforementioned purpose.  However, denying this Motion will cause significant financial hardship to the Acthar Plaintiffs, many of whom are consumers of limited means who will be forced to absorb the costs associated with any delay in litigating their claims.

### *There is a Substantial Probability the Acthar Plaintiffs Will Succeed on the Merits*

76.     When a party seeks to lift an automatic stay, the required showing for the movant's probability of success is "very slight."  *In re Rexene Products*, 141 B.R. at 578; *see also In re Continental Airlines, Inc.*, 152 B.R. 420, 426 (D. Del. 1993) ("Even a slight probability on the merits may be sufficient to support lifting an automatic stay in an appropriate case.").  It "merely requires a showing that [the movant's] claim is not frivolous."  *Levitz Furniture Inc. v. T. Rowe Price Recovery Fund L.P. (In re Levitz)*, 267 B.R. 516, 523 (Bankr. D. Del. 2000).

77.     As detailed in each of the respective complaints of the Acthar Plaintiffs, the Acthar Plaintiffs' probability of success on the merits is substantially greater than "very slight." There can be no dispute that the Acthar Plaintiffs' probability of success passes muster under the equitable balancing test.

78.     Accordingly, when weighing the above factors, it is clear that this Court should lift the automatic stay as to the Acthar Plaintiffs' cases.

WHEREFORE, the Acthar Plaintiffs respectfully request relief from the automatic stay to pursue their claims in the Federal Court Actions and the State Court Actions to resolution and final judgment, in order that any claims for indemnity by Express Scripts may be satisfied

as part of the Debtor-Defendants' plan of reorganization, including from applicable insurance

coverage.

Date:    November 4, 2020
         Wilmington, Delaware

CIARDI CIARDI & ASTIN

*/s/ Daniel K. Astin*
Daniel K. Astin (No. 4068)
1204 North King Street
Wilmington, DE 19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com

-and-

Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
CIARDI CIARDI & ASTIN
1905 Spruce Street
Philadelphia, PA 19103
Telephone:  (215) 557-3550
Facsimile:  (215) 557-3551
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

-and-

Donald E. Platt, Jr., Esquire
(Admitted *pro hac vice*)
HAVILAND HUGHES
201 S. Maple Ave., Suite 110
Ambler, PA 19002
Telephone: (215) 609-4661
Facsimile: (215) 392-4400
Haviland@havilandhughes.com

*Attorneys for the Acthar Plaintiffs*