## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 21-12-1644, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; and SERIES 21-12-1645, a designated series of MSP RECOVERY CLAIMS COM, SERIES LLC | Case No. 3:20-cv-50056 <br><br> Honorable Iain D. Johnston |
| Plaintiffs, | |
| v. | |
| EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS HOLDING COMPANY; CURASCRIPT, INC. d/b/a CURASCRIPT SPECIALTY PHARMACY; ACCREDO HEALTH GROUP, INC.; and UNITED BIOSOURCE CORPORATION, LLC | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs' Third Amended Complaint (TAC) against Defendants Express Scripts Inc., Express Scripts Holding Company, CuraScript Specialty Pharmacy, Accredo Health Group Inc., and United BioSource Corporation, LLC ("Express Scripts Entities"), alleges that Defendants violated federal antitrust statutes and Florida consumer protection statutes, by agreeing to raise the price of the drug Acthar to a supracompetitive level. Defendants filed this motion to dismiss all claims. For the reasons below, the motion is granted in part and denied in part.

1

## I. BACKGROUND[1]

This case is infamous throughout the Western Division, and now has a third district court judge ruling on a motion dismiss. District Judge Kapala, and then District Judge Lee (now a judge on the 7th Circuit), undoubtedly labored over the previous motions to dismiss that Defendants ask this Court to completely disregard and revisit previous rulings. Finding no good cause to grant such a request, the Court will not do so.

**Procedural History**

Judge Lee dismissed the First Amended Complaint without prejudice, finding that Plaintiffs had adequately pled prudential standing but not antitrust standing [Dkt. 320]. Plaintiffs then filed a Second Amended Complaint (SAC) and Defendants subsequently filed a motion to dismiss the SAC. But two days before briefing was completed, then defendants Mallinckrodt ARD, Inc., and Mallinckrodt PLC ("Mallinckrodt Defendants") filed for bankruptcy and the case was stayed pending resolution of the bankruptcy proceedings [Dkt. 474]. When the stay was lifted, Plaintiffs filed a motion to amend their complaint seeking to substitute the named plaintiffs with a different series of class members, withdraw all claims against the Mallinckrodt Defendants, and add a new defendant, Accredo. The motion was granted [Dkt. 553], and Defendants now seek to dismiss the TAC [Dkt. 592].

---

[1] Unless otherwise indicated, the Court draws these allegations from the third amended complaint and are accepted as true for purposes of resolving the motion to dismiss. *Landmark Am. Ins. Co. v. Deerfield Constr. Inc.*, 933 F.3d 806, 809 (7th Cir. 2019).

**The Parties**

Plaintiffs are the assignees of recovery rights originally belonging to AvMed, Inc. ("AvMed"). AvMed is a Florida corporation that offers Medicare Advantage plans ("MA Plans") providing Medicare benefits to their beneficiaries as well as individual, family, and employer health insurance plans ("commercial plans").

Mallinckrodt, an unnamed co-conspirator, is the United States manufacturer of the drug Acthar. Mallinckrodt distributes Acthar through specialty pharmacy distributors to specialty pharmacies. CuraScript SD Specialty Distribution ("CuraScript SD") is a specialty pharmacy distributor and through a contractual agreement became Mallinckrodt's exclusive distributor of Acthar in 2007.[2] Mot. to Diss., at 6. Accredo and Curascript SP Specialty Pharmacy ("CuraScript SP") are specialty pharmacies that receive Acthar from the distributor, CuraScript SD, and dispense Acthar to patients. Express Scripts, Inc. and Express Scripts Holding Company ("Express Scripts"), provide pharmacy benefit management ("PBM") services and own CuraScript SD, CuraScript SP, and Accredo. From 2012 through 2017, Express Scripts also owned United BioSource Corporation ("UBC"), which provided customer and reimbursement support for Acthar purchasers.

