## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 21-12-1644, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; and SERIES 21-12-1645, a designated series of MSP RECOVERY CLAIMS COM, SERIES LLC, | Case No.: 3:20-cv-50056 |
| | Honorable Iain D. Johnston, District Judge |
| Plaintiffs, | Honorable Lisa A. Jensen, Magistrate Judge |
| | FOURTH AMENDED CLASS ACTION COMPLAINT |
| EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS HOLDING COMPANY; PRIORITY HEALTHCARE DISTRIBUTION, INC., d/b/a CURASCRIPT SD SPECIALTY DISTRIBUTION; CURASCRIPT, INC. d/b/a CURASCRIPT SPECIALTY PHARMACY; ACCREDO HEALTH GROUP, INC.; and UNITED BIOSOURCE CORPORATION, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

## **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 5

PARTIES ............................................................................................................................. 5

    I.    Plaintiffs ................................................................................................................ 5

    II.   Defendants............................................................................................................ 10

    III.  The Mallinckrodt Entities (Unnamed Co-conspirators).................................... 12

FACTUAL ALLEGATIONS ............................................................................................ 13

    I.    Acthar Distribution: Exclusive Distribution through Express Scripts and Affiliated Entities and the Price Fixing and Monopolization Scheme................................ 14

    II.   Express Script's Role in the Price-Fixing and Monopolization Scheme........................... 25

    III.  Monopoly Power, Synacthen Acquisition, and Relevant Market ...................... 30

    IV.  Antitrust Injury.................................................................................................... 40

CLASS ALLEGATIONS ................................................................................................. 41

CAUSES OF ACTION ..................................................................................................... 45

COUNT I ........................................................................................................................... 46

COUNT II .......................................................................................................................... 50

COUNT III ........................................................................................................................ 53

PRAYER FOR RELIEF.................................................................................................... 56

JURY DEMAND ............................................................................................................... 57

i

## FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs, SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 17-03-615"); SERIES 21-12-1644, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 21-12-1644"); and SERIES 21-12-1645, a designated series MSP RECOVERY CLAIMS COM, SERIES LLC ("Series 21-12-1645") on behalf of themselves and the Classes described herein, bring this action against EXPRESS SCRIPTS HOLDING COMPANY, a Delaware corporation; EXPRESS SCRIPTS, INC., a Delaware corporation ("Express Scripts"); PRIORITY HEALTHCARE DISTRIBUTION, INC., d/b/a CURASCRIPT SD SPECIALTY DISTRIBUTION, a Florida corporation ("CuraScript" or "CuraScript SD"); CURASCRIPT, INC. d/b/a CURASCRIPT SP SPECIALTY PHARMACY, a Delaware corporation ("CuraScript SP"); ACCREDO HEALTH GROUP, INC., a Delaware corporation ("Accredo"); and UNITED BIOSOURCE LLC, a Delaware limited liability company, ("UBC"); and allege as follows.

## NATURE OF THE ACTION

1.      Plaintiffs are the assignees of recovery rights originally held by AvMed, Inc. ("AvMed"). AvMed is a Florida corporation that offers Medicare Advantage plans ("MA plans") to Medicare-eligible beneficiaries as well as individual, family, and employer health insurance plans (collectively, "Commercial plans"). Plaintiffs bring this action to challenge Defendants' anticompetitive practices, independently and in concert with the manufacturer, concerning the sale of the drug H.P. Acthar Gel ("Acthar"). Whether for its MA plans or Commercial plans, AvMed is a third-party payer ("TPP") in relation to the medical and pharmaceutical products and services used by its beneficiaries.

2.      Acthar, a treatment for certain chronic inflammatory or autoimmune conditions, has

1

been available since 1952, and for nearly half a century its price was modest. In 2001, a vial of the drug cost $40.00.

3.     However, by 2018, the same vial cost over **$39,000.00**: a **97,500%** price increase. It is as if the price of milk increased from $3.00 to over $2,900.00 per gallon, or a mortgage payment rose from $2,000,00 to over $2.00 million per month. Over the same time period, the rate of inflation was 2.08%.

4.     Acthar's price increases are not the product of market or regulatory forces. The "repricing" of Acthar was the result of a purposeful and illegal course of conduct by Acthar's manufacturer, Mallinckrodt and its predecessor, Questcor Pharmaceuticals Inc. ("Questcor"), in concert with pharmaceutical benefit management company, Express Scripts, and three of Express Scripts' subsidiaries – CuraScript; United BioSource Corporation; and Accredo. This conduct consists of a complex scheme involving illegal monopolization and anticompetitive conduct resulting in a thousandfold increase in costs on payers such as Plaintiffs' Assignor, AvMed and similarly-situated Classes of third-party payers.

5.     Prior to being transformed into Mallinckrodt's billion-dollar golden goose, Acthar's origins were humble. The drug is an adrenocorticotropic hormone ("ACTH") analogue produced from the pituitary gland of pigs. It was invented in the late 1940s by the meat company, Armour, as a byproduct of pork-processing operations. At the time, Acthar was considered a miracle drug because it stimulated the body's production of cortisol, provoking a natural anti-inflammatory response that was beneficial for the treatment of various conditions. At a time when broad approvals without support from clinical trials were commonplace at the U.S. Food and Drug Administration ("FDA"), Acthar was given broad approval in 1952 to treat a wide range of ailments.

2

6.      This also occurred before the commercial development of synthetic steroid drugs (corticosteroids) and many popular non-steroidal anti-inflammatory drugs (NSAIDs), such as ibuprofen. The advent of these safe, inexpensive alternative treatments, in pill form, greatly reduced the demand for an injectable drug derived from the pituitary gland of pigs. By the 1990s, only a few key uses remained for Acthar. For example, Acthar remains the gold standard for the treatment of infantile spasms, a rare but catastrophic epileptic syndrome affecting babies and toddlers two years old or younger. Otherwise Acthar is a drug of last resort.

7.      In 2001, Mallinckrodt's predecessor, Questcor, purchased the right to produce Acthar for $100,000.00 plus modest royalties.

8.      Thereafter began a run of exponential price increases. The cost of Acthar ballooned from $40.00 in 2001 to $750.00 immediately after it was acquired. Questcor raised the price to $1,650.00 by 2007. In the summer of 2007, the price rose to $23,269.00 per vial. And the increases did not stop or reverse course; instead, the price of Acthar increased **eight more times** so that by 2018, the drug cost $38,892 per vial. And since treatment with Acthar usually requires at least three vials, a single course of treatment can cost nearly $120,000.00.

9.      In just over a decade, Acthar was transformed into a billion-dollar cash machine. In August 2014—in the midst of this meteoric price rise—Questcor merged into Mallinckrodt in a deal valued at approximately $5.9 billion. At the time, Acthar was the only drug product sold by Questcor.

10.     Mallinckrodt and Express Scripts orchestrated the price increases of Acthar through two types of improper conduct.

11.     *First*, in 2007, Mallinckrodt (Questcor at the time) vertically integrated its sales by distributing Acthar exclusively through CuraScript. Acthar prescriptions were obtained through

3

the "Acthar Support & Access Program" managed by UBC, and Acthar is sold by the Express Scripts owned and operated specialty pharmacy, Accredo, as well as a limited network of specialty pharmacies, including CuraScript SP. As explained below, this arrangement allowed Mallinckrodt and Express Scripts to set and control the supracompetitive price of Acthar through every step of the supply chain and eliminated the otherwise natural competition between multiple wholesalers and amongst retailers that would ensure greater availability of Acthar at competitive prices.

12.     *Second,* Mallinckrodt and Express Scripts worked together to eliminate any competition. Mallinckrodt acquired and then shelved the rights to Acthar's much cheaper synthetic equivalent ACTH, a drug called Synacthen Depot ("Synacthen"). Drug giant Novartis AG ("Novartis") was already selling Synacthen in Europe, Asia, and South and Central America, but the drug was not approved for use in the United States. After Novartis launched an auction for Synacthen, Mallinckrodt substantially outbid the competition for the rights to Synacthen in the U.S. But rather than undertake the process of obtaining FDA approval for the only drug that was a direct competitor of its best-selling product, Mallinckrodt never seriously attempted to bring Synacthen to market for any clinical use for which Acthar was approved. This kept the price of Acthar artificially high. Because of this anticompetitive behavior, the FTC and several states sued Mallinckrodt for antitrust violations and later reached a $100 million settlement, as well as an agreement that Mallinckrodt would sublicense its Synacthen rights to a third party.

13.     As a direct and proximate cause of Mallinckrodt's and Express Scripts' anticompetitive and illegal conduct, Plaintiffs' Assignor, AvMed, and members of the Classes have paid higher supracompetitive prices for Acthar than they would have absent these violations. Plaintiffs bring this antitrust class action to recover damages to the maximum extent permitted by law and to put an end to Defendants' anticompetitive behavior.

4

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely the Sherman Act, 15 U.S.C. § 1, *et seq*.

15. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from the Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

16. This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over violations of state consumer protection laws.

17. This Court has personal jurisdiction over the Defendant pursuant to 15 U.S.C. § 22 and because Defendants waived any objections to personal jurisdiction in this District after requesting – and being granted – transfer of the action from the Central District of California where the case was originally, and properly, filed.

**PARTIES**

I. **Plaintiffs**

18. Series 17-03-615 is a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 17-03-615), a Delaware series limited liability company, with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33134.

19. Series 17-03-615 has the right to seek reimbursement for payments of Acthar made by its assignor AvMed for which Defendants are liable due to the anticompetitive conduct alleged herein.

20. Series 21-12-1644 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, with its principal place of business at 2701 S. Le Jeune

5

Road, Coral Gables, Florida 33134.

21.      Series 21-12-1644 has the right to seek reimbursement for payments of Acthar made by its assignor AvMed for which Defendants are liable due to the anticompetitive conduct alleged herein.

22.      Series 21-12-1645 is a designated series of MSP Recovery Claims COM, Series LLC, a Delaware series limited liability company, with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33134.

23.      Series 21-12-1645 has the right to seek reimbursement for payments of Acthar made by its assignor AvMed for which Defendants are liable due to the anticompetitive conduct alleged herein.

24.      From 2010 to present, AvMed made purchases of Acthar for its Medicare Advantage beneficiaries and enrollees of its Commercial plans.

25.      On June 26, 2019, AvMed irrevocably assigned to Series 17-03-615 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "AvMed Medicare Assignment"). *See* AvMed Medicare Assignment attached as Exhibit A.