**Factual Allegations**

Acthar is an adrenocorticotropic hormone ("ACTH") drug used to treat a rare pediatric illness that causes infantile spasms and dangerous seizures during the first two years of a child's life. Acthar is the only FDA approved ACTH drug sold in

---

[2] Curascript SD is not a named Defendant, and a separate legal entity from Defendant Curascript SP Specialty Pharmacy.

the United States. When Mallinckrodt acquired the production rights to Acthar in 2001, it sold for $40.00 per vial. Plaintiffs state that immediately after the acquisition, Mallinckrodt raised the price for a vial of Acthar to $750.00. In 2007, the price for Acthar was raised to $1,650.00 and later that year again raised to $23,269.00. By 2018, Mallinckrodt increased the price for a vial of Acthar to $38,892.00.

According to Plaintiffs, Defendants and Mallinckrodt unlawfully drove up the price of Acthar through two unlawful schemes. First, agreeing and implementing a system where Acthar was exclusively distributed by the Defendants. And second, by purchasing the rights to the only available Acthar substitute, Synacthen, and never bringing it to market thereby eliminating Acthar competition and preserving Mallinckrodt's monopoly power.

Plaintiffs allege that in 2007, Mallinckrodt agreed with Defendants to make Acthar exclusively available through CuraScript SD, dispensed through a limited network of specialty pharmacies including Accredo and CuraScript SP, all of which was coordinated through the "Acthar Hub" operated by UBC. After the 2007 agreement, Mallinckrodt suddenly pulled Acthar from traditional pharmaceutical wholesalers and retail pharmacies. Plaintiffs further allege that UBC intentionally referred as many Acthar purchasers as possible to the Express Scripts' specialty pharmacy, Accredo.

From 2010 to 2022, AvMed purchased Acthar for MA Plan beneficiaries and enrollees of its commercial plans. Plaintiffs assert they were harmed by Defendants'

unlawful actions when AvMed paid artificially inflated prices for Acthar directly to Express Scripts as its PBM, and when AvMed paid inflated prices to its non-Express Scripts PBMs (CVS and Catalyst), which in turn paid Defendants for the Acthar prescriptions.

Acthar has very few substitutes globally, and none in the United States. Synacthen is one such substitute and is a synthetically derived ACTH medication used to treat the same conditions as Acthar outside of the United States. Synacthen however, does not have FDA approval for use in the United States. Prevailing in a bidding war with other pharmaceutical companies, Mallinckrodt purchased the development and sales rights to Synacthen in the United States for $135 million. However, Mallinckrodt never attempted to commercialize Synacthen and instead shelved its newly acquired asset. Plaintiffs maintain the motivation behind this move was to protect Mallinckrodt's Acthar monopoly and drive-up drug prices.[3]

Based on this conduct, Plaintiffs claim that Defendants violated Section 1 (Count II) and Section 2 (Count I) of the Sherman Act, *see* 15 U.S.C. §§ 1, 2, and the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Count III), *see* Fla. Stat. §§ 501.201. Defendants now filed this motion to dismiss the TAC [Dkt. 592].

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b) challenges the sufficiency of the plaintiff's complaint. *Carlson v. CSX Transp., Inc.*, 758 F.3d

---

[3] Mallinckrodt's conduct with its Synacthen acquisition led the FTC to bring an action against Mallinckrodt under the FTC Act, Section 2 of the Sherman Act, and state antitrust laws. The FTC later announced that Mallinckrodt agreed to a $100 million settlement.

819, 826 (7th Cir. 2014). Under Rule 8, a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a complaint to be plausible, the plaintiff's factual allegations—as opposed to any legal conclusions—must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all the plaintiff's well-pleaded factual allegations and views them—and all reasonable inferences—in the light most favorable to the plaintiff. *Landmark Am. Ins. Co*, 933 F.3d at 809. Additionally, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 587 (7th Cir. 2009). A plaintiff must show through his allegations that it is plausible rather than merely speculative that he entitled to relief. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). The moving party bears the burden of establishing the insufficiency of the plaintiff's allegations. *Gunn v. Cont'l Cas. Co.¸* 968 F.3d 802, 806 (7th Cir. 2020).