26.      The AvMed Medicare Assignment also provided for a due diligence period wherein the parties would exchange deliverables and enter into a separate "Stand-Alone Assignment Agreement" further evidencing the AvMed Assignment. Upon completion of the due diligence period and satisfaction of the various deliverables and agreed upon conditions, the parties finalized the transaction, including exchanging compensation and executing the Stand-Alone Assignment Agreement ("Stand-Alone Assignment"). *See* AvMed Stand-Alone Assignment attached as Exhibit B.

6

27.     The AvMed Medicare Assignment and Stand-Alone Assignment assigned claims under CMS Contract ID Number H1016 for dates of service up to June 26, 2019.

28.     The AvMed Stand-Alone Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including MSP Recovery, LLC) and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services, provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statues and laws (all of the items set forth in (i)-(iii), the "Assigned Claims"), except for those claims described on Schedule A ("Excluded Claims"). The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

29.     The "Excluded Claims" identified in Schedule A are claims against "Ames's network healthcare providers and current and former members" as well as "[c]laims arising from and related to GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico[.]" Defendants are not AvMed "network healthcare provider[s]" or "current [or] former member[s]" and the claims at issue in this action do not relate to "GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico."

30.     Consideration was given between each party in executing the AvMed Medicare Assignment.

31.     On December 31, 2020, AvMed irrevocably assigned to Series 17-03-615 all rights

to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Second AvMed Medicare Assignment"). *See* Second AvMed Medicare Assignment attached as Exhibit C.

32.     The Second AvMed Medicare Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from June 27, 2019 to July 31, 2020.

33.     The Second AvMed Medicare Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to (i) all Quarterly Claims arising from or evidenced in the Quarterly Claims Data, whether based in contract, tort, or statutory right, and all related recovery and receivable rights arising from and related to the Quarterly Claims Data transferred to MSP Recovery, LLC; (ii) any and all causes of action, claims, and demands of any nature whatsoever relating to payments for health care services provided to individuals enrolled under Assignor's Medicare Advantage plan(s) …, and all legal or equitable rights (including, but not limited, to subrogation) to pursue and/or recover monies related to the Quarterly Claims that Assignor had, may have had, or has asserted against any party in connection with the Quarterly Claims Data; and (iii) all causes of action, claims, rights, and demands of any nature whatsoever, legal or equitable, against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Quarterly Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii) …, except for Assignor's right to recovery, under any theory against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute. The assignment of the Quarterly Assigned Claims is irrevocable and absolute.

34.     Consideration was given between each party in executing the AvMed Medicare Assignment.

35.     On December 28, 2021, AvMed irrevocably assigned to Series 21-12-1644 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Third AvMed Medicare Assignment"). *See* Third AvMed

Medicare Assignment attached as Exhibit D.

36.    The Third AvMed Medicare Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from August 1, 2020 through June 30, 2021.

37.    The Third AvMed Medicare Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Claims arising from or evidenced in the Claims Data transferred to MSP Recovery, LLC commencing with and encompassing dates of service from August 1, 2020 through and including June 30, 2021 (the "Assigned Claims"), except for Assignor's right to recover, under any theory, against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute.

38.    Consideration was given between each party in executing the AvMed Medicare Assignment.

39.    On March 31, 2022, AvMed irrevocably assigned to Series 21-12-1645 all rights to recover for health care services provided to any of members or enrollees in AvMed's group or individual health insurance plans. (the "AvMed Commercial Assignment"). *See* AvMed Commercial Assignment attached as Exhibit E.

40.    The AvMed Commercial Assignment assigned claims for dates of service from January 1, 2000 to December 31, 2020.

41.    The AvMed Medicare Assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Claims existing as of the date hereof, and all related claims recovery and reimbursement rights and causes of action of any nature whatsoever arising from, in connection with, or evidenced by the Claims Data transferred by Assignor to Assignee to MSP Recovery, LLC related to Assignor's group or individual

9

health insurance coverage, i.e., the commercial claims, encompassing and covering the range of date of service or payment commencing January 1, 2000 through December 31, 2020 (the "Assigned Claims"). The assignment of the Assigned Claims shall be irrevocable and absolute. The Assigned Claim encompass the recovery, receivable, and reimbursement rights, and all causes of action of any nature whatsoever, arising from the Assigned Claims.

## II.    Defendants

42.    Express Scripts, Inc. and Express Scripts Holding Company ("Express Scripts") are Delaware corporations with their principal place of business at 1 Express Way, St. Louis, Missouri 53121. In 2007, Mallinckrodt agreed with Express Scripts to provide integrated services critical to the anticompetitive scheme described herein, and to do so through certain of Express Scripts' subsidiaries. Each of these subsidiaries had separate functions, but their coordinated purpose was to support and maintain Mallinckrodt's inflated Acthar prices, including by acting as Mallinckrodt's agent for purposes of pricing. Unless otherwise noted, reference to "Express Scripts" refers to the company's role as a Pharmacy Benefit Manager ("PBM"). In the pharmaceutical market today, and throughout the relevant time period for class recovery in this matter, every third-party payer (such as AvMed) must contract with a PBM in order to administer pharmaceutical benefits to its beneficiaries.

43a.    Priority Healthcare Distribution, Inc., d/b/a CuraScript SD Specialty Distribution ("CuraScript" or "CuraScript SD") is a Florida corporation doing business at 255 Technology Park, Lake Mary, Florida, 32746. CuraScript is a wholly owned subsidiary of Express Scripts. CuraScript served as Mallinckrodt's exclusive distributor for Acthar. CuraScript was engaged by Mallinckrodt to deliver Acthar to a network of specialty pharmacies, which then delivered the medicine to patients' homes. This part of the operation is managed by CuraScript.

43b.    CuraScript, Inc., d/b/a CuraScript SP Specialty Pharmacy ("CuraScript SP") is a

10

Delaware corporation with its principal place of business at 6272 Lee Vista Boulevard, Orlando FL, 32822. CuraScript SP is a wholly owned subsidiary of Express Scripts. CuraScript SP is a specialty pharmacy which delivered Acthar to patients' homes.

44. Accredo Health Group, Inc. ("Accredo") is a Delaware corporation with its principal place of business at 1640 Century Center Parkway, Memphis, Tennessee 38134. Accredo is a wholly-owned subsidiary of Express Scripts. Accredo is a specialty pharmacy services company that purports to assist patients in obtaining medications, including by advocating for insurance coverage of the drug.

45. United BioSource Corporation, formerly known as HealthBridge and now known as United BioSource LLC ("UBC"), a Delaware corporation with its principal place of business at 920 Harvest Drive, Blue Bell, Pennsylvania 19422. UBC provided pharmaceutical support services. During most of the relevant time period, UBC was also an Express Scripts subsidiary, though Express Scripts completed its sale of UBC to a private equity firm in 2018.[1] UBC was engaged by Mallinckrodt to act as the administrator for the reimbursement of Acthar, interacting directly with patients and third-party payers by coordinating various patient- assistance programs, including the ASAP Program described further below. UBC was responsible for selecting the specialty pharmacy within the limited special pharmacy network from which a patient could obtain Acthar. Mallinckrodt's control over UBC ensured that UBC primarily selected Express Scripts' specialty pharmacy, Accredo, to dispense Acthar to patients, and only resorting to other specialty pharmacies in the network when Accredo was unable to fill a prescription.

---

[1] According to Express Scripts' Form 10-K for 2017, Express Scripts has agreed to indemnify UBC for, and retain the responsibility for the defense of, this action. *See* Express Scrips Holding Co., 2017 Form 10-K Annual Report,
https://www.sec.gov/Archives/edgar/data/1532063/000153206318000004/esrx- 12312017x10k.htm (Feb. 27, 2018) (last visited June 28, 2022).

46. As applied to Acthar, UBC acted as the hub, designing and coordinating Acthar's sale, distribution, and reimbursement through its patient access programs. So, for example, when a doctor prescribes an initial or renewal course of Acthar to a patient, the prescription is sent to the "Acthar Hub" and a case manager is assigned to the patient through UBC or Accredo, which performs administrative services associated with obtaining insurance coverage of the drug from health plans such as AvMed and Class Members. CuraScript SD, as the Acthar distributor, ships the drug to the specialty pharmacy, such as Accredo or CuraScript SP, and the health plan pays their PBM. Payment then flows from the PBM back to Mallinckrodt.

## III. The Mallinckrodt Entities (Unnamed Co-conspirators)

47. Mallinckrodt ARD LLC has its principal place of business at 1425 Route 206, Bedminster, NJ, 07921. Mallinckrodt ARD LLC was previously named Mallinckrodt ARD, Inc. Prior to its merger with Mallinckrodt plc, Mallinckrodt ARD LLC was named Questcor Pharmaceuticals, Inc.

48. Mallinckrodt ARD LLC is a subsidiary of Mallinckrodt plc, an Irish public limited company with its corporate headquarters in Staines-upon-Thames, United Kingdom. Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG. On April 4, 2014, Mallinckrodt plc entered into an Agreement and Plan of Merger with Questcor, a California corporation located at 3260 Whipple Road, Union City, California 94587. Mallinckrodt absorbed Questcor as a wholly owned subsidiary on August 14, 2014 for approximately $5.6 billion.

49. Questcor survived the merger as a wholly owned indirect subsidiary of Mallinckrodt plc and continued to market Acthar thereafter, until changing its name to Mallinckrodt ARD, Inc. on July 27, 2015.

12

50.     On January 26, 2019, Mallinckrodt ARD, Inc. converted to Mallinckrodt ARD LLC, and it continues to market Acthar to this day.

51.     On October 12, 2020, Mallinckrodt plc and Mallinckrodt ARD LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. On June 16, 2022, Mallinckrodt plc and Mallinckrodt ARD LLC emerged from bankruptcy pursuant to the court's reorganization plan. The companies continue to sell Acthar.

## FACTUAL ALLEGATIONS

52.     Acthar was first developed by physicians at the Mayo Clinic in collaboration with a pharmaceutical division of Armour and Company, in the late 1940s.

53.     Acthar is an adrenocorticotropic hormone ("ACTH"), which stimulates the adrenal cortex to secrete cortisol, corticosterone, aldosterone, and other androgenic substances.

54.     Acthar was approved by the U.S. Food and Drug Administration ("FDA") on April 29, 1952, as a slow-release injectable form of ACTH for the treatment of over fifty conditions. This approval was prior to the Kefauver Harris Amendment of 1962, which required drug manufacturers to provide proof of efficacy and safety. Over time, the approved indications diminished to 19 conditions.

55.     Rhone-Poulenc Rorer (which later merged with Hoechst AG to form Aventis which subsequently merged with Sanofi S.A.) acquired the rights to Acthar from Armour and Company. Around the time of acquisition, a vial of Acthar cost $40.00.