A motion to dismiss under Rule 12 (b)(1) "tests whether the court has subject matter jurisdiction." *Johnson v. Illinois*, No. 1:20-cv-05862, 2021 U.S. Dist. LEXIS 179674, at *3 (N.D. Ill. Sep. 21, 2021). When presented with both a Rule 12(b)(1) motion to dismiss for lack of jurisdiction along with a Rule 12(b)(6) motion, the Court should address the jurisdictional question first, as it is a threshold question. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). As the party invoking

federal jurisdiction, Plaintiffs bear the burden of establishing that the Court has subject matter jurisdiction over their complaint. *See Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). If a complaint fails to sufficiently allege Article III standing, the court can either dismiss the complaint with leave to amend, or it can dismiss the case for want of jurisdiction, without prejudice. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019).

## III. ANALYSIS

Defendants argue that the TAC should be dismissed for two primary reasons. First, Defendants argue that at a threshold level Plaintiffs lack standing and their claims are time barred. Next, Defendants argue that even if the complaint survives threshold scrutiny, the TAC should still be dismissed because it is not well pleaded and does not state claims under the Sherman Act or the FDUTPA.

### A. THRESHOLD ARGUMENTS

Defendants bring a three-part threshold argument challenging the validity of the TAC. First, Defendants argue that Plaintiffs do not have prudential standing to bring an antitrust claim. Second, according to Defendants, Plaintiffs' direct purchaser claims are time barred. And finally, Defendants contend that Plaintiffs do not have standing to bring their indirect purchaser claims.

### *Prudential Standing*

Defendants assert that Plaintiffs lack prudential standing to bring a claim because the assignments of AvMed's claims to Plaintiffs were completed after the

7

filing of the initial complaint on October 30, 2017. Mot. to Diss., at 11. But Plaintiffs argue that because the original named plaintiffs had prudential standing, they too have prudential standing. Plaintiffs further argue that this Court should exercise its discretion under the law of the case doctrine and not interrupt the previous finding of prudential standing by Judge Lee [Dkt. 320].

"The distinction between the requirements of constitutional standing and prudential standing is significant." *Potter v. Cozen & O'Connor*, 46 F.4th 148, 154 (3d Cir. 2022). Unlike Article III standing, prudential standing is not jurisdictional. *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013). Prudential standing requires plaintiffs to "assert their own legal rights and interests and [not] rest their claims to relief on the legal rights or interests of third parties." *MSP Recovery Claims, Series LLC v. Mallinckrodt ARD, Inc. (MSP Recovery Claims I)*, No. 18 C 00379, 2019 U.S. Dist. LEXIS 237283, at *11 (N.D. Ill. Jan. 25, 2019). If prudential standing is not established at the time of filing, the deficiency may be cured after the complaint is filed. *Swearingen-El v. Cook County Sheriff's Dep't*, 456 F. Supp. 2d 986, 989–90 (N.D. Ill. 2006).

The law of the case doctrine refers to a district court's obligation to honor the ruling of an appellate court as well as prior rulings made by a different member of the same court. *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1996). Judicial reassignment "does not mean going back to square one." *Id.* (citing *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816–17 (1988)). Although the law of the case doctrine is discretionary, generally a court will not revisit an earlier ruling

absent compelling reasons such as a change in law or fact that renders the earlier ruling clearly wrong or unjust. *Best*, 107 F.3d at 546 (citing *Avita v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1291, 1227 (7th Cir. 1995)).

Defendants' motion frames their standing argument as one for lack of *prudential* standing, but much of Defendants' argument seems to confuse prudential standing with Article III standing. As previously noted, the distinction between the two is significant. *Potter*, 46 F.4th at 154. The Defendants either are confused by the distinction themselves or are attempting to blur the issue for the Court. But there is no confusion that Plaintiffs' argument prevails.