56.     Acthar's value is limited because it is the "gold standard" for treating only one condition, infantile spasms ("IS"). IS is a serious condition in infants but affects less than 2,000 children per year in the United States. And Acthar was not approved by the FDA to treat IS until 2010, further limiting its value.

57.     In addition to treating IS, Acthar is approved as last-line treatment for relapses and flare ups of specific diseases (such as multiple sclerosis) in populations that cannot tolerate traditional therapy with corticosteroids and related drugs, or for whom such therapies have not been successful.

58.     In 2001, Questcor acquired Acthar from Aventis for $100,000.00 plus a royalty rate for sales over $10 million.

59.     Immediately after acquisition, Questcor increased the price of Acthar to $748.00 per vial. From 2001 until 2014, the end payer price of Acthar grew to $1,980.00 per vial.

60.     In 2014, Questcor was purchased by Mallinckrodt for $5.9 billion. At the time of acquisition, Acthar comprised 98% of Questcor's sales.

61.     By 2017, Acthar was generating approximately $1.2 billion in sales, accounting for 35% of Mallinckrodt's total revenue. In 2021, Acthar generated approximately $593.6 million in sales, accounting for 26.9% of Mallinckrodt's net sales.

I.     **Acthar Distribution: Exclusive Distribution through Express Scripts and Affiliated Entities and the Price Fixing and Monopolization Scheme**

   A.     **The Acthar Support and Access Program ("ASAP") and Limited Distribution of Acthar**

62.     For decades, Acthar was distributed to any doctor, hospital, wholesaler or specialty pharmacy that requested the drug to treat seriously ill patients. After Questcor acquired the rights to Acthar, it initially maintained that broad distribution network.

63.     Prior to 2007, Acthar was sold through a typical distribution chain. The chain of distribution was as follows: Questcor would sell Acthar to multiple distributors who in turn sold Acthar to pharmacies. The pharmacies placed orders with the distributors based on their respective levels of sales and inventory practices. Physicians would write prescriptions for Acthar which

14

would be sent to the pharmacies, and patients would purchase the drug directly from the pharmacy of their choice. In fact, most of Questcor's products (and thus Acthar) were sold through three distributors which accounted for 91% of their business in 2006.

64.     On July 2, 2007, Questcor issued an Urgent Product Alert advising health care professionals that as of August 1, 2007, Acthar would be available exclusively through the specialty pharmacy distributor, CuraScript (owned by Express Scripts) and coordinated through the "Acthar Hub" which is operated by UBC (owned by Express Scripts at the time) and dispensed through a limited network of specialty pharmacy distributors (including Accredo).

65.     Acthar would no longer be available through traditional pharmaceutical wholesalers or retail pharmacies. At Mallinckrodt's direction, by 2012 the limited network of specialty pharmacies authorized to dispense Acthar was comprised of: Accredo; Aetna Specialty Pharmacy; Caremark Specialty Pharmacy; CIGNA Tel Drug; CuraScript SP Specialty Pharmacy; RX Solutions/OptumRX; Walgreen Specialty Pharmacy; and Special Care Pharmacy Services (Puerto Rico).

66.     Notwithstanding the limited number of specialty pharmacies authorized to dispense Acthar, Mallinckrodt, in concert with Express Scripts, ensured that the UBC-operated hub was set up to refer as many patients as possible to Express Scripts' specialty pharmacy, Accredo, for obtaining Acthar.

67.     According to Questcor's Interim President, Don Bailey, "the goal of Questcor's new strategy is to make manufacturing and distribution of Acthar economically viable on a stand-alone basis."[2] In actual fact, the goal of this "new strategy" was to lock patients into receiving

---

[2] Citron Research, *Questcor (NASDAQ:QCOR): A Single Digit Stock in 18 Months or Less and Here's Why* (July 10, 2011), https://citronresearch.com/wp-content/uploads/2012/07/qcor-final-v7-edit.pdf (last visited June 30, 2022).

Acthar through one distribution channel controlled by Mallinckrodt and Express Scripts, and to ensure prescription, distribution, and payment through one source, Express Scripts. Mallinckrodt maintained this exclusive arrangement with Express Scripts from 2007 until April 22, 2022, when Mallinckrodt substituted its CuraScript exclusive distribution agreement for one with a new exclusive distributor, FFF Enterprises, Inc.

68.     The exclusive distribution system with CuraScript was presented as providing "seamless support for Acthar," but was in fact just a mechanism to label Acthar as a "specialty" drug and exponentially increase the price of treatment. Questcor believed that the cost for one course of treatment could approach $80,000.00 to $100,000.00.[3]

69.     Instead of making the use of Acthar "economically viable," the new distribution system allowed Questcor and Express Scripts to conspire to increase the price of Acthar. Following the new agreement with Express Scripts, the price of Acthar was increased from $1,980.00 to $27,922.80 per vial. The vertical exclusive distribution agreement eliminated competition between wholesalers and amongst traditional pharmacies which would otherwise have exerted pressure for lower Acthar prices.

70.     As part of efforts to limit the Acthar distribution channel, Mallinckrodt, in concert with UBC set up the Acthar Support & Access Program ("ASAP").

71.     Under this new distribution scheme, a prescription for Acthar could only be obtained through ASAP.

72.     Once a physician decides to prescribe Acthar, the physician must complete an "Acthar Start Form" ("AS Form") and fax the form to the "Acthar Hub."

73.     The AS Form requires the following information: (1) patient demographics; (2)

---

[3] *Id.*

insurance information; (3) health care provider information; (4) Acthar prescription information (*e.g.*, diagnosis, injection instructions); (5) prescription, consent, and statement of medical necessity; (6) diagnosis information; (7) history of corticosteroid use; (8) concurrent medications; (9) relevant treatment history; and (10) other relevant clinical information.

74.     The form requires multiple signatures from the prescribing physician. The physician must sign a statement of medical necessity authorizing "United BioSource LLC ("UBC"), the current operator of the Acthar Hub, and other designated operators of the Program to perform a preliminary assessment of benefit verification for this patient…"

75.     Each patient must acknowledge that by signing the AS Form, they are authorizing their insurance company, physicians, and pharmacy to "disclose to Mallinckrodt ARD Inc. ('Mallinckrodt'), the distributor and its agents, authorized designees and contractors, including Mallinckrodt reimbursement support personnel and United BioSource LLC ('UBC') or any other operator of the Acthar Hub on behalf of Mallinckrodt" health information relating to their medical condition, treatment, and insurance coverage. The authorization allows for "Mallinckrodt and its agents" to provide services to the patient including reimbursement and coverage support, medication shipment tracking, and home injection training.

76.     The "Acthar Hub" is managed by UBC, which assigns each patient a case manager. The case manager calls each patient to discuss insurance coverage, affordability of copayments, injection training, etc. Once the prescription is approved by the insurance company, the case manager arranges for the drug to be delivered by a specialty pharmacy selected by UBC within a limited network of specialty pharmacies authorized to dispense Acthar.

77.     The specialty pharmacy receives Acthar directly from CuraScript, as the exclusive distributor of Acthar. The specialty pharmacy then sends a starter kit directly to the patient. This

entire distribution process is coordinated by UBC.

78.     Patients who obtained Acthar prescriptions from August 2007 until November 2017 could not receive their prescription without going through at least two Express Scripts subsidiaries. In fact, if Accredo or CuraScript SP Specialty Pharmacy dispensed the drug, patients would go through Express Scripts subsidiaries for the entire process of obtaining the drug, namely CuraScript, UBC, and Accredo.

79.     Patients were required to participate in ASAP, which was operated by UBC, to obtain their prescriptions. Their Acthar prescriptions were distributed exclusively through CuraScript, which sent the product to the patients' specialty pharmacy.

80.     After Express Scripts sold UBC, patients who received Acthar from November 2017 to April 22, 2022 still had to go through an Express Scripts subsidiary to obtain their prescriptions, as CuraScript was the exclusive distributor of the drug.

**B.     The Payment Flow Resulted in Plaintiffs' Assignor, AvMed, Submitting Payments for Acthar that Flowed Directly to Defendants**

81.     There are two alternative but related ways in which the Acthar payment flow, as created and implemented by Defendants, resulted in harm to Plaintiffs' Assignor, AvMed: (1) AvMed directly paid Express Scripts (as its PBM); and (2) AvMed paid its non-Express Scripts PBM (e.g., CVS), which in turn paid Accredo and CuraScript SP for the Acthar prescriptions.

**1.     AvMed Paid Express Scripts Directly for Acthar (Direct Purchaser)**

82.     Express Scripts is one of the largest PBM companies in the United States. Express Scripts has substantial buying power as a result of its representation of the largest number of buyers in the pharmaceutical marketplace. Wielding both the largest collection of patients in the United States and a direct shipment channel for specialty drugs, Express Scripts is in a unique position to

negotiate the lowest prices for specialty drugs in the United States. This bargaining power gives Express Scripts the ability to push back against attempts by pharmaceutical drug manufacturers that charge inflated prices for drugs above the actual market value of the drugs.

83.     Although Express Scripts styles itself as a PBM, it does more than simply process claims for prescriptions filled at retail pharmacies. In addition to "retail pharmacy claims processing, formulary management, utilization management and home delivery pharmacy services", Express Scripts offers "specialty services that deliver . . . high-cost injectable, infused, oral or inhaled drugs," and "compliance programs, . . . drug therapy management programs, [] data analysis, and [] distribution services."[4]

84.     Acting "either directly or through its subsidiaries", Express Scripts serves as a direct pipeline from a pharmaceutical manufacturer to the patient, facilitating the direct distribution of a prescription drugs from the factory to the patient's home.

85.     Express Scripts provides what it calls "integrated specialty services."[5] These integrated services include a PBM (Express Scripts), a specialty pharmacy distributor (CuraScript), and a specialty pharmacy provider (Accredo or CuraScript SP).

86.     Express Scripts coordinates these functions through UBC, its so-called pharmaceutical support services hub.

87.     With respect to Acthar, Mallinckrodt has a contract with UBC to coordinate the delivery of Acthar through the ASAP Program. Beginning with its July 2, 2007, announcement,

---

[4] Express Scripts Holding Company, 2012 Form 10-K Annual Report, https://www.sec.gov/Archives/edgar/data/1532063/000119312513063930/d450292d10k.htm (Feb. 18, 2013) (last visited June 28, 2022).

[5] *Corporate Overview*, CURASCRIPT SD, https://curascriptsd.com/corporate-overview (last visited June 29, 2022).