In what the Court can only assume is Defendants' Article III standing argument, Defendants argue that substituted named plaintiffs must independently have standing at the time the complaint was filed. Mot. to Diss., at 11. Defendants assert that because the named plaintiffs in the TAC assigned their claims to MSP after the original complaint, the substituted named plaintiffs do not have standing. Id. But Plaintiffs argue that what matters is if the *original* named plaintiffs had standing at the time of filing, and that the substituted named plaintiffs have standing at the time of amendment. Resp. to Mot. to Diss,. at 12, Dkt. 612. The Plaintiffs have the better argument. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended.") Defendants further argue that "plaintiffs' claims do not relate back to the filing of the initial complaint because this Court held that the plaintiffs'

lacked standing when they filed their initial complaint." Mot. to Diss., at 13. But neither Judge Kapala nor Judge Lee held that Plaintiffs lacked Article III standing. The Court agrees with Plaintiffs' argument that under the law of the case doctrine, "there is no basis to revisit these earlier rulings on the original plaintiffs' constitutional standing" and finds no good cause to interrupt Judge Kapala's or Judge Lee's well-reasoned rulings that the original plaintiffs had Article III standing. *Best*, 107 F.3d at 546; Resp. to Mot. to Diss., at 9.

Even so, taking the facts in the TAC as true, the claims that the substituted named plaintiffs represent did, in fact, make purchases of Acthar before the initial complaint was filed, and therefore the substituted plaintiffs independently have standing. See TAC, ¶¶ 94, 97, 99. Still Defendants argue that the named plaintiffs cannot be imputed with AvMed's standing based on post-litigation assignments. In support of this position, Defendants cite to various district court cases outside the Northern District of Illinois, but the Court does not find the reasoning from those cases persuasive. See D's Reply to Mot. to Diss., at 3, Dkt. 623. It is a common law principle that through assignment, Plaintiffs stand in the shoes of AvMed with all its rights and claims, and, therefore, Plaintiffs are imputed with AvMed's standing. *See Maneikis v. St. Paul Ins. Co.*, 655 F.2d 818, 828 (7th Cir. 1981); *see also FDIC v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993) ("An assignee stands in the shoes of his assignor.").

Next, Defendants argue that Plaintiffs lack prudential standing because the TAC allegedly fails to identify specific allegations of representative claims such as

payments received via assignment, dates of service, names of purchasers, payment dates for Acthar, and names of beneficiaries prescribed Acthar. Plaintiffs, however, plead various general allegations in the TAC that provide notice to the Defendants about the scope of the claims and argue that they are not required allege the specifics that Defendants demand. Resp. to Mot. to Diss., at 14–5. Defendants appear to hold Plaintiffs to a heightened pleading standard, but do not identify case law to support imposing such a standard. Indeed, on a motion to dismiss plaintiffs must only allege facts to nudge claims across the line from conceivable to plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court finds Plaintiffs' general allegations sufficient because the specificity demanded by the Defendants is not necessary at the pleading stage. *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 920 (7th Cir. 2002) ("general" factual allegations suffice at the pleading stage, details on "where? when? sell to whom? – can come later.")

### Statutes of Limitations

Defendants argue that Plaintiffs' direct purchaser claims should be dismissed because they accrued in 2014 which falls outside of the Sherman Act's and FDUTPA's four-year statutes of limitations. Mot. to Diss., at 15. Plaintiffs concede that the TAC falls outside all relevant limitation periods but argue that time imitations are not applicable here because the filing of the initial complaint on October 30, 2017, tolled the limitations for all absent class members. Resp. to Mot. to Diss., at 16. So, Plaintiffs must either show how the limitations periods were tolled, or that the TAC relates back to the original complaint.

Plaintiffs argue that they are entitled to *American Pipe* tolling which makes their claims timely. *See American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). In *American Pipe,* the Supreme Court held that "timely filing of a class action tolls the applicable statute of limitations for all persons within the scope of the class alleged in the complaint." *In Re All State Corp. Secs. Litig.*, 966 F.3d 595, 615 (7th Cir. 2019) (citing *American Pipe*, 414 U.S. at 552–53). "The *American Pipe* rule eliminates the need for members of the putative class to rush to court to protect their rights while class certification is still pending." *Id.* But Defendants argue that Plaintiffs were not part of the putative class because "they are not alleged to have purchased Acthar or possessed any recovery rights to reimbursement" at the time of filing, so *American Pipe* tolling does not apply. Reply to Mot. to Diss., at 9. But as previously discussed, based on the assignment, Plaintiffs are merely standing in the shoes of AvMed who have sufficiently alleged purchases of Acthar before the filing of the original complaint. Therefore, Plaintiffs are part of the original putative class and *American Pipe* tolling applies.