Mallinckrodt directed physicians to prescribe Acthar through the ASAP Program. Prescriptions are submitted to the ASAP program through the Acthar Start (AS) Form. This form authorizes UBC to coordinate reimbursement with Express Scripts and direct the prescription to a "designated specialty pharmacy." Unless required to go elsewhere, UBC would designate Accredo as the specialty pharmacy.

88.     Accordingly, health plans that receive PBM services from Express Scripts paid Express Scripts directly for Acthar that was distributed by CuraScript – pursuant to CuraScript's exclusive distribution agreement with Mallinckrodt – and dispensed by Accredo, as demonstrated



by Figure 1 below.

89.     Figure 1 demonstrates how Acthar is prescribed, authorized, distributed and paid for through Express Scripts. Payment flows are represented by green arrows traveling from the third-party payer to Express Scripts to Mallinckrodt, while product flows are represented by

orange, solid one-way arrows flowing from Mallinckrodt to the patient. Plaintiffs' Assignor, AvMed, directly contracted with Express Scripts for pharmacy benefits for its Medicare Advantage plans during the periods described below. Pursuant to its respective contract with Express Scripts, AvMed directly paid Express Scripts for Acthar that was dispensed to its enrollees by Accredo and CuraScript SP. As demonstrated by the above Figure 1, the Acthar payment made by AvMed flows directly back to Mallinckrodt through Express Scripts, notwithstanding the various fees Express Scripts charges Mallinckrodt.

### AvMed's Medicare PBM Contact with Express Scripts

90.     Starting January 1, 2012, AvMed contracted with Express Scripts to provide pharmacy benefit services, among other things, for its Medicare Advantage plans ("ESI Medicare PBM Agreement"). Express Scripts acted as AvMed's PBM until December 31, 2014.

91.     Under the ESI Medicare PBM Agreement, AvMed retained Express Scripts to provide a prescription drug program, including but not limited to:

    i.   Retail pharmacy and mail order pharmacy;

    ii.  Specialty drug pharmacy services;

    iii. Point-of-care;

    iv.  Physician office communications;

    v.   Cost containment initiatives developed and implemented by ESI; and

    vi.  Financial incentives to participating pharmacies for their participation in such
         initiatives.

92.     One of the medications AvMed contracted for Express Scripts to supply was Acthar. Acthar was listed as a "specialty drug" in the agreement and was identified under "other specialty agents."

93.     AvMed agreed to pay Express Scripts certain reimbursement rates for specialty pharmacy drugs as established by Express Scripts for each such drug. The reimbursement rates for each drug varied. Mallinckrodt set the average wholesale prices of Acthar used by Express Scripts for reimbursement.

94.     Throughout 2014, Defendants shipped Acthar to four AvMed Medicare enrollees. Express Scripts then charged AvMed for the Acthar, pursuant to the terms of the ESI Medicare PBM Agreement. AvMed paid Express Scripts these charges.

95.     While "cost containment" is not a defined term in the ESI Medicare PBM Agreement, the plain meaning of the words denotes the act, process or means of keeping something within limits, and preventing the expansion of something. Here, the "something" which Express Scripts contracted to "contain" was the "cost" of specialty pharmacy drugs, like Acthar. However, Express Scripts charged AvMed for Acthar prescriptions under its Medicare Advantage plans. Given that these drugs would have cost a small fraction of this amount prior to the repricing scheme for Acthar that Express Scripts facilitated, Express Scripts hardly met its obligation to provide cost containment.

96.     Because Express Scripts had entered into an exclusive arrangement with the manufacturer of Acthar for direct distribution of Acthar to patients, Express Scripts had no incentive to fulfill its contractual obligations to obtain a lower cost for Acthar than Mallinckrodt wished to charge.

### 2.     AvMed Submitted Payments for Acthar through Other PBMs which Paid Accredo and CuraScript SP for Acthar (Indirect Purchaser)

97.     Between 2015 and 2021, AvMed contracted with CVS to provide pharmacy benefit services, among other things, for its MA plans. During this time period, Defendants shipped Acthar to nine AvMed Medicare enrollees through Accredo and/or CuraScript SP.

98.     Pursuant to this contract, CVS charged AvMed for the Acthar and AvMed paid CVS such charges. CVS, in turn, paid Accredo and CuraScript SP for the Acthar prescriptions.

99.     Between 2010 and 2015, AvMed contracted with Catalyst Rx to provide pharmacy benefit services, among other things, for its commercial plans. During this time period, Defendants shipped Acthar to twenty-one AvMed commercial enrollees through Accredo and/or CuraScript SP.

100.    Pursuant to AvMed's contact with Catalyst, Catalyst then charged AvMed for the Acthar pursuant to the terms of the pharmacy benefit services agreement. AvMed paid Catalyst such charges. Catalyst, in turn, paid Accredo and CuraScript SP for the Acthar prescriptions.

101.    Between 2015 and 2019, AvMed contracted with CVS to provide pharmacy benefit services, among other things, for its commercial plans. During this time period, Defendants shipped Acthar to two AvMed Medicare enrollees through Accredo and CuraScript SP.

102.    Pursuant to AvMed's contract with CVS, CVS then charged AvMed for the Acthar pursuant to the terms of the pharmacy benefit services agreement. AvMed paid CVS such charges. CVS, in turn, paid Accredo and CuraScript SP for the Acthar prescriptions.

103.    Accordingly, health plans that receive PBM services from non-Express Scripts PBMs (e.g., CVS), paid the non-Express Scripts PBMs for Acthar that was distributed by CuraScript – pursuant to CuraScript's exclusive distribution agreement with Mallinckrodt. The non-Express Scripts PBMs then paid Accredo and/or CuraScript SP for Acthar, as demonstrated by Figure 2.



104.     Figure 2 demonstrates how Acthar is prescribed, authorized, distributed and paid for through a non-Express Scripts PBM. Payment flows are represented by green arrows traveling from the third-party payer to the non-Express Scripts PBM to Mallinckrodt, and from the third-party payer to the non-Express Scripts PBM to the Express Scripts specialty pharmacies, Accredo and/or CuraScript SP. The product flows are represented by orange, solid one-way arrows flowing from Mallinckrodt to the patient. Plaintiffs' Assignor, AvMed, contracted with Catalyst and CVS for pharmacy benefits for its Medicare Advantage and Commercial plans during the periods described above. Pursuant to its respective contract with Catalyst and CVS, AvMed paid Catalyst and CVS for Acthar that was dispensed to its enrollees by Accredo and CuraScript SP. Catalyst and CVS, in turn, paid Accredo and/or CuraScript SP for Acthar.

105.     Distributing Acthar through one distributor and making the drug available by a

limited network of specialty pharmacies eliminated competition between wholesalers and amongst retailers that would otherwise have exerted pricing pressure on Mallinckrodt to keep the price of Acthar at its level prior to the exclusive distribution arrangement. Thus, the restricted output and artificially inflated pricing of Acthar enabled by the exclusive distribution agreement harmed Plaintiffs' Assignor, AvMed, and the Classes, given that payers and consumers were deprived of the pro-competitive benefits of an open distribution network.

106.    But for Defendants' illegal anticompetitive scheme described above, Plaintiffs' Assignor, AvMed, and members of the Classes, would not have paid artificially inflated prices for Acthar.

## II.    Express Script's Role in the Price-Fixing and Monopolization Scheme

107.    As the largest PBM in the U.S., Express Scripts is in a position to negotiate the lowest price for any drug, whether or not it is given the dubious description of "specialty". This power allows Express Scripts to challenge attempts by drug manufacturers to charge inflated prices exceedingly above the market value.

108.    This bargaining power and ability to provide "cost containment" is one of the reasons a third-party payer, like AvMed, hires Express Scripts as its PBM.

109.    In fact, Express Scripts asserts it helps control costs by:

      a.    "identifying products and offering solutions that focus on improving patient outcomes and assist in controlling costs";

      b.    "evaluating drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary";

      c.    "offering cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members";

      d.      "leveraging purchasing volume to deliver discounts to health benefit providers"; and

      e.      "promoting the use of generics and lower-cost brands."[6]

110.      Express Scripts' Chief Medical Officer, Dr. Steve Miller, has touted the power of Express Scripts to obtain lower prices for its customers in multiple public forums. A selection of his comments regarding Express Scripts' power are below:

> When I joined the company, we represented 12 million members. We're at 85 million today. That gives us extraordinary sway in the marketplace. If you think about any other aspect of health care, no one else has that many lives that they can represent.[7]

> We have tremendous scale, which allows us to get the best deals for our plan sponsors from both the pharmaceutical manufacturers and also the pharmacies. If any pharmacy chain ever becomes too large, we're able to move our patients and… get the lowest cost.[8]

> I think because of the continued escalation of cost, you need a PBM now more than ever. And what a best-in-class PBM like Express Scripts does really ensures great health outcomes and more affordable costs.[9]

> Pharma has shown that they feel very emboldened with their pricing power. We're using our clout in the marketplace to really tamp these down for our clients.[10]

---

[6] Express Scripts Holding Co., 2017 Form 10-K Annual Report, https://www.sec.gov/Archives/edgar/data/1532063/000153206318000004/esrx- 12312017x10k.htm (Feb. 27, 2018) (last visited June 28, 2022).

[7] Peter Wehrwein, *A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma* MANAGED CARE MAG.COM (Apr. 2015), https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and- talk-us-pharma.

[8] Shelby Livingston, *Q&A: Dr. Steve Miller, Express Scripts Holding Co.*, BUSINESS INSURANCE (May 22, 2016), http://www.businessinsurance.com/article/00010101/STORY/305229991/Q&A- Dr-Steve-Miller,-Express-Scripts-Holding-Co.

[9] *Id.*

[10] Meg Tirrell, *Express Scripts Looks to Limit Drug Price Increases*, CNBC (Oct. 2, 2015), https://www.cnbc.com/2015/10/07/express-scripts-looks-to-limit-drug-price-increases.html.

There are pharma companies that recognize this is in their best interest…They, like us, want to get to a sustainable marketplace. They know if they're overcharging for drugs that have very little efficacy, that puts them in a competitive disadvantage.[11]

Discussions to control costs have never been more important, as recent estimates put global drug spend at $1.5 trillion by 2021, according to data from Quintiles IMS Holding. Yet sometimes, in the drug pricing debate, blame is placed on one part of the drug distribution system when, in fact, all of us – pharmaceutical companies, pharmacy benefit managers (PBMs), policymakers and payers – have a role to play in achieving better affordability and accessibility for medicine. As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with our industry partners to make that possible.[12]

[I]t is incumbent upon the pharmacy benefits managers to more forcefully illustrate the critical role we play in making medicine more affordable and accessible. For example, we partnered with a drug maker who was willing to lower the price of its hepatitis C drug. In doing so, we were able to provide 50,000 patients affordable access to this medication.[13]

We are constantly trying to be vigilant and chase the bad actors out of the marketplace.[14]

111.     Through these statements, Express Scripts has acknowledged its ability to influence the pharmaceutical market and its ability to lower the costs of drugs.