Defendants also argue that *American Pipe* tolling is inapplicable because the original complaint was dismissed for lack of standing. Mot. to Diss., at 15.  In support Defendants, rely on *Walters v. Edgar*, where the Seventh Circuit held that *American Pipe* tolling only applies to claims when the original plaintiff had standing. 163 F.3d 430, 432–33 (7th Cir. 1998). As previously noted, Judge Kapala ruled only that the Plaintiffs lacked prudential standing, which is not a jurisdictional issue. See Dkt. 154. Defendants do not provide any support for their

argument that *American Pipe* tolling is not applicable when a case is found to lack prudential standing, except for their assertion that *Walters* should be interpreted more broadly to encompass issues of prudential standing. The Court finds no reason to expand *Walters*, so the statutes of limitations on Plaintiffs' claims tolled.

The Court also notes that Fed. R. Civ. P. 15(c) is instructive on whether a claim relates back to an original complaint for statute of limitations purposes. "The central inquiry under Rule 15(c) is whether the original complaint 'gave the defendant enough notice of the nature and scope of the plaintiff's claim that that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one.'" *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 741 (7th Cir. 2018) (quoting *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006)). Even "significant" changes to a complaint can relate back to the original complaint so long as the defendant had fair notice from the outset. *Supreme Auto Transp., LLC*, 902 F.3d at 741. There is no doubt that Defendants had fair notice and should not be surprised by the nature and scope of the claims against them. Indeed, there have been "three prior pleading attempts, three rounds of motion to dismiss briefing, two dismissal orders by this Court, and the benefit of years of discovery…" Mot. to Diss., at 1. Consequently, the relevant statutes of limitations do not bar Plaintiffs claims from proceeding.

***Antitrust Standing***

Defendants next argue that Plaintiffs' indirect purchaser claims should be dismissed for lack of Article III standing, lack of antitrust standing, and lack of causation.

To determine Article III standing, a plaintiff must show that he "(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co, (Marion II),* 29 F. 4th 337, 345 (7th Cir. 2022). Antitrust standing outlines the circumstances when a person may recover from an antitrust violator. *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002). There are two main cases analyzing antitrust standing. The first is *Illinois Brick Co. v. Illinois,* where the Supreme Court held that indirect purchasers from an alleged antitrust violator may not bring federal antitrust actions. 431 U.S. 720, 732 (1977). The second is *Associated General Contractors of California, Inc. v. California State Council of Carpenters ("ACG"),* which requires courts to analyze "proximate cause" to determine whether a plaintiff is a "proper party" to bring suit. 459 U.S. 519 (1983). If a claim fails either of the standards announced in *Illinois Brick* or *ACG*, the claim must be dismissed for lack of antitrust standing. *See MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, 20 C 50056, 2020 U.S. Dist. LEXIS 51200 at *12–13 (N.D. Ill. Mar. 23, 2020); *Loeb Indus.*, 306 F.3d at 480–84.

Defendants describe Plaintiffs' claims related to purchases of Acthar from CVS and Catalyst as "indirect purchaser" claims. Defendants argue that these

14

"indirect purchaser" claims "for payments that AvMed allegedly made to CVS and Catalyst for Acthar, pursuant to its contracts with those non-Express Scripts Entity PBMs" are prohibited under *Illinois Brick*. Mot to Diss., at 16. Defendants further argue that as indirect purchasers, they cannot bring suit for paying higher downstream prices because of alleged anticompetitive behavior upstream. *Id*. at 17. The Seventh Circuit, however, has made an exception to the *Illinois Brick* indirect purchaser limitation for plaintiffs who purchase from an antitrust co-conspirator and permits suits against any member of the conspiracy. *Marion II*, 29 F.4th at 342. But here, the Plaintiffs do not allege that CVS or Catalyst, as non-Express Scripts Entity PBMs, are co-conspirators so they cannot meet the co-conspirator exception to *Illinois Brick's* direct-purchaser requirement. Given that Plaintiffs fail the *Illinois Brick* standard for antitrust standing, the Court need not address the *ACG* proximate-cause issue. *See Loeb Indus.*, 306 F.3d at 480–84. Accordingly, Plaintiffs' indirect purchaser claims are dismissed.