112.     Beginning in 2007, Express Scripts' CuraScript SD became the exclusive distributor of Acthar.[15] This exclusive distribution arrangement was intended by Mallinckrodt and

---

[11] Jaimy Lee, *Express Scripts' Steve Miller Takes on Drug Industry in Pricing Battle* MM+M (Feb. 1, 2015), http://www.mmm-online.com/payersmanaged-markets/express-scripts-steve- miller-takes-on-drug-industry-in-pricing-battle/article/460559/.

[12] Steven Miller, *Is Drug Pricing at an Inflection Point?*, REAL CLEAR HEALTH (Apr. 14, 2017), https://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_11 0550.html.

[13] *Id.*

[14] Katie Thomas, *Specialty Pharmacies Say Benefit Managers Are Squeezing Them Out*, N.Y. TIMES (Jan. 9, 2017), https://www.nytimes.com/2017/01/09/business/specialty-pharmacies-say-benefit-managers-are-squeezing-them-out.html.

[15] Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, N.Y. TIMES (Apr. 19, 2008) https://www.nytimes.com/2008/04/19/business/19specialty.html.

Express Scripts to be the vehicle to radically re-price Acthar in such a way that payers would be powerless to do anything other than pay the inflated price.



Source: Business Insider, *Jim Chanos' pharma short got crushed after an ally bashed it to all Wall Street* (June 6, 2017), www.businessinsider.com/mallinckrodt-stock-price-after-express-scripts-question-acthar-2017-6 (last visited on June 24, 2022).

113.     In the time period following August 2007, Express Scripts was handling each and every aspect of Acthar distribution through the above-described functions. CuraScript was the exclusive specialty pharmaceutical distributor, Accredo was the specialty pharmacy provider, and UBC coordinated both the product and money flows through the ASAP Program. Rather than fulfilling a PBM's role as industry watchdog, Express Scripts blatantly escorted the fox into the henhouse.

114.     The higher the price for Acthar, the more money Express Scripts stands to make as the sole distributor, as demonstrated by the fact that in 2017 CuraScript's exclusive distribution

agreement with Mallinckrodt was amended to give CuraScript a percentage of the price at which Acthar is sold, thereby growing CuraScript's margin through increased prices. In other words, by helping Mallinckrodt maintain and enhance its monopoly power in the ACTH market, both Express Scripts and Mallinckrodt realized greater profits at the expense of payers like AvMed.

115.     In the spring of 2017, Express Script's Senior Vice President, Supply Chain and Specialty Pharma, Everett Neville, made public statements in an apparent attempt to deflect from Express Scripts' role in creating the repriced Acthar, stating, "I don't think [Acthar is] a very great [drug] – it's a pretty poor drug with a very limited need and certainly [Express Scripts Chief Medical Officer, Dr,] Steve[Miller] could comment." He went on to say, "I think [Dr. Miller] and I both would agree, and ***I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value***." (emphasis added). Mr. Neville went on to state that he "personally told [Mallinckrodt's] management team that **their drug is hugely overpriced** and that he "know[s] [Dr. Miller] has as well." (emphasis added).

116.     Despite these empty protestations, Express Scripts has done nothing to reduce the price for patients. Instead, the price for Acthar remains outrageously – and dangerously – high.

117.     Express Scripts' failure to use its substantial power to negotiate and reduce the cost of Acthar is in stark contrast to its prior actions regarding the drug Daraprim.

118.     In 2015, Turing Pharmaceuticals, LLC ("Turing") acquired the rights to Daraprim and increased the price from $13.50 to $750.00 per pill. A years' worth of treatment rose from $6,500.00 to $361,000.00.

119.     On December 1, 2015, ESI announced that it would partner with Imprimis Pharmaceuticals to "drive access to a low-cost alternative to Daraprim." Express Scripts would provide an alternative to Daraprim for the cost of $1.00 per pill. Dr. Steve Miller explained, "[o]ur

goal is always to put medicine within reach by making it more affordable and accessible."[16]

120.     Had it chosen to, and had it not conspired with Mallinckrodt, Express Scripts could have called a swift end to Mallinckrodt's blatant attempt to maintain its ACTH monopoly.

## III.    Monopoly Power, Synacthen Acquisition, and Relevant Market

### A.    Monopoly Power

121.     Defendants have enhanced and maintained Mallinckrodt's monopoly power in the United States through an exclusive distribution arrangement with CuraScript in 2007, in violation of antitrust laws.

122.     Immediately after acquiring the rights to sell Acthar, Mallinckrodt's predecessor company, Questcor, increased the price from approximately $40.00 per vial to nearly $750.00 per vial.

123.     By the end of 2006, Acthar accounted for 94 percent of Questcor's net sales. On August 27, 2007, Questcor increased the price of Acthar by more than 1,300% overnight, from $1,650.00 to $23,269.00 per vial. The decision to charge tens of thousands for a vial of Acthar was spearheaded by Questcor's chief executive, Don Bailey, who spent most of his career as an executive with a defense contractor, not in the pharmaceutical industry.

124.     Questor has since raised the price of Acthar on multiple occasions since 2011 to $38,892 per vial in 2018. On February 1, 2022, Mallinckrodt increased the price to $41,459 per vial.[17]

---

[16] Express Scripts Press Release, *An Affordable Alternative for Daraprim: $1 per Pill*, EXPRESS SCRIPTS (Dec. 1, 2015), https://www.express-scripts.com/corporate/articles/affordable-alternative-daraprim-1-pill (last visited June 24, 2022).2015), https://www.express-scripts.com/corporate/articles/affordable-alternative-daraprim-1-pill (last visited June 24, 2022).

[17] Mallinckrodt, Our Product Pricing, MALLINCKRODT, https://www.mallinckrodt.com/corporate-responsibility/Our-Product-Pricing/ (last visited June 24,

125.    Acthar net sales increased from $218 million in 2011 to more than $1 billion in 2015.

126.    Medicare spending on Acthar increased geometrically from 2011 to 2015, with total spending of more than $2.5 billion and more than $700 million in 2018 alone.

127.    Several factors constitute further evidence of Mallinckrodt's monopoly power.

128.    **Lack of Competition**. Until January 2022, Acthar represented 100% of the sub-market for long-acting ACTH drugs in the United States, for all indications.[18] Acthar continues to represent 100% of the sub-market for long-acting ACTH drugs available in the United States, approved for the treatment of infantile spasms.

129.    Although Acthar may face limited competition at the margin from other drugs in the broader adrenal hormone class, in practice it competes almost entirely in a separate market (or submarket) for long-acting ACTH drugs. In the United States, for years, Acthar was the only long-acting ACTH drug approved by the FDA. Mallinckrodt acknowledges this in its financial filings, stating that "Acthar Gel has limited direct competition due to the unique nature of the product." Acthar may have some medical similarity to other drugs in the adrenal hormone class, but economically it is in a distinct market.

130.    One of the main reasons for the absence of competition with Acthar is the unavailability of Synacthen, a close medical and economic substitute. Mallinckrodt's conduct with respect to Synacthen is addressed further below.

---

2022)

[18] In November 2021, the FDA approved Purified Corticotropin Gel for treatment of certain autoimmune disorders, including acute exacerbations of multiple sclerosis and rheumatoid arthritis. Purified Corticotropin Gel is not approved for the treatment of infantile spasms. Purified Corticotropin Gel entered the market in January 2022.

131.     **Enhanced Profitability**. Acthar's price increases were effective at increasing Mallinckrodt's profits because they did not result in much, if any, loss of volume to drugs that are potential medical substitutes. Mallinckrodt's revenues on Acthar grew from $218 million in 2011 to $953 million in 2019. Mallinckrodt's profits on Acthar likewise increased by hundreds of millions of dollars per year during the period from 2011 to 2019. Mallinckrodt therefore exercised its monopoly power by profitably pushing through significant and durable price increases on Acthar.

132.     Mallinckrodt restricted output of Acthar – through its 2007 vertical integration with CuraScript – in order to achieve and maintain this pricing. Had Acthar been offered at a lower price, similar to the price Synacthen is sold at in other countries, or similar to the price Acthar used to be sold by Aventis, demand for the product would increase because more people who want long-acting ACTH drugs would be able (or willing) to afford them. Instead, Mallinckrodt has increased the price of Acthar each year such that its price increased by nearly 103,547.50% since 2007, suppressing uninfluenced market demand and output of Acthar relative to what it would have been if Synacthen or Acthar were widely available at competitive prices.

133.     **High Barriers to Entry.** Despite the lack of patent protection for Acthar, the U.S. ACTH market is still characterized by high barriers to entry. This includes FDA approval, which is required to market drugs to U.S. consumers. Drugs sold outside of the U.S. are therefore not viable substitutes.

134.     Furthermore, developing a safe, effective, and reliable substitute would require substantial investments of resources and time, with no guarantee of success. One would have to source the active ingredient, develop a sustained-release depot-injection formulation, scale production, conduct clinical trials, and undergo rigorous FDA review, particularly because Acthar

is derived from a biological and not a chemical process. Mallinckrodt's CEO has assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

**B.      Mallinckrodt Engaged in Anticompetitive Conduct by Acquiring the Only Competitor, Synacthen**

135.      By 2013, Mallinckrodt had identified a competitive threat to Acthar's dominance of the ACTH market. Novartis had developed Synacthen Depot (cosyntropin depot) ("Synacthen"), a synthetically derived ACTH medication, which, like Acthar, could be injected intra-muscularly to treat the range of indications for which Acthar is approved, including first and foremost, IS.

136.      Synacthen is a synthetic ACTH drug with similar biological activities and pharmacological effects as Acthar. In Europe, Canada, and other parts of the world, doctors treat patients with Synacthen for the same conditions that are treated with Acthar in the U.S.

137.      Questcor considered the drugs so similar that it submitted Synacthen information to support its application to the FDA to expand the label indications for Acthar. It also cited Synacthen studies in its Acthar marketing materials.

138.      Before June 2013, Novartis marketed and sold Synacthen abroad. For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly. Questcor therefore sought to acquire the rights to Synacthen as a defensive move to prevent competitors from acquiring it and developing it as a competitor to Acthar.

139.      In late 2011, Novartis decided to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

33

140.     Each of the three firms planned to develop and use Synacthen to compete directly with Acthar, and to price Synacthen well below Acthar. The three firms had the necessary expertise and financing, as well as sufficient business and regulatory plans, to develop Synacthen for the U.S. market.