The claims are currently dismissed without prejudice as they might be cured by amendment. But the Court cautions Plaintiffs in this regard. This is an old case, and much discovery has been conducted. The Court assumes that if Plaintiffs had sufficient evidence that CVS and Catalyst were co-conspirators, the Court would have been made aware of it by now. But because, at least in theory, the defect might be curable, this Court should give Plaintiffs an opportunity to amend the complaint. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). Plaintiffs should not view this opportunity as a pleadings

challenge. By August 11, 2023, Plaintiffs must file a position statement as to what, if any, evidence they have that CVS and Catalyst are co-conspirators, and if that would be sufficient to allow them to amend the pleadings consistent with Rule 11.

## B. ANTITRUST CLAIMS

Turning to the merits of Plaintiffs' antitrust claims, because the indirect purchaser claims have been dismissed, the Court only analyzes the merits of the direct purchase claims. In Count I, Plaintiffs allege that Defendants violated Section 2 of the Sherman Act by conspiring with Mallinckrodt to maintain and enhance Mallinckrodt's monopoly power. In Count II, Plaintiffs allege that Mallinckrodt and Defendants also conspired to restrain trade in violation of Section 1 of the Sherman Act. Defendants move to dismiss Counts I and II, arguing that the allegations against them fail to state a plausible claim.

"To state a Section 1 claim, a plaintiff must allege that the defendant (1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Marion II*, 29 F.4th at 349 (internal citations omitted). A Section 2 claim requires a plaintiff to allege (1) the existence of a combination or conspiracy; (2) overt acts in furtherance of the conspiracy; (3) an effect upon a substantial amount of interstate commerce; and (4) the existence of a specific intent to monopolize. *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 739, 755–56 (N.D. Ill. 2019) (citing *The Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540–41 (7th Cir. 1986)).

Plaintiffs base their Section I and II claims on the same conduct by Defendants, Mallinckrodt's "new strategy" for Acthar. Plaintiffs allege this new strategy was comprised of two anticompetitive actions that allowed Mallinckrodt to enhance and maintain its monopoly: the exclusive dealing arrangement between Mallinckrodt and Express Scripts; and Mallinckrodt's Synacthen acquisition. Because the two claims are based on the same conduct, the Court will analyze them together.

The parties dispute the existence of anticompetitive conduct, which is required for claims under Section 1 and Section 2. *City of Rockford*, 360 F. Supp. at 756 (collecting cases). In analyzing the anticompetitive conduct, Plaintiffs implore the Court to apply the "per se" analysis, while the Defendants maintain that the more recent Seventh Circuit case of *Marion II* requires the court to apply the "rule of reason" analysis. 29 F. 4th at 348. While true that *Marion II* directs courts to apply the "rule of reason" analysis to alleged vertical conspiracies, at the pleading stage it is sufficient for Plaintiffs to plausibly allege that Defendants engaged in conduct designed to enhance and maintain monopoly power over the Acthar market, so the Court need not yet determine which type of analysis to apply in evaluating Defendants' conduct. *City of Rockford*, 360 F. Supp. at 754 ("After discovery, the court can better determine whether and how to take a more detailed look at the effects of defendants' conduct"); *Marion II*, 29 F.4th at 348–49 (courts must resolve the threshold question of whether a claim is sufficiently pled before applying the rule of reason analysis).