141.     The Synacthen asset package sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process. Because Synacthen had a long history of safe and effective use abroad, a buyer would not need to begin the research, development, testing, or manufacturing process from scratch. The asset package would therefore substantially lower the barriers to entry in the U.S. market.

142.     The bidding process occurred in late 2012 and early 2013. Questcor signed a confidentiality agreement with Novartis and submitted an offer for Synacthen. Novartis negotiated with the three alternative bidders in parallel with Questcor, and each company had exchanged deal terms with Novartis and had submitted a formal offer. The offers by the three alternative bidders were comparable to each other in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales. Unlike the three alternative bidders, however, Questcor had only inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. It nevertheless submitted a bid several multiples higher than the other bidders, offering Novartis $135 million compared to one of the other bidders' (Retrophin) $16 million.

143.     On June 11, 2013, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements"), that gave Questcor exclusive rights to develop, market, and sell Synacthen in the United States. Under the

Agreements, Questcor was obligated to pay a minimum of $135 million to Novartis for Synacthen.

144. On information and belief, Novartis knew and understood that Questcor did not intend to develop Synacthen. This may be inferred from the fact that Questcor's bid for Synacthen was substantially higher than that of its competitors, even though Questcor had done far less, and was in a worse position, to bring Synacthen to market. In addition, Novartis was not naïve, and could be expected to understand that Questcor would have little interest in developing the only synthetic competitor to Acthar, its extraordinarily lucrative non-synthetic product.

145. Questcor claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the drugs' similarities, any therapeutic indication that Questcor might have pursued with Synacthen could have been pursued with Acthar.

146. Fourteen months after Questcor acquired Synacthen, Mallinckrodt acquired Questcor for $5.6 billion, an amount almost entirely attributable to the value of Acthar.

147. Neither Questcor nor Mallinckrodt made more than superficial efforts to pursue commercialization of Synacthen, however. Instead, Mallinckrodt chose to shelve the asset and thereby protect Acthar monopoly pricing. This scheme resulted in harm not only to Plaintiffs' Assignor and the Classes, but the market as a whole given that consumers and payers were deprived of the pro-competitive benefits that the introduction of Synacthen would have brought as an alternative, cheaper medication to Acthar.

148. Mallinckrodt's conduct led the FTC, joined by the states of Alaska, Maryland, New York, Texas, and Washington, to bring an action against Mallinckrodt under the FTC Act, Section 2 of the Sherman Act, and state antitrust laws. On January 18, 2017, the FTC announced that Mallinckrodt had agreed to pay $100 million to settle the suit. The parties also filed, and the court approved, a stipulated court order requiring Questcor to grant a license to develop Synacthen to

35

treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC. On July 14, 2017, the FTC announced that it had approved a sublicense granting West Therapeutic Development, LLC certain rights to develop and market Synacthen in the United States.

149. Moreover, Mallinckrodt's decision to exclusively contract with Express Scripts to provide limited distribution for Acthar removed Express Scripts' competitive pressure in the marketplace to lower Acthar prices. Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise Acthar prices to exorbitant levels throughout the relevant time period. This illegal exercise of monopoly power included Mallinckrodt's acquisition and shelving of Acthar's direct competitor, Synacthen.

### C. The Relevant Market

150. **Product Market**. During the relevant time period, the relevant product market is long-acting ACTH drugs, consisting of Acthar and Synacthen. During the relevant time period, Acthar was the only long- acting ACTH drug approved by the FDA for sale in the United States.

151. Alternatively, long-acting ACTH drugs are a valid submarket within a broader market for adrenal hormone drugs.

152. **Public Recognition.** Long-acting ACTH drugs are recognized by Mallinckrodt, medical providers, and the public as differentiated from other adrenal hormone drugs:

> i. Acthar is publicly touted by Mallinckrodt as being "unique" and facing limited competition from other drugs, including corticosteroids. Additionally, medical providers and the public generally view Acthar as distinct from other adrenal hormone drugs such as corticosteroids. One basis for such a view may be that certain medical researchers, mostly funded by Mallinckrodt, have published studies that recognize long-acting ACTH

36

drugs as medically distinct from corticosteroids.

    ii.    The FTC recognized "ACTH drugs" as a relevant antitrust market when evaluating Mallinckrodt's acquisition of Synacthen. The FTC alleged in its complaint against Mallinckrodt related to that acquisition that Acthar had "a 100% share of the market for ACTH drugs in the United States" because "[n]o other ACTH drug is FDA-approved for therapeutic use."

    iii.    Mallinckrodt's predecessor identified Synacthen as a potential competitive threat in its SEC filings before it licensed the rights to sell that drug in the United States. Mallinckrodt has relied upon studies using Synacthen to support its request for certain label indications to the FDA.

153.    **Product characteristics and uses.** Long-acting ACTH drugs' competition and method of action are distinct from other adrenal hormone drugs.

    i.    Long-acting ACTH drugs' biological mechanism of action is distinct from other drugs in that they stimulate the adrenal gland to produce cortisol. Glucocorticoid drugs are synthetic forms of cortisol that do not work through the adrenal gland.

    ii.    Long-acting ACTH drugs are believed by some medical providers to be differentiated from other adrenal hormone drugs because of this distinction in its biological method of action. Certain medical research, sponsored by Mallinckrodt, also claim that Acthar achieves superior results to corticosteroids and/or support differing effects of Acthar on the body relative to corticosteroids.

154.    **Unique production facilities.** Long-acting ACTH drugs are made in different facilities and using different processes than other adrenal hormone drugs:

i.     Acthar is produced at only one facility in Prince Edward Island, Canada. Acthar is produced using a complex, biologic process that is difficult to replicate.

ii.     Glucocorticoid drugs are synthesized by manufacturers of chemicals for pharmaceuticals in a variety of facilities throughout the world. These facilities are not equipped to produce Acthar, nor could they be easily modified in order to do so.

155.     **Distinct Customers**. Long-acting ACTH drug customers are distinct from customers for other adrenal hormones.

i.     Users of Acthar are distinct from users of other adrenal hormone drugs because those drugs have either failed to treat their conditions, or those drugs are contraindicated for that patient. Therefore, corticosteroid drugs are not a viable option for that patient.

ii.     The FDA has instructed that Acthar be labeled as "having limited therapeutic value in those conditions responsive to corticosteroid therapy." Plaintiffs' Assignor, AvMed limits approved use of Acthar (other than for infantile spasms) under its policies to patients who have "contraindications or intolerance to corticosteroids that are not expected to also occur with" Acthar. Other insurers impose very similar restrictions on Acthar's use. Mallinckrodt acknowledges that Acthar "may not be prescribed unless a clear benefit in efficacy or safety is demonstrated or until alternatives have failed to provide positive patient outcomes or are not well tolerated by the patient."

      iii.    Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

156.    **Distinct Prices**. Prices for long-acting ACTH drugs are distinct from prices for other adrenal hormone drugs:

      i.    Acthar's price is distinct from that of other adrenal hormone drugs. Prices of drugs to payers, such as AvMed, are the full cost of the drug, less any portion of the cost for which the member is responsible. Acthar's price to AvMed is significantly higher than the average prescription price for a Glucocorticoid drug.

      ii.    Acthar's price to patients in the form of co-insurance or co-payments is substantially higher than the price for other adrenal hormone drugs. Co-insurance amounts average in the thousands, whereas co-insurance for Glucocorticoid prescriptions are less than $10.00.

      iii.    Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

157.    **Sensitivity to price changes**: Prices and quantities of long-acting ACTH drugs are not sensitive to changes in prices of other adrenal hormone drugs:

      i.    The price of Acthar has increased repeatedly and substantially while the price of other Glucocorticoid drugs has decreased.

      ii.    The cross-price elasticity between Acthar and Glucocorticoid drugs is extremely small. The cross-price elasticity between Acthar and short-acting adrenocorticotrophic hormones is extremely small.

    iii.    The cross-price elasticity between Synacthen and Acthar is believed to be highly significant (above 2.0).

    iv.    Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

158.    **Distinct vendors**. Long-acting ACTH drugs are sold by vendors that are distinct from those that sell other adrenal hormone drugs.

    i.    Acthar is distributed only through a limited network of specialty pharmacies (*e.g.*, Accredo, BriovaRx, Senderra), while other adrenal hormone drugs are widely available through tens of thousands of retail and other mainstream pharmacies throughout the country. Acthar requires special handling that retail pharmacies are not well equipped to provide.

    ii.    Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

159.    **Geographic Market**. The relevant market is the entire United States.

## IV.    Antitrust Injury

160.    Defendants' anticompetitive conduct had the following effects, among others:

    i.    Price competition has been restrained or eliminated with respect to Acthar;

    ii.    The price of Acthar has been fixed, raised, stabilized, or maintained at artificially inflated levels;

    iii.    Purchasers of Acthar have been deprived of free and open competition; and

    iv.    Purchasers of Acthar, including Plaintiffs' Assignor, AvMed, paid artificially inflated prices.

161.    The purpose of Defendants' conduct was to exclude competition and raise, fix, or

maintain the price of Acthar. As a direct and foreseeable result, Plaintiffs and the Classes paid supracompetitive prices for Acthar during the Class Period.

162. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for Acthar than they would have paid in the absence of Defendants' illegal conduct, and as a result have suffered damages.

163. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLASS ALLEGATIONS

164. Plaintiffs bring this action on behalf of themselves and the following Classes:

**Direct Purchaser Class**

All third-party payers (TPP) who, at any time from 2007 to the present, on behalf of the TPPs' Medicare Advantage Plan beneficiaries, through Express Scripts as Pharmacy Benefit Manager (PBM), paid some or all of the purchase price of Acthar (or later provided reimbursement for same under a legal obligation to do so).

This class includes the holder of an assignment of recovery rights from a TPP described above.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

**Indirect Purchaser Class**

All third-party payers (TPP) who, at any time from 2007 to the present, on behalf of the TPPs' medical and/or pharmacy benefit plan beneficiaries, and through a Pharmacy Benefit Manager (PBM) other than Express Scripts, paid Accredo and/or CuraScript SP some or all of the purchase price of Acthar (or later provided reimbursement for same under a legal obligation to do so).

This class includes the holder of an assignment of recovery rights from a TPP described above.

This class excludes: (a) Defendants, their officers, directors, management, employees,

subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

165.     Plaintiffs brings this action pursuant to Federal Rule of Civil Procedure 23, both individually and on behalf of (a) national damages classes; and/or (b) various state-wide damage sub-classes, during the period from August 1, 2007 to present.