*Exclusive Distribution*

Defendants argue that Plaintiffs have not plausibly alleged that the exclusive distribution agreement between Mallinckrodt and Express Scripts reduced competition or affected price. In the TAC, Plaintiffs allege that immediately after Mallinckrodt and Express Scripts adopted their "new strategy" and implemented the exclusive distributorship agreement, Defendants were able to drive up the price of Acthar from $1,650 to $23,269 and eliminate competition from the Acthar market. Plaintiffs further allege that Express Scripts continued to engage in anticompetitive conduct when it acted in concert with Mallinckrodt to further increase prices of Acthar to upwards of $38,000. Defendants argue that because Mallinckrodt enjoyed monopoly power over Acthar with 100% control of the ACTH market, "with no competitive substitutes," there was no competition for it to reduce or suppress, so there is no antitrust violation. Defendants cite various out of circuit cases that suggest that the exclusive distribution agreement provided "no monopolistic benefit to [the manufacturer] that it d[id] not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined." Mot. to Diss. at 23 (citing *E & L Consulting, Ltd. v. Domain Industries Ltd.*, 472 F. 3d 23 (2d Cir. 2006)). In other words, because Mallinckrodt was a monopoly, it could set the price for Acthar to any price it wished to maximize its profits, regardless of any assistance by Express Scripts. But Plaintiffs question why, if Mallinckrodt was already enjoying all its monopolistic benefits, did it wait to dramatically increase the price of Acthar until after exclusive distributorship agreement instead of the

18

many years before implementing the "new strategy." Plaintiffs conclude that but for its exclusive distribution agreement with the Express Scripts, Mallinckrodt could not have implemented the price increases from $1,650 to upward of $38,000. The Court agrees that Plaintiffs have plausibly alleged an antitrust violation based on the proximity of the price increases to the beginning of the exclusive distribution agreement. *See Kleen Prod. LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1080 (N.D. Ill. 2011).

While an exclusive distributorship alone does not violate the Sherman Act, *U.S. v. Arnold, Schwinn & Co.*, 388 U.S. 365 (1967), Plaintiffs do not solely rely on the distribution agreement to state their claim. Instead, Plaintiffs allege that it was the exclusive distributorship along with Defendants agreement to fix Acthar prices at supracompetitive levels that constitutes Sherman Act violations. Indeed, increased prices along with Mallinckrodt's market power is direct evidence of anticompetitive effects. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). But Express Scripts argue that as a downstream intermediary, they had no antitrust duty to "push back" against Mallinckrodt's price increases. This argument fails because, as Plaintiffs point out, the allegations are not that the Defendants had an affirmative duty to prevent Mallinckrodt's anticompetitive conduct. Rather Plaintiffs allege that Defendants agreed with Mallinckrodt to fix prices for Acthar. See TAC at 51. Although Defendants have no duty to prevent illegal conduct, they have an affirmative duty to not agree and participate in an anticompetitive conspiracy.

But Defendants argue that Plaintiffs fail to plausibly allege an agreement to fix prices because "there are no allegations in the TAC of any direct evidence of an agreement to set prices. Instead, they rely on circumstantial evidence…" Reply to Mot. to Diss., at 20. Defendants' argument fails because it is well settled law that there is nothing wrong with relying upon circumstantial evidence to state a claim. *Hollis v. Ceva Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 623 (N.D. Ill. 2022). In fact, "circumstantial evidence is the lifeblood of antitrust law" because direct evidence will rarely be available to prove the existence of a price-fixing conspiracy. *City of Rockford*, 360 F. Supp. 3d 739, 748–49 ("Plaintiffs can allege an antitrust conspiracy by pleading circumstantial evidence of an illegal agreement"); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984) ("There must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.")

### *Synacthen Acquisition*

Plaintiffs allege that Mallinckrodt's acquisition of Synacthen deprived the market of a lower-cost alternative to Acthar with no procompetitive justification. Plaintiffs submit that the acquisition and the immediate decision to shelve Synacthen rather than bring it to market unreasonably restrained trade. On the other hand, Defendants argue there was no antitrust violation because they had no legal duty to force Mallinckrodt to bring Synacthen to market, and also argue that Plaintiffs did not allege an agreement between Mallinckrodt and Defendants