166.     As discussed in this Complaint, Defendants have enjoyed ill-gotten gains from the sales of Acthar at the expense of Class Members, who suffered damages to their property and business. Such damages apply to all Class Members (and Plaintiffs as the rightful assignees of those organizations). Class action law has long recognized that, when a company engages in conduct that has uniformly harmed many claimants such as Plaintiffs, other direct payers, and third-party payers, class resolution is an effective tool to redress the harm.

167.     Here, the Class Members have been deprived of property and money by being forced to purchase prescriptions of Acthar at unlawfully elevated prices as a direct result of Defendants engaging in anticompetitive conduct, as alleged throughout this Complaint.

168.     The Classes are properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy shown as follows:

    a.     Numerosity: Joinder of all Class Members is impracticable. Upon information and belief, there are many hundreds of third-party payers and related entities throughout the United States that were forced to pay artificially inflated, anticompetitive prices for Acthar. Thus, the numerosity element for class certification is met.

    b.     Commonality: Questions of law and fact are common to all members of the Classes. The common questions of law and fact include, but are not limited

42

to: (1) whether Defendants and Mallinckrodt conspired to restrain competition in the ACTH market; (2) whether the price of Acthar was inflated as a result of Defendants' conduct; (3) whether Defendants violated Sections 1 and 2 of the Sherman Act; (4) whether Defendants violated state and federal laws; (5) whether and to what extent Defendants' conduct caused antitrust injury to Plaintiffs and Class Members; and (6) the appropriate measure of damages sustained by Plaintiffs and Class Members. Specifically, Defendants' misconduct was directed at all Class Members, their affiliates, and those respective organizations that provide prescription benefits. Defendants' illegal pattern of anticompetitive conduct had a common, adverse effect on all purchasers of Acthar. All members of the Class have common questions of fact or law. Each Class Member shares the same needed remedy, *i.e.*, reimbursement for the inflated prices and lost money due to Defendants' anticompetitive activities. These common questions and others predominate over questions, if any, that affect only individual Class Members.

c.   Typicality: Plaintiffs' claims are typical of the Class Members' claims, as all have been damaged in the same manner. Plaintiffs' and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, and share the same legal theory. As the putative class representatives, Plaintiffs possess the same interests and suffered the same injury as the other Class Members, which demonstrates a legal sufficient nexus between Plaintiffs' claims and the Class Members' claims. Plaintiffs'

43

claims are typical of the Class Members' claims because Defendants anticompetitive behavior caused Plaintiffs' Assignor, AvMed to pay inflated prices for Acthar. Plaintiffs, like the Class Members, have a right to reimbursement for prescriptions of Acthar at anticompetitive prices. Plaintiffs' and Class Members' claims are based on the same statutes, regulations, legal theories and factual situations. Defendants' business practices, acts and omissions are materially the same with respect to Plaintiffs' and the Class Members' claims, as will be Defendants' legal defenses. Plaintiffs' claims are, therefore, typical of the Class.

d.  <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests in vindicating these claims are shared with all members of the Class and there are no conflicts between the named Plaintiffs and the putative Class Members. In addition, Plaintiffs are represented by counsel who are competent and experienced in class action litigation and also have no conflicts.

e.  <u>Ascertainability</u>: Each Class is readily ascertainable and the records for each Class should exist, including, specifically, within Defendants' own records and transaction data.

169.  The Classes are properly brought and should be maintained as a class action under Rule 23(b) because a class action in this context is superior. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class.

170.  Proceeding with a class action is superior to other methods for fair and efficient

44

adjudication of this controversy because, *inter alia*, such treatment will allow a large number of similarly-situated third-party payers to litigate their common claims simultaneously, efficiently, and without the undue duplications of effort, evidence, and expense that individual actions would induce; individual joinder of the individual members is wholly impracticable; the economic damages suffered by the individual class members may be relatively modest compared to the expense and burden of individual litigation; and the court system would benefit from a class action because individual litigation would overload court dockets and magnify the delay and expense to all parties. The class action device presents far fewer management difficulties and provides the comprehensive supervision by a single court with economies of scale.

171.     A class action is superior in that the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class. These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

172.     The Classes are properly brought under Rule 23(b)(1)(A), (b)(1)(B), and (b)(3).

## **CAUSES OF ACTION**

173.     Plaintiffs and the putative Classes allege that Defendants participated in a vertical price fixing scheme and their monopolistic, anticompetitive behavior caused Plaintiffs' Assignor, AvMed and members of the Classes to suffer harm by paying inflated prices for Acthar prescriptions for their enrollees.

174.     The collusion and monopolistic activity between Defendants created an atmosphere which drove up the costs of Acthar, resulting in Class damages.

45

## COUNT I
## MAINTENANCE OF MONOPOLIZATION OF THE ACTH MARKET (15 U.S.C. § 2)

175. Plaintiffs re-alleges and incorporate herein by reference each of the preceding allegations as if fully set forth herein and further allege as follows.

176. Mallinckrodt has, and at all relevant times, had monopoly power in the market for long-acting ACTH drugs in the United States. Since 2007 Mallinckrodt has acted and conspired with Express Scripts to maintain and enhance its monopoly power.

177. In 2007, Mallinckrodt announced a "New Strategy" in order to maintain and enhance its monopoly. This new strategy could not have succeeded without the involvement of Express Scripts as Mallinckrodt's exclusive agent.

### Anticompetitive Act 1: Restricted Distribution

178. On July 2, 2007, Mallinckrodt decided to restrict distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to CuraScript, a subsidiary of Express Scripts. The goal of this strategy was to lock patients into receiving Acthar through one channel and prevent otherwise natural competition between multiple wholesalers and pharmacies from exerting pricing pressure on Acthar.

179. When Mallinckrodt began its new strategy on July 16, 2007, it established the ASAP Program. The ASAP Program allowed Mallinckrodt to limit its direct distribution of the drug to the patient through just one avenue: Express Scripts. Mallinckrodt entered an exclusive arrangement with Express Scripts to provide Acthar directly to patients, and to receive payments for Acthar directly from payers.

180. Express Scripts was Mallinckrodt's exclusive agent to operate the ASAP Program. Through ASAP, Defendant UBC facilitated all aspects of Acthar's distribution and payment. UBC utilized Express Script's pharmacy arrangement services (Accredo), specialty drug distribution

46

and specialty pharmacy (CuraScript SD and CuraScript SP Specialty Pharmacy) and direct billing and payment (Express Scripts) functions to allow Mallinckrodt to maintain and enhance its monopoly power.

181.     Mallinckrodt has willfully maintained its monopoly power in the U.S. market through its exclusive arrangement during the relevant time period. Having Express Scripts as its exclusive agent, Mallinckrodt was able to raise its prices tenfold initially, and nearly double in the ensuing years. This restriction of output and artificial inflation of Acthar prices resulted in harm to Plaintiffs' Assignor, AvMed, the Class and the market as a whole, given that payers and consumers were deprived of the pro-competitive benefits of an open distribution channel that, by nature, would result in greater access to Acthar at lower prices.

### Anticompetitive Act 2: The Synacthen Acquisition

182.     By 2013, Mallinckrodt had identified a competitive threat to its monopoly power, despite its exclusive arrangements with Express Scripts. When Novartis decided to sell Synacthen Depot to a competitor, Mallinckrodt acted to protect its monopoly. Recognizing that the entry of Synacthen to the U.S. would threaten its monopoly power, Mallinckrodt purchased the exclusive rights to Synacthen.

183.     Mallinckrodt disrupted the Synacthen bidding process by intervening at the last minute to pay multiple times what had been offered by other bidders. Paying $135 million, Mallinckrodt licensed the U.S. rights to Synacthen from Novartis but did not bring this viable synthetic alternative to market. Instead, it acted only to eliminate the nascent competitive threat to its monopoly posed by an independently owned Synacthen.

184.     This conduct contributed to Mallinckrodt's maintenance of monopoly power. Both anticompetitive acts – the exclusive arrangement with Express Scripts and the Synacthen

acquisition – had the purpose and effect of suppressing rather than promoting competition in the market. Mallinckrodt was able to raise prices at will.

185.    As a result of its conspiracy with the Defendants, Mallinckrodt used its enhanced monopoly power to inflate the prices of Acthar as set forth herein. As of February 1, 2022, the price of Acthar is $41,459.[19]

186.    The challenged conduct caused Plaintiffs' Assignor, AvMed and the Class to pay artificially inflated prices for Acthar, but also harmed the market by depriving payers and consumers from a cheaper alternative product deemed to be as effective as artificially priced Acthar.

187.    There is no procompetitive justification for the conduct of Mallinckrodt and Express Scripts in collaboration with Express Scripts' subsidiaries CuraScript, UBC, and Accredo. These companies combined to lock Acthar into a restricted distribution model, overseen by the ASAP Program, to ensure enhanced monopoly profits for Mallinckrodt and Express Scripts. The Synacthen acquisition only prevented competition and preserved the enhanced monopoly power Mallinckrodt enjoyed due to Express Scripts' collusion. But for this anticompetitive conduct, Plaintiffs' Assignor, AvMed and members of the Class would not have paid as much for Acthar.

### Plaintiffs' Assignor Directly Purchased Acthar from Co-Conspirator Express Scripts and Was Harmed by Defendants' Anticompetitive Conduct

188.    As described in preceding sections of this Complaint, Plaintiffs' Assignor, AvMed paid for Acthar on behalf of its enrollees by submitting payment directly to Express Scripts (pursuant to AvMed's PBM contracts with Express Scripts) in order for its enrollees to be dispensed Acthar by Accredo and CuraScript SP. Express Scripts, Accredo, and CuraScript SP are

---

[19] *See supra* n.17.

co-conspirators in the anticompetitive scheme described herein.

189. During the relevant time period, the product shipped from Mallinckrodt's agent (CuraScript) to co-conspirator Accredo or CuraScript SP (after UBC administers the patient's coverage determination) that shipped it directly to the patient. Payments flowed directly from AvMed to Express Scripts, for the benefit of Mallinckrodt. Express Scripts only deducts its agreed-upon share of payments from AvMed before forwarding the rest to Mallinckrodt.

190. During the period of its contract with Express Scripts, AvMed paid Express Scripts for the purchases of Acthar.

191. Accordingly, AvMed has been directly injured in its business and property by reason of Mallinckrodt's unlawful monopolization in concert with Express Scripts. The injuries sustained by AvMed consist of paying higher prices to purchase Acthar than it would have paid absent the conduct of Mallinckrodt and its exclusive agent, Express Scripts. Such injuries are the type of harm that antitrust laws were designed to prevent and flow from Mallinckrodt's and Express Scripts' unlawful conduct.

### Plaintiffs' Assignor Purchased Acthar from a Non-Conspirator PBM and Was Harmed by Defendants' Anticompetitive Conduct

192. As described in preceding sections of this Complaint, Plaintiffs' Assignor, AvMed paid for Acthar on behalf of its enrollees by submitting payments to its PBMs, Catalyst and CVS, in order for it enrollees to be dispensed Acthar by Accredo and CuraScript SP.

193. During the relevant time period, payments flowed directly from AvMed to Catalyst and CVS. Catalyst and CVS then paid Accredo and CuraScript SP for Acthar. The product shipped from co-conspirator CuraScript SD to co-conspirators Accredo or CuraScript SP (after UBC administers the patient's coverage determination) that shipped it directly to the patient.

194. During the period of its contacts with Catalyst and CVS, AvMed paid Catalyst and

CVS, who then paid Accredo and/or CuraScript SP for the purchase of Acthar.

195.     Accordingly, AvMed has been injured in its business and property by reason of Mallinckrodt's unlawful monopolization in concert with Express Scripts. The injuries sustained by AvMed consist of paying higher prices to purchase Acthar than it would have paid absent the conduct of Mallinckrodt and its exclusive agent, Express Scripts. Such injuries are the type of harm that antitrust laws were designed to prevent and flow from Mallinckrodt's and Express Scripts' unlawful conduct.

196.     As described herein, Defendants' acts and practices constitute monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

197.     Plaintiffs demand that judgment be entered in their favor and in favor of the Classes against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT II
## ANTICOMPETITIVE AGREEMENTS IN
## UNREASONABLE RESTRAINT OF TRADE (15 U.S.C. § 1)

198.     Plaintiffs re-alleges and incorporate herein by reference each of the preceding allegations as if fully set forth herein and further allege as follows.

199.     As set forth above, Mallinckrodt entered into exclusive distribution agreements with Express Scripts. These agreements preserved and extended Mallinckrodt's monopoly power and allowed both Mallinckrodt and Express Scripts to raise the prices for Acthar paid by Plaintiffs' Assignor, AvMed and members of the Class.

200.     The maintenance of Mallinckrodt's monopoly over the relevant market would not have been possible without its agreement in restraint of trade with Express Scripts.

201.     Express Scripts is the largest buying agent of pharmaceuticals in the country. It has

substantial buying power as a result of its position as the largest representative of pharmaceutical purchasers.

**Express Scripts' Agreement with Mallinckrodt to Fix Prices for Acthar**

202.     There was no legitimate business justification on the part of Express Scripts to agree to charge the inflated end payer prices set by Questcor to its clients, but it so agreed. As alleged above, Express Scripts was profiting from the illegal exclusive distribution through the activities of its subsidiaries (CuraScript, Accredo, and UBC) involved in the distribution of Acthar.

203.     Plaintiffs' Assignor, AvMed contracted with Express Scripts to provide pharmacy benefit services. Instead of exercising its mighty power as one of the country's largest PBMs to negotiate for lower prices of Acthar on behalf of payers such as AvMed, Express Scripts accepted the inflated end payer prices set by Mallinckrodt (which were in part enabled by Mallinckrodt's distribution of Acthar through exclusive distributor CuraScript), forcing AvMed to pay supra-competitive prices for Acthar on behalf of its enrollees that flowed through Express Scripts back to Mallinckrodt.

204.     AvMed also paid for Acthar through PBMs Catalyst and CVS for prescriptions distributed to its enrollees through Accredo and CuraScript SP. The payments to Catalyst and CVS were a direct result of the illegal conspiracy between Mallinckrodt and Express Scripts that UBC direct as many patients as possible to Accredo or CuraScript SP. Catalyst and CVS charged AvMed the end payer price agreed to by Mallinckrodt and Express Scripts. As a result, the Mallinckrodt-Express Scripts agreement to fix prices preserved and enhanced Mallinckrodt's monopoly power and injured payers like AvMed by being charged artificially inflated prices for Acthar.

205.     At all relevant times, Mallinckrodt's exclusive agreements with Express Scripts assisted Mallinckrodt in: (a) eliminating competition within the Acthar distribution channel that

would otherwise have precluded Acthar from being priced at supra-competitive levels; (b) maintaining Mallinckrodt's dominant market share and monopoly power in the long-acting ACTH market; (c) maintaining prices at artificially high levels for Acthar; and (d) otherwise reaping the benefits of Mallinckrodt's enhanced monopoly power.

206.    There is no procompetitive justification for the conduct of either Mallinckrodt or Express Scripts and the market as a whole was deprived of natural competition between multiple wholesalers and amongst pharmacies that would otherwise have ensured the greater availability of Acthar at competitive prices.

207.    Plaintiffs' Assignor, AvMed has been injured in its business and property by reason of the alleged collusion and conspiracy between Mallinckrodt and Express Scripts, its exclusive agent, which had the purpose and effect of raising and stabilizing inflated prices for Acthar. Express Scripts facilitated, enabled, assisted, and furthered Mallinckrodt's substantial foreclosure and exclusion of competition and monopolization of the market.

208.    The injuries of Plaintiffs' Assignor, AvMed consists of paying higher prices to purchase Acthar than it would have paid absent the unlawful conduct of Mallinckrodt and Express Scripts. Plaintiffs' Assignor's injuries are the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

209.    Defendants' acts and practices constitute anticompetitive agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

210.    Plaintiffs demand that judgment be entered in their favor and in favor of the Classes against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT III
## VIOLATION OF FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT, Fla. Stat. §§ 501.201, *et seq*.

211.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

212.     During the Class Period, Defendants engaged in continuing unfair, false, unconscionable, or deceptive acts or practices with respect to the sale of Acthar, in violation of various state consumer protection statutes, as set forth below.

213.     The unfair, false, unconscionable, or deceptive acts or practices consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anti-competitive prices for Acthar in the U.S. Moreover, Defendants concealed their agreements from Plaintiffs, Class Members, and the public.

214.     Defendants' anticompetitive conduct described above was knowing, willful and constituted flagrant violations of several state consumer protection statutes as described below.

215.     Plaintiffs and other similarly situated payers in the Class in each of the below states have been injured in their business and property due to Defendants' unfair, false, unconscionable, or deceptive acts or practices. Plaintiffs and other similarly situated payers in the Class have paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct. In addition, Defendants have profited significantly from the aforesaid unlawful behavior. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of members of Plaintiffs and other similarly situated payers in the Class.

216.     Accordingly, Plaintiffs and other similarly situated payers in the Class, in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and costs

of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

217.     During the Class Period, Defendants engaged in continuing unfair methods of competition, unconscionable, or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq*. ("Florida Deceptive and Unfair Trade Practices Act").

218.     The Florida Deceptive and Unfair Trade Practices Act is designed to "protect the consuming public from those that engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202. The Act declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204.

219.     Plaintiffs are "interested persons" and "consumers' within the meaning of the Fla. Stat. § 501.203(6).

220.     Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

221.     The unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anticompetitive prices for Acthar in the U.S. Moreover, Defendants concealed their agreements from Plaintiffs, Plaintiffs' Assignor, AvMed, Class Members, and the public.

222.     Specifically, Mallinckrodt conspired with Express Scripts to limit the distribution channel of Acthar in order to artificially inflate the end prices paid by payers such as Plaintiffs' Assignor. This illegal scheme was achieved in concert with Express Scripts entities CuraScript, CuraScript SP, UBC (as operator of the HUB responsible for administering the ASAP Program

and coordinating the patient's Acthar prescription with a specialty pharmacy, specifically endeavoring to prioritize Accredo as the specialty pharmacy of choice), and Accredo (as Express Scripts' specialty pharmacy responsible for Acthar directly to patients).

223. Additionally, Mallinckrodt further limited competition and was able to raise the price of Acthar to supra-competitive levels by purchasing and shelving Acthar's direct competitor, Synacthen.

224. Defendants' anticompetitive conduct described above was knowing, willful and constituted flagrant violations of the Florida Deceptive and Unfair Trade Practices.

225. Defendants' illegal conduct substantially affected Florida commerce and consumers, including Plaintiffs' Assignor, AvMed and members of the Class.

226. Plaintiffs' Assignor, AvMed and other similarly situated payers in the Class that purchased Acthar in Florida, have been injured in their business and property due to Defendants' unfair methods of competition, unconscionable, deceptive, or unfair acts or practices. Plaintiffs' Assignor, AvMed and other similarly situated payers in the Class have paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct. In addition, Defendants have profited significantly from the aforesaid unlawful behavior. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs' Assignor, AvMed, other similarly situated payers in the Class, and the market as a whole, that would otherwise have benefited from the greater availability of Acthar at lower prices in light of an open distribution channel and competition from lower priced alternatives such as Synacthen. But for Defendants' illegal conduct, Plaintiffs' Assignor, AvMed and the Class would not have paid as much for Acthar.

227. Accordingly, Plaintiffs seek to recover against each Defendant the amount of their

actual damages, attorneys' fees, and costs pursuant to Fla. Stat. §§ 501.211 and 501.2015.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class described herein, pray for the following relief:

a.  Certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1)(A), (b)(1)(B), and (b)(3);

b.  Designate Plaintiff as representative for the respective Classes and Plaintiffs' undersigned counsel as Class Counsel for the respective Classes;

c.  Enter a judgment against Defendants for the violations alleged herein;

d.  Enjoin and restrain Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anti-competitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anti-competitive practices set forth above;

e.  Award to Plaintiffs and Class Members actual damages incurred as a result of the wrongful acts complained of herein, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

f.  Award statutory damages set forth herein under the statutory claims alleged; Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

g.   Grant Plaintiffs and Class Members alleged herein such other and further

relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs and the Classes demand a trial by jury of all issues so triable in this cause.

Dated: August 16, 2023                    Respectfully submitted,

*/s/ Peggy J. Wedgworth*
Peggy J. Wedgworth (*pro hac vice*)
Michael Acciavatti (*pro hac vice*)**
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, NY 10022
(212) 594-5300
pwedgworth@milberg.com
macciavatti@milberg.com
** admitted in Pennsylvania only

Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe St., Ste. 2100
Chicago, IL 60606
(312) 593-3354
gklinger@milberg.com

*Attorneys for Plaintiffs*

## **<u>CERTIFICATE OF SERVICE</u>**

I, Peggy J. Wedgworth, hereby certify that on August 16, 2023, the foregoing document and its referenced exhibits were filed with the Clerk for the United States District Court for the Northern District of Illinois using the CM/ECF system, which sent electronic notification to counsel of record.


<u>*/s/ Peggy J. Wedgworth*</u>
Peggy J. Wedgworth