20

relating to Synacthen. But, as pled, the Synacthen Acquisition was not distinct from the exclusive distribution arrangement, rather Plaintiffs allege that both actions arise from the same anticompetitive conspiracy. In *City of Rockford*, relating to Mallinckrodt's Synacthen acquisition, the Court held that "the elimination of competition with no procompetitive justification is the type of conduct that the antitrust laws were designed to guard against." 360 F. Supp. at 755 (internal citations omitted). Here, Defendants argue that *City of Rockford* was wrongly decided, and insist the Court should instead adopt the reasoning of *United Ass'n of Plumbers & Pipefitters Local 332 of S. N.J. v. Mallinckrodt ARD, LLC*, No. 20-188, 2020 U.S. Dist. LEXIS 148343 at * 43–44 (D.N.J. Aug. 18, 2020) (finding Plaintiffs had not plausibly alleged the existence of an agreement between Mallinckrodt and Express Scripts regarding the Synacthen acquisition). The Court, however, finds the reasoning of *City of Rockford* more persuasive. Discovery may reveal that Defendants did not participate in the Synacthen acquisition. but, at this stage of litigation, taking all reasonable inferences from the TAC in Plaintiffs' favor, Plaintiffs have sufficiently alleged that the Synacthen acquisition integral to the alleged conspiracy. *See City of Rockford*, 360 F. Supp. 3d at 749.

## C. STATE LAW CLAIM

Plaintiffs bring a consumer protection claim alleging that Defendants engaged in continuing unfair methods of competition, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq*. To prevail on a FDUTPA claim, a plaintiff

must show (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1344 (S.D. Fla. 2021). Plaintiffs base the FDUTPA claim on the same allegations as their federal antitrust claims, so the claim rises and falls with the federal claims.

The parties dispute the second prong, causation. Defendants argue that the FDUTPA claim should fail because Plaintiffs have not sufficiently established causation under the *AGC* proximate-cause standard and because Plaintiffs have not articulated how Florida courts analyze causation differently, the *AGC* standard should apply.[4]

In deciding whether to apply the *AGC* standard to state law claims, the Court looks to see if the state's highest court has ruled on the issue. *City of Rockford*, 360 F. Supp. 3d at 759; *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 814–15 (N.D. Ill. 2017). "In the absence of guiding decisions by the state's highest court," the Court will "consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would disagree." *Id.* (citing *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012)). The Florida Supreme Court has yet to weigh in on FDUTPA causation; however, the text of the statute and appellate decisions are instructive. There must be a causal connection between the alleged violation and the alleged damages. *See* Fla. Stat. § 501. 211(2) ("[A] person who has suffered a

---

[4] Defendants initially argued that Plaintiffs may not bring FDUTPA claims as an indirect purchaser, but in their reply brief concede that the statute is not subject to the *Illinois Brick* direct-purchaser rule. Resp. to Mot. to Diss. at 14.

loss *as a result* of a violation of this part . . ."; *Rebekah Kurimski v. Shell Oil Co.*, No. 21-80727-CV, 2022 U.S. Dist. LEXIS 136040 at *33 (S.D. Fla. June 29, 2022) ("[T]o be actionable an unfair or deceptive trade practice must be the cause of loss or damage to a consumer.") (quoting *Gen. Motors Acceptance Corp. v. Laesser*, 718 So. 2d 276, 277 (Fla. 4th DCA 1998)); *Stewart Agency, Inc. v Arrigo Enters.*, 266 So. 3d 207, 213 (Fla. 4th DCA 2019) ("Causation under the FDUTPA must be direct, rather than remote or speculative.") (quoting *Lombardo v. Johnson & Johnson Consumer Cos., Inc.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015)). Here, Plaintiffs allege that directly because of Defendants' anticompetitive conduct they paid inflated prices for Acthar. Therefore, Plaintiffs have sufficiently alleged a claim under the FDUTPA.

## IV. CONCLUSION

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' direct purchaser claims, finding Plaintiffs have met their burden at the pleading stage. The Court currently grants Defendants' motion to dismiss Plaintiffs' indirect purchaser claims without prejudice. *Runnion*, 786 F.3d at 519. After the Court reviews Plaintiffs' position statement, it will determine whether to allow Plaintiffs to amend to address the co-conspirator issue, or to convert the dismissal to dismissal with prejudice. Plaintiffs are given until August 24, 2023, to file an amended complaint per this order.

Date: July 28, 2023

Honorable Iain D. Johnston
United States District Judge

